## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHN DOE | ) | |
| | ) | Case No. 16-cv-08298 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| THE UNIVERSITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |

---

## JOHN DOE'S VERIFIED COMPLAINT AND REQUEST FOR A TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

---

### NATURE OF JOHN DOE'S MOTION FOR A TEMPORARY RESTRAINING ORDER

1.      As detailed below, Defendant The University of Chicago ("UC) violated Plaintiff John Doe's ("John Doe")[1] rights under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, ("Title IX") in at least the seven different ways – five of which are:

i.   UC retaliated against John Doe by withdrawing him from a physics lab he was taking with UC student Jane Roe ("Roe") which occured *after*: (a) UC determined Roe's 2014 complaint regarding John Doe was meritless; and (b) John Doe engaged in protected activities which included attempting to defend himself

---

[1] Contemporaneously with the filing of the Complaint in this case, Plaintiff has filed a motion to proceed under pseudonym which seeks permission of the Court to proceed anonymously given the sensitive and private nature of the allegations in the Complaint. *See generally, John Doe's Motion to Allow the Parties to Use Pseudonyms.* For the same reasons, Plaintiff refers to the female student defendant in the instant complaint as "Jane Doe" and another female UC student who previously filed false allegations against Plaintiff as "Roe." *Id.*

against Roe's continuing defamatory conduct *after* UC determined Roe's complaint meritless;

ii.   UC retaliated against John Doe by unlawfully rejecting John Doe's May 5, 2016 Title IX complaint ("John Doe's May 2016 Title IX Complaint") regarding Roe's friend - Defendant Jane Doe ("Jane Doe") - who violated UC's anti-retaliation provisions by engaging in a campaign which falsely alleged John Doe sexually assaulted Jane Doe and other females;

iii.  In retaliation against John Doe's protected activities, UC is adjudicating Jane Doe's bad-faith, false, and retaltiory June 2016 Title IX complaint against John Doe ("Jane Doe's June 2016 IX Complaint") even though Jane Doe's own public writings, which UC possesses, prove Jane Doe's allegations against John Doe are undeniably false;

iv.   UC engaged in retaliation by refusing to acknowledge, as Plaintiff has repeatedly established, that Jane Doe's June 2016 IX Complaint violates UC's anti-retaliation provisions and/or policies prohibiting the filing false of charges against fellow students; and

v.    UC is violating Title IX's prohibitions against "selective enforcement" and/or hostile environments by subjecting John Doe to a disciplinary proceeding on basis of his male gender.

2.    Adding insult to injury, UC is adjudicating Jane Doe's June 2016 Title IX Complaint pursuant to UC's 2015-16 Student Manual ("UC's 2015 Manual"). UC is doing so even though: (a) Jane Doe's allegations involve conduct that occurred in 2013; (b) UC's 2015 Manual imposes highly stringent limitations on students' sexual interactions which were *not*

contained in UC's 2013-14 Student Manual ("UC's 2013 Manual"); and (c) it was *impossible* for John Doe to know whether his consensual physical encounters with Jane Doe in 2013 might violate subsequently created stringent mandates in UC's 2015 Manual.

3.      In engaging in the aforementioned conduct, UC subjects John Doe to a fundamentally unfair, arbitrary and capricious disciplinary procedure that violates both Title IX and UC's policies and/or procedures related to allegations of sexual misconduct during UC's 2013-14 and 2015-16 academic years. ("UC's Policies").  UC is doing so even though John Doe provided UC notice of the unlawful conduct detailed above and requested corrective action. Instead of correcting these violations, UC rebuffed John Doe at every turn.  As a result, John Doe had no choice but to file this Verified Complaint seeking temporary, preliminary, and final injunctive relief and damages.  Although the Verified Complaint contains many causes of action, John Doe moves for immediate relief only as to his promissory estoppel, negligence, and/or Title IX retaliation claims.

## NATURE OF THE ACTION

4.      Having been irreparably harmed by false allegations of sexual misconduct, John Doe seeks damages, declaratory relief, and injunctive relief to remedy emotional, mental, economic, and physical harm caused by Defendants. Plaintiff's causes of action include: defamation, violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, promissory estoppel, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress.

5.      For example, UC violated Title IX by creating a gender biased, hostile environment against males, like John Doe, based in part on UC's pattern and practice of investigating and disciplining male students who accept physical contact initiated by female

students, retaliating against male students, and providing female students preferential treatment under its Title IX policies.

6.     In addition, UC breached its duties and promises to John Doe by applying UC's 2015 Manual to allegations of misconduct in 2013.

7.     John Doe's harm stems from UC's retaliation against John Doe for asserting his rights under Title IX in response to Jane Roe's false sexual assault complaint against him. John Doe was further harmed by UC's discriminatory and retaliatory refusal to allow John Doe to file a Title IX complaint against Jane Doe for harassment and retaliation after she knowingly published false statements that he had committed a sexual assault when she knew such statement was false. Yet, after John Doe sought legal assistance outside of UC to stop Jane Doe from publishing false statements about him, UC allowed Jane Doe to file a Title IX complaint to retaliate against John Doe for an alleged sexual assault over two years earlier.

8.     John Doe did not sexually assault Jane Doe.  Rather, Jane Doe initiated and/or consented to all relevant physical contact with John Doe. Jane Doe never filed nor contemplated filing sexual assault allegations against John Doe until he attempted to assert his Title IX rights against her. But, Jane Doe's admissions against interest in ¶112 below definitively prove: (a) Jane Doe initiated and consented to all contact with John Doe; and (b) Jane Doe's sole motivation for filing the sexual assault allegation was retaliation in violation of Title IX.

9.     Upon information and belief, [2] Jane Doe acted with malice when she falsely told UC that John Doe sexually assaulted her after he initiated legal action to stop her defamatory

_____

[2] It should be noted, the "information and belief" allegations in the Complaint are based on at least the following two factors: (1) the evidence referenced and/or exhibits attached to this Complaint which provide a plausible basis for Plaintiff's "information and belief" allegations; and (2) John Doe's belief that Defendants are in possession and/or control of additional evidence supporting Plaintiff's "information and belief" allegations that John Doe believes he will obtain in discovery.

statements against him, in part, because she needed a justification for her actions and because she was angry with John Doe. Evidence supporting this belief includes, but is not limited to, Jane Doe's admissions against interest in ¶112 below which definitively prove: (a) Jane Doe initiated and consented to all contact with John Doe; and (b) Jane Doe's sole motivation for filing the sexual assault allegation was retaliation in violation of Title IX.

10.     Upon information and belief, UC knew that: (a) John Doe had not sexually assaulted Jane Doe and that Jane Doe had initiated and/or consented to all physical contact with John Doe; and (b) Jane Doe's sexual assault allegations were retaliatory. Evidence supporting this belief includes, but is not limited to the information contained in ¶¶8-9 above which UC possesses.

11.     Nevertheless, UC is conducting a disciplinary proceeding against John regarding Jane Doe's June 2106 Title IX Complaint against John Doe while refusing to engage in a disciplinary proceeding prompted by John Doe's protected activity in notifying UC of the bad faith, false, and retaliatory nature of Jane Doe's 2016 Title IX Complaint. Instead, UC is engaging in Title IX retaliation by conducting an unlawful disciplinary proceeding in which UC will adjudicate John Doe's 2013 consensual physical encounter with Jane Doe pursuant to UC's 2015 Manual instead of the applicable 2013 Manual. Upon information and belief, UC is utilizing the 2015 Manual because it contains provisions less favorable to male students. Evidence supporting this belief includes, but is not limited to the fact that John Doe put UC on notice of some of examples of this less favorable treatment.

## FACTS

### The Parties and Non-Parties Essential to the Complaint

12.     John Doe, is a domiciliary of Somers, NY. At all relevant times John Doe was

and remains a student in good standing at UC.

13.     On information and belief, UC is an Illinois non-profit corporation with a principal place of operation located in Chicago, Illinois.

14.     Jane Doe is a student at UC currently residing in Chicago, Illinois who engaged in a pattern of publishing public false and defamatory statements against John Doe long before Jane Doe ever filed the retaliatory, bad faith, and false allegations contained in Jane Doe's June 2016 Title IX Complaint.

15.     Non-defendant Roe's conduct is essential to understanding the nature of the allegations and the specifications of Defendants' misconduct. Jane Roe was at all relevant times a personal friend of Jane Doe and a student at UC.

## Jurisdiction and Venue

16.     This action arises under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, and Illinois common law. This Court has jurisdiction over this action by virtue of federal question jurisdiction pursuant to 28 U.S.C. § 1331 and the protection of civil rights pursuant to 28 U.S.C. § 1343.

17.     This Court has personal jurisdiction over Defendants because Defendants reside and/or conduct business within the State of Illinois.

18.     Venue rests with this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

## The History of UC'S Unlawful Discipline and Retaliation against John Doe

19.     On April 11, 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") sent a "Dear Colleague" letter to colleges and universities with instructions on how to comply with Title IX when investigating and resolving complaints of

sexual misconduct. ("2011 Dear Colleague Letter") (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html accessed 8/21/16). This letter echoes the mandates of President Obama's Administration that Colleges like UC equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment. For instance, the 2011 Dear Colleague Letter:

a) states: "1 in 5 _women_ are victims of completed or attempted sexual assault while in college' . . . [a]dditionally, the likelihood that a _woman_ with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population. The Department is deeply concerned about this problem . . . ." *2011 Dear Colleague Letter*, p.2 (emphasis added);

b) warns that "the majority of campus sexual assaults occur when _women_ are incapacitated, primarily by alcohol." *Id.,* (emphasis added);

c) suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against _Women_ which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability. . . ." *Id.,* p.19 (emphasis added); and

d) warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs." In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. *Id.* p.15;

20. In order to provide females preferential treatment, the 2011 Dear Colleague Letter also imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves. For example, the 2011 Dear Colleague Letter required schools adopt the lowest burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing" and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt." The 2011 Dear Colleague Letter also mandated schools "minimize the burden on the complainant." *The 2011 Dear Colleague Letter*, pp.15-16.

21.     Similarly, on April 29, 2014, OCR published a document signed by OCR's assistant secretary of education Catherine E. Lhamon ("Sec. Lhamon") titled "Questions and Answers on Title IX and Sexual Violence." ("OCR's 2014 Q&A") (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf accessed 8/21//16). OCR's 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. For example, OCR's 2014 Q&A states schools:

a)  "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings." *OCR's 2014 Q&A,* p.30;

b)  May decide to eliminate all opportunities for "cross-examination." *Id.,* p.31; and

c)  Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event." *Id.,* pp.30, 38.

22.     Neither OCR's 2014 Q&A nor the 2011 Dear Colleague Letter were subject to notice-and-comment rulemaking, and therefore their validity as binding law is at best questionable. As a result, Senator James Lankford wrote to the DOE on January 7, 2016 to express his concerns that the DOE's Dear Colleague letters are not interpretive, but are unlawfully altering the regulatory and legal landscape of Title IX and the U.S. Constitution. https://www.thefire.org/sen-james-lankford-letter-to-the-education-department/          (accessed 8/21/16). Following Senator Lankford's letter, Representative Earl Ehrhart from Georgia filed a lawsuit against the DOE on April 21, 2016 in the United States District Court for the Northern District of Georgia alleging that the DOE's implementation of the 2011 Dear Colleague letter was unconstitutional and unlawful. *See* http://www.saveservices.org/wp-content/uploads/Ehrhart-v.-DOE-2016.pdf  (accessed 8/21/16).

23.     Similar allegations were made against DOE in two federal lawsuits.  The first is *Neal v. Colorado State Univ.-Pueblo, et al., Case No. 1:16-cv-00873,* which was filed on April 19, 2016 in the United States District Court for the District of Colorado.  The second is *John Doe v. Lhamon et al.,* which was filed in U.S. District Court for the District of Columbia https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/06/16141411/doe-v-lhamon-complaint.pdf (accessed 8/21/16). This Complaint contains the following information about how OCR is pressuring colleges around the county to make it more difficult for male students' accused of sexual misconduct to defend themselves:

a)  "Princeton University . . . continue[d] to use a 'clear and persuasive evidence' standard after publication of the [2011 Dear Colleague Letter.  As a result] OCR informed Princeton in a letter dated November 5, 2014 that its policy 'did not provide for an adequate, reliable and impartial investigation.' In a 'Resolution Agreement' accompanying that letter, OCR required Princeton to adopt 'the proper standard of review of allegations of sexual misconduct (preponderance of the evidence).'"

b)  " . . . in a letter dated December 30, 2014, OCR informed Harvard Law school (HLS) that the sexual misconduct policy it continued to use after publication of the [2011 Dear Colleague Letter] ***improperly*** used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, ***in violation of Title IX***. [emphasis in original]. The letter confirmed elsewhere that '[t]his higher standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence,' by January 15, 2015, procedures 'that comply with the applicable Title IX regulations and OCR policy,' which procedures must include, among other things, '[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence."

c)  "In a letter dated October 31, 2013, OCR notified the State University of New York (SUNY) System that '[t]he grievance procedures used by' Buffalo State 'do not specify whether the arbitrator should use the preponderance of evidence standard in investigating allegations of sexual harassment' and further that Morrisville State College 'fail[ed] to . . use the preponderance of the evidence standards to investigate allegations of sexual harassment." It ordered the SUNY System to 'revise the SUNY system grievance procedures to ensure that these comply with the requirements of Title IX; including using the preponderance of evidence standard to investigate allegations of sexual misconduct.'"

d) "OCR has ordered at least two schools to adopt grievance procedures that explicitly forbid parties from directly cross-examining each other in sexual misconduct disciplinary proceedings despite the fact that the [2011 Dear Colleague Letter] states that personal cross-examination is only 'strongly discouraged.'"

e) "in a Resolution Agreement with Rockford University signed on April 24, 2015, OCR required Rockford University to present to OCR for review a draft Title IX policy that stated, among other things, that 'the parties may not personally question or cross-examine each other during the hearing.'"

f) " . . . in a resolution agreement with Southern Virginia University entered on or around December 23, 2014, OCR required Southern Virginia University to draft, by March 31, 2015, Title IX grievance procedures that stated, 'if cross-examination of parties is permitted . . . the parties will not be permitted to personally question or cross-examine each other.'" *Id.,* pp. 13-15, ¶¶47-52.

24.     As a result, UC has treated the 2011 Dear Colleague Letter as law and revised UC policies accordingly. https://news.uchicago.edu/article/2014/06/26/changes-approach-sexual-misconduct-take-effect-july-1 (accessed 8/21/16).

25.     This may be because in February 2014, Sec. Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." *See, Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases, Chronicles of Higher Education, February 11, 2014,* located at http://chronicle.com/article/Colleges-Are-Reminded-of/144703/ (accessed 8/21/16).

26.     Consistent with this message from Sec. Lhamon, in June 2013, UC became ensnared in an investigation by DOE's OCR because of its handling of sexual assault and harassment complaints. (*Exhibit 1* containing DOE Announcement of Higher Education Institutions Investigation); https://www.washingtonpost.com/local/education/federal-government-releases-list-of-55-colleges-universities-under-title-ix-investigations-over-handling-

of-sexual-violence/2014/05/01/e0a74810-d13b-11e3-937f-d3026234b51c_story.html (accessed 8/21/16); http://hpherald.com/2014/02/19/u-of-c-facing-title-ix-investigation/ (accessed 8/21/16).

27.     The DOE's scrutiny of UC intensified on or about February 3, 2016, when the DOE opened two additional investigations at UC for possible violations of Title IX over the handling of sexual violence and harassment complaints. http://chicagomaroon.com/2016/03/04/university-faces-new-federal-title-ix-investigations/ (accessed 8/21/16); http://projects.chronicle.com/titleix/investigations/?search_term=chicago&start=&end= (accessed 8/21/16); http://www.chicagotribune.com/news/local/breaking/ct-universities-sexual-violence-investigations-20160301-story.html (accessed 8/21/16).

28.     Upon information and belief, OCR's investigations of UC involve multiple complaints filed by females who claimed UC failed to discipline males adequately for sexual misconduct.  Evidence supporting this belief, includes, but is not limited to the following http://hpherald.com/2014/02/19/u-of-c-facing-title-ix-investigation/ (accessed 8/21/16).

29.     At all times relevant to this Complaint, UC's investigations by DOE's OCR were ongoing. Upon information and belief, during these investigations, OCR pressured UC to equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.  Unfortunately, UC is only one of many institutions subject to these types of OCR investigations.  *See e.g.,* Nick Anderson, *Tally of Federal Probes of Colleges on Sexual Violence Grows 50 Percent Since May,* WASH POST, Oct. 19. 2014, https://www.washingtonpost.com/local/education/tally-of-federal-probes-of-colleges-on-sexual-violence-grows-50-percent-since-may/2014/10/19/b253f02e-54aa-11e4-809b-8cc0a295c773_story.html (accessed 8/21/16); http://projects.chronicle.com/titleix/cases

(containing database of information related DOE's Title IX investigations of colleges and universities since 2011) (accessed 8/21/16).

30.     OCR's investigations primarily involve females alleging the universities they attend condone sexual harassment and/or sexual violence by males. These complaints by female students have triggered OCR investigations of academic institutions that include, but are not limited to: (i) the University of Virginia; (ii) Southern Methodist University; (iii) Yale University; (iv) George Washington University; (v) Tufts University; and (vi) the University of Montana in Missoula. *See generally,* http://www2.ed.gov/documents/press-releases/university-virginia-letter.pdf (containing OCR's letter to the University of Virginia regarding OCR's Title IX investigation (accessed 8/21/16); http://www2.ed.gov/documents/press-releases/southern-methodist-university-letter.pdf (containing OCR's letter to Southern Methodist University regarding OCR's Title IX investigation accessed 8/21/16); http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-a.html (containing OCR's letter to Yale University regarding OCR's Title IX investigation) (accessed 8/21/16). http://www2.ed.gov/about/offices/list/ocr/docs/investigations/11112079-a.pdf (containing OCR's letter to George Washington University regarding OCR's Title IX investigation (accessed 8/21/16); and http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-a.html (containing OCR's letter to Tufts University regarding OCR's Title IX investigation) (accessed 8/21/16).

31.     Many academics and organizations have raised alarms that DOE/OCR's worthwhile goal of protecting female college students from sexual misconduct has evolved into an unlawful example of federal governmental overreach that violates the rights of male students who never engaged in misconduct. *See e.g., Open Letter From Sixteen Members of Penn Law*

12

*School Faculty* (Feb. 17. 2014), http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/02/19/open-letter-from-16-penn-law-school-professors-about-title-ix-and-sexual-assault-complaints/ (accessed 8/21/16) ("Although we appreciate the efforts of Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."); Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?: The Need For Judicial Review and Additional Due Process Protections In Light of New Case Law,* 84 Fordham Law Review (2016); Barclay Sutton Hendrix, *A Feather On One Side, A Brick On The Other: Tilting The Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, (2013); Stephen Henrick, *A Hostile Environment for Student Defendants*: *Title IX and Sexual Assault on College Campuses,* 40 N. Ky. L. Rev. 49 (2013); *Rethink Harvard's Sexual Harassment Policy,* LE6TTER TO EDITOR, BOSTON GLOBE, Oct. 15, 2015, http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html (accessed 8/21/16); Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair? The Need For Judicial Review And Additional Due Process Protections In Light Of New Case Law*, 84 Fordham L. Rev. 2289 (2016); Janet Halley, *Trading the Megaphone for the Gravel Gavel in Title IX Enforcement,* HARV. L. REV. F. 103, 103-17, (2014); Samantha Harris, *Campus Judiciaries on Trial: An Update from the Court,* HERITAGE FOUNDATION, Oct. 6. 2015; http://www.heritage.org/research/reports/2015/10/campus-judiciaries-on-trial-an-update-from-the-courts (accessed 8/21/16); Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault,* Yale Law and Policy Review Volume

33; Issue 2 (2015); Robin Wilson, *Presumed Guilty,* CHRONICLE OF HIGHER EDUCATION (Sept. 3. 2014) http://chronicle.com/article/Presumed-Guilty/148529/?cid=a&utm_medUCm=en (accessed 8/21/16); ("Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."); *Dershowitz and Other Professors Decry 'Pervasive and Severe Infringement' of Student Rights,* Jacob Gershman (May 18, 2016), http://blogs.wsj.com/law/2016/05/18/dershowitz-and-other-professors-decry-pervasive-and-severe-infringement-of-student-rights/ (accessed 8/21/16).

32.    As detailed in many of the publications cited above, OCR's investigations put millions of dollars in federal student aid at risk. This is because DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university, such as UC, did not do enough to discipline males alleged to have engaged in sexual misconduct with female students. Sec. Lhamon confirmed this risk of losing federal funds at a national conference at Dartmouth in the summer of 2014 when she said, "I will go to enforcement, and I am prepared to withhold federal funds." *See, How Campus Sexual Assaults Came to Command New Attention,* NPR, August 12, 2014 located at http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (accessed 8/21/16).

33.    In June 2014, Sec. Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . . ." In addition, Sec. Lhamon noted:

"If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments."

http://www.help.senate.gov/hearings/sexual-assault-on-campus-working-to-ensure-student-safety (accessed 8/21/16).

34.     For UC, the withdrawal of federal funding would be catastrophic in part because, upon information and belief, UC's undergraduate students received approximately $3,000,000 in Pell Grants and over $8,600,000 in Federal Student Loans in 2015. *See generally,* http://nces.ed.gov/collegenavigator/?q=university+of+chicago&s=all&id=144050 (accessed 8/21/16).

35.     As detailed in some of the publications cited above, OCR investigations put immediate and tremendous pressure upon universities, such as UC: (a) aggressively prosecute males accused of sexual misconduct; (b) severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence, and (c) equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

36.     Upon information and belief, OCR pressured UC to change its burden of proof for sexual misconduct offenses from clear and convincing to a preponderance of the evidence standard.  Upon information and belief, UC agreed to this change to make it easier to: (a) find accused male students responsible in sexual misconduct cases, even if it meant depriving these accused male students of their Constitutional rights; and (b) equate "complainants" in sexual

15

misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government. http://www.chicagoreader.com/chicago/university-of-chicago-rape-culture-sexual-assault/Content?oid=19237712 (accessed 8/21/16).

37.     The use of the preponderance of the evidence standard has also been challenged in a paper submitted by the American Association of University Professors in March 2016. (*Exhibit* 2 containing AAUP paper).

38.     Therefore, upon information and belief, pressure from governmental agencies such as OCR/DOE and/or internal forces at UC caused UC to apply its Title IX policies in an unlawful and gender biased manner against John Doe. Evidence of UC's gender bias, includes but is not limited to, the fact that UC is prosecuting Jane Doe's June 2016 Title IX complaint against John Doe, while rejecting: (a) John Doe's Title IX complaints containing John Doe's May 2016 Title IX complaint against Jane Doe; and (b) John Doe's complaint regarding the bad faith, false, and retaliatory nature of Jane Doe's June 2016 Title IX Complain.

39.     In addition, upon information and belief, UC adopted gender-biased policies and procedures for addressing complaints of sexual assault in order to avoid negative publicity that the university did not adequately handle sexual assault investigations. UC was motivated at least in part to avoid negative publicity by campus advocates, by UC's "Clothesline Project," and to avoid and/or limit the impact of the negative publicity. http://www.chicagoreader.com/chicago/university-of-chicago-rape-culture-sexual-assault/Content?oid=19237712 (accessed 8/21/16); https://thinkprogress.org/university-of-chicago-alumni-demand-sexual-assault-reform-saying-nothing-has-changed-in-decades-18aaa57b229#.48zwib746 (accessed 8/21/16);

http://chicago.cbslocal.com/2014/09/25/university-of-chicago-students-protest-rape-threat-from-hackers/ (accessed 8/21/16).

40.    In addition, based on the information detailed in this Complaint and upon information and belief, UC's discriminatory treatment of John Doe occurred in part because of UC's archaic assumptions that female students do not sexually assault or harass their fellow male students because females are less sexually promiscuous than males. Evidence supporting this belief includes, but is not limited to, UC is prosecuting Jane Doe's June 2016 Title IX complaint against John Doe, while rejecting: (a) John Doe's Title IX complaints containing John Doe's May 2016 Title IX complaint against Jane Doe; and (b) John Doe's complaint regarding the bad faith, false, and retaliatory nature of Jane Doe's June 2016 Title IX Complaint.

41.    In engaging in the conduct detailed in the preceding paragraph and below, UC is failing to comply with OCR's guidance regarding the credibility of the parties and the presence of corroborating evidence.    *See generally, OCR's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* ("OCR's Sexual Harassment Guide") (January 2001) (available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf accessed 8/21/16).    For example, OCR's Sexual Harassment Guide recommends evaluating the "relative credibility" of evidence by looking at the level of detail and consistency of each person's account . . .  in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist."  *OCR's Sexual Harassment Guide,* p.9.

42.    Upon information and belief, UC engaged in the gender biased behavior and/or Title IX retaliation detailed in this Complaint, in part because of fear that President Obama's Administration might cut off UC's access to federal funding if UC did not provide preferential

17

treatment to females such as Jane Doe. Evidence supporting this belief includes The White House's April 2014 report entitled "Not Alone" which threatens the elimination of federal funds by stating: "[i]f OCR finds a Title IX violation, the school risks losing federal funds. www.whitehouse.gov/sites/default/files/docs/report_0.pdf (accessed 8/21/16).

43.     The White House also noted that:

> The Justice Department (DOJ) . . . shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools receiving DOJ financial assistance. If schools are found to violate Title IX and a voluntary resolution cannot be reached, DOJ can . . . seek to terminate DOJ funds. www.whitehouse.gov/sites/default/files/docs/report_0.pdf (accessed 8/21/16).

44.     President Obama's federal funding threats dovetail with his Administration's "It's On Us" campaign that states: "[a]n estimated one in five women has been sexually assaulted during her college years. . . ." https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus (accessed 8/21/16); https://www.whitehouse.gov/the-press-office/2014/04/29/fact-sheet-not-alone-protecting-students-sexual-assault (accessed 8/21/16).

45.     Upon information and belief, in response to pressure from the DOE/OCR, UC joined the "It's On Us" Campaign. https://news.uchicago.edu/article/2014/09/19/national-campaign-combat-sexual-violence-complements-campus-efforts (accessed 8/21/16).

46.     However, the Obama Administration's allegations that 20% of America's female college students are being sexually assaulted by their male counterparts is false. For example, over 90% of the colleges and universities in the United States reported **none** of their students was raped in 2014. *See generally, Exhibit 3*. Similarly, among its student body of approximately 6000 undergraduate students, UC reported 13 sexual assaults in 2014, 11 sexual assaults in 2013, and

8 sexual assaults in 2012. http://commonsense.uchicago.edu/page/crime-information-and-statistics (accessed 8/21/16). *See, also,* http://www.uchicago.edu/admissions/ (accessed 8/21/16).

47.      Nevertheless, UC routinely portrays a large portion of their male students as sexual predators. For example, UC relied on its Spring 2015 Climate Survey, in which only 31.7% of the student population participated, to publicize via its website the "Key Findings and Implication" indicating that "University of Chicago students experience sexual misconduct, including sexual assault, at rates similar to those reported by other institutions." http://csl.uchicago.edu/sites/default/files/UChicago%20Spring%202015%20Climate%20Survey%20Exec%20Summary.pdf (accessed 8/21/16). Specifically, UC represented in its "Key Findings and Implications" that 1 in 7 of its female undergraduate students had been victims of sexual assault. *Id*.

48.      Although UC will likely allege UC's enforcement of sexual misconduct policies and the White House's "It's On Us" campaign are gender neutral, both are irreparably tainted by gender bias against male students. http://news.indiana.edu/releases/UCb/UC-in-the-news/dnb-10-21-2015.shtml (accessed 6/21/16). UC's Spring 2015 Climate Survey indicates that women are the primary victims and that education efforts geared towards consent are directed at males. *See,                                                                      also,* http://csl.uchicago.edu/sites/default/files/NORC%20UChicago%20Spring%20Climate%20Survey%20Report.pdf (accessed 8/21/16). *See, also*, http://csl.uchicago.edu/get-involved/climate-survey-project/spring-2015-climate-survey-materials/message-on-sexual-misconduct (accessed 8/21/16).

49.      In addition, Vice President Joe Biden has made it clear that the purpose of the "It's On Us" campaign is to protect female students from male students. *See e.g.,*

https://www.osu.edu/buckeyesact/vpbidenvideo.html (accessed 8/21/16).  VP Biden also made it clear that President Obama's Administration and the DOE used Title IX investigations and potential loss of federal funding to encourage university presidents to join the campaign. *Id.*  In addition, VP Biden encourages "guys" to take the "It's On Us" pledge to combat the fact that 1 in 5 college women are the victim of sexual assault while attending college.  *Id.*

50.     As a result, UC encourages its faculty, staff and students to take the "It's On Us" pledge which seeks to protect female students from male students with statements such as:

a.   "It's on us to make sure *guys* know that if *she* doesn't or can't consent to sex, it's sexual assault*." See generally,* http://itsonus.org/index.html#pledge (accessed 6/21/16)*;* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ve d=0CCMQFjABahUKEwjW2vihqpbJAhUI02MKHeaeC94&url=http%3A%2 F%2Fitsonus.org%2Fassets%2Ffiles%2FIt%27s_On_Us_Organizing_Guide_ Fall_2015.pdf&usg=AFQjCNGy24MM2vn7- N7HwwUnshc6d6q0gQ&sig2=nlpOPMfxwODg7eSMWYrbxA&cad=rja (accessed 6/21/16) (emphasis added);

b.   Suggesting individuals videotape themselves "[s]ay[ing] to camera…it's on us to recognize that if a *woman* doesn't or can't consent to sex, it's rape." *Id.,* (emphasis added);

c.   Stating: "*Never* blame the victim," "*always* be on the side of the survivor," and "*trust* the survivor." *Id..* (emphasis added);

d.   VP Biden's statement that those that make their rape allegations public "give millions of women hope." *Exhibit 4*, containing It's On Us Twitter Page; and

e.   President Barack Obama's statement on International Day for the Elimination of Violence Against Women that: "…together we can change our culture for the better by ending violence against *women and girls*…IT'S ON US…"; *Exhibit 5* (containing page from It's On Us Facebook page) (emphasis added).

51.     Similarly, The White House's April 2014 report entitled "Not Alone" also asserts at page 5: "[o]ne in five women is sexually assaulted in college." https://www.notalone.gov/assets/report.pdf (accessed 8/21/16).

20

52.     According to UC's 2015 Climate Survey Report, there were 2,669 female undergraduate students enrolled at UC's main campus. http://csl.uchicago.edu/sites/default/files/NORC%20UChicago%20Spring%20Climate%20Survey%20Report.pdf (accessed 8/21/16). Therefore, if the one in five statistic were applicable, approximately 534 female UC students would be sexually assaulted during their four-year stay at UC. Yet, as detailed above, UC reported 32 sexual assaults over the course of three years.

53.     Emily Yoffe's 2014 article in *Slate* refutes sexual assault statistics relied on by President Obama and/or UC. Emily Yoffe, The College Rape Overcorrection, SLATE, Dec. 7, 2014,http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html (accessed 8/21/16). Ms. Yoffe asked Christopher Krebs - the lead author of the study cited by President Obama - whether his study represented the experience of the approximately 12 million female students in America. *Id.* Mr. Krebs stated those involved in the study, "don't think one in five is a nationally representative statistic." *Id.* This was because Mr. Krebs stated his sampling of only two schools "[i]n no way . . . make[s] our results nationally representative." *Id. See also,* Heather MacDonald, *An Assault on Common Sense,* The Weekly Standard, Nov. 2, 2105, http://www.weeklystandard.com/an-assault-on-common-sense/article/1051200 (accessed 8/21/16) (detailing why a recent survey conducted by Association of American Universities has been improperly distorted to falsely suggest large percentages of female college students are being sexually assaulted on America's college campuses).

54.     Ms. Yoffe also noted that if the "one-fifth to one-quarter assertion [regarding sexual assaults on college campuses were accurate that] would mean that young American college women are raped at a rate similar to women in Congo, where rape has been used as a

weapon of war." Emily Yoffe, The College Rape Overcorrection, SLATE, December 7, 2014,

http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_i

s_a_serious_problem_but_the_efforts.html (accessed 8/21/16). And, Ms. Yoffe debunked the

sexual assault statistics relied on by President Obama and/or UC by discussing a:

> "special report from the Bureau of Justice Statistics title 'Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013' . . . [which] found that contrary to frequent assertions by some elected officials, about the particular dangers female college students face, they are less likely to be victims of sexual assault than their peers who are not enrolled in college. The report found . . . the incidence [of sexual assault] . . . was far lower than anything approaching 1 in 5: 0.76 percent for nonstudents and 0.61 percent for students." Emily Yoffe, The Problem with Campus Sexual Assault Surveys, SLATE, Sept. 24, 2015. http://www.slate.com/articles/double_x/doublex/2015/09/aau_cam pus_sexual_assault_survey_why_such_surveys_don_t_paint_an_a ccurate.html (accessed 8/21/16).

55. In response to pressure from the DOE, the DOJ, and/or the White House, educational institutions like UC are being counseled to severely limit procedural protections afforded male students like John Doe in sexual misconduct cases. Two groups providing such counseling are: (1) the Association of Title IX Administrators' ("ATIXA"); and (2) the National Center for Higher Education Risk Management ("NCHERM")

56. UC relies on both ATIXA and NCHERM in addressing allegations of sexual misconduct. In fact, UC's current Associate Dean for Disciplinary Affairs Jeremy Inabinet ("Inabinet") is concurrently employed as a consultant for NCHERM and affiliated with ATIXA. *See e.g., Exhibit 6.* Inabinet consults with universities and counsels them to comply with recommendations from NCHERM and ATIXA in matters such as drafting Title IX policies, handling campus sexual assault investigations and the resulting "backlash." *Id.* And, upon information and belief, UC hired Inabinet because his affiliations with NCHERM and ATIXA

eased relations with students who were protesting UC's handling of sexual assault allegations and helped UC to avoid negative publicity arising out of criticism from the student body and the press.        http://www.chicagoreader.com/chicago/university-of-chicago-rape-culture-sexual-assault/Content?oid=19237712 (accessed 8/21/16).

57.    Unfortunately, the facts detailed in this Complaint prove UC embraces NCHERM's gender bias views against male students alleged to have engaged in sexual misconduct.  NCHERM's gender biased views include, but are not limited to, the following:

   a)    NCHERM uses the feminine pronouns when referring to the victim of alleged sexual misconduct., *See, Exhibit 7* (containing pages from NCHERM website);

   b)    NCHERM uses masculine pronouns when referring to the student accused of perpetrating allegations of sexual misconduct, referring to them as "the usual suspects". *Id.*

   c)    NCHERM alleges the burden of proof regarding whether a female student consented to sexual contact should be placed on the male student because: "[t]he core of consent is the right of the victim to be unmolested until she gives clear permission for sexual activity to take place-what I call sexual sovereignty." *Id.,*

   d)    NCHERM's bias in favor of female victims is reflected in an Open Letter from the NCHERM Group which states: ". . . our experience suggests victims tell the truth." *See, Exhibit 8* containing NCHERM's Open Letter)

58.    Similarly, the facts detailed in this Complaint prove UC explicitly and/or implicitly incorporate and/or embrace ATIXA and NCHERM's gender bias and goal of limiting the procedural protections afforded male students like John Doe in sexual misconduct cases. ATIXA and NCHERM's goal regarding these limitations is detailed in part in their "2014 Whitepaper" entitled *Equity Is Such A Lonely Word.*    www.ncherm.org/.../2012/01/2014-Whitepaper-FINAL.pdf (accessed 8/21/16).  This Whitepaper states:

"victims have historically been accorded 3/5 of the rights of an accused individual (or less), and *victims are typically women*, equity may require institutions to recalibrate the pendulum to right the historical imbalance. An equitable process on many campuses will force a victim focus, but only as a casualty of history." (emphasis added).

59.     ATIXA's Whitepaper also details OCR's demands that colleges limit the due process rights of males accused of sexual misconduct by stating: (a) "[a] hearing became a panel . . . [t]he panel afforded presumptions of innocence, rights to attorneys, rights to remain silent. Rights, rights, rights. But, we forgot about victims along the way." and (b) OCR's 2011 Dear Colleague Letter "indicated that we must deconstruct part of the due process castle . . . [and ensure the] complainants should be inconvenienced only as far as absolutely required to remedy the discrimination." *Id.,* pages 5, 13-14.

60.     Here, UC's 2015 Manual, as well as the decision to utilize the UC's 2015 Manual to adjudicate allegations of misconduct against John Doe that allegedly occurred in 2013, prove UC implemented NCHERM and ATIXA's call to "deconstruct" the rights afforded male students accused of sexual misconduct.

61.     UC's legitimate goal of preventing sexual assault is *not* the issue in, nor is it the basis for, this Complaint.  Rather, this Complaint addresses UC's unlawful and/or gender biased treatment of innocent male students like John Doe via sexual misconduct proceedings that afford females unconstitutional preferential treatment.

62.     UC's unlawful actions and/or gender bias created a hostile environment which in turn created an adverse educational setting in violation of Title IX in part because UC engages in sex stereotyping discrimination based on unlawful notions of masculinity and femininity. This hostile environment causes innocent males on UC's campus to be unlawfully disciplined and

treated and interferes with males' ability to participate in or benefit from various activities including learning on campus.

63.     Although UC may allege UC Policies are gender neutral, this is a pretext for UC's anti-male discrimination implemented to subject and discipline innocent male students like John Doe to sexual misconduct proceedings that afford females unlawful preferential treatment. Evidence exposing this pretext includes, but is not limited to UC's depiction of sexual violence on campus as being a gender-based violence and that sexual violence prevention is a "gender relations" issue.     https://csl.uchicago.edu/get-help/resources-sexual-violence-prevention/get-involved (accessed 8/21/16).

64.     Altogether, the information detailed above manifests UC's pattern and practice of: (a) providing preferential treatment to females – like Jane Doe - who allege they were sexually assaulted my male students; and (b) imposing presumptions against male students – like John Doe – who are falsely accused of sexual misconduct.  In addition, the allegations detailed above, and the allegations to follow specific to John Doe, demonstrate that UC was motivated by pro-female, anti-male bias that was, at least in part, adopted to refute criticism within the student body and public press that UC was turning a blind eye to female complaints of sexual assault.

**Fall 2013-Spring 2014:  John Doe's Consensual Interactions With
Jane Doe and Roe and UC's Failure to Remedy Roe's Sexual Harassment and Retaliation**

65.     John Doe and Jane Doe became acquainted prior to their first semester as students at UC in September 2013 through a Facebook page for accepted students.  John Doe and Roe met during their first semester at UC. Although John Doe had one or more dates with Jane Doe and Roe individually, at no time did he ever assault or engage in any non-consensual sexual activity with either Roe or Jane Doe.

66.     Nevertheless, in the spring quarter of 2014, after John Doe broke off his relationships with Roe and Jane Doe, Roe filed a complaint with UC which falsely accused John Doe of sexual misconduct (or non-consensual sexual activity) regarding alleged conduct occurring in December 2013. Despite UC's anti-male gender bias conduct and gross negligence in conducting an investigation, a UC disciplinary panel engaged in what - upon information and belief was extremely unique occurrence at UC - ultimately rejected Roe's false claims and completely exonerated John Doe of wrongdoing in May, 2014 after John Doe engaged in protected activity by providing testimony to UC.  UC's letter attesting to John Doe's exoneration of the false charges brought by Roe is attached hereto as *Exhibit 9*.  Evidence supporting John Doe's information and belief regarding the rare nature of his exoneration includes, but is not limited, the evidence of UC's gender bias against male students articulated in this Complaint.

67.     Dissatisfied with UC's decision to exonerate John Doe, Roe commenced a vendetta against John Doe that included placing John Doe's name on the so-called "Hyde Park List" in the fall of 2014. The "Hyde Park" list was a Tumblr page accusing six UC current and former male students of sexual assault or sexual harassment. http://www.thecollegefix.com/post/19575/ (accessed 8/21/16). Roe also falsely and maliciously advised members of UC's community that John Doe was a sexual predator. In the aftermath of the "Hyde Park" list, upon information and belief, Roe also publicly lied about the outcome of the 2014 hearing by falsely telling UC students that UC found John Doe "guilty" at the May 2014 hearing but failed to punish John Doe.  Evidence supporting this belief, includes, but is not limited to conversations John Doe had – after UC rejected Roe's complaint as meritless - with fellow UC students who told John Doe about the allegations Roe was making against John Doe.  When the "Hyde Park" list was published, John Doe engaged in protected activities by

bringing Roe's conduct to the attention of UC's employees involved in his earlier disciplinary process. John Doe did so even though he never expected to find himself engaging in protected activities such as this in part because he has championed against sexual assault and the rights of females. In addressing these issues, John Doe was told UC's "confidentiality" policies prohibited him from personally refuting Roe's defamation within UC's Community" related to her allegations about his disciplinary process (and) John Doe's knowledge UC took no steps to correct Roe's conduct. *See Exhibit 9A*.

68. Because UC refused to address Roe's sexual harassment and retaliation, Roe blogged in October, 2014 that UC was forcing her to participate in class "with the person who sexually assaulted [her]." Given Roe's aforementioned conversations with UC students detailed in part in ¶67, UC students who had heard Roe's false allegations about John Doe knew Roe was referring to John Doe.

69. Shortly thereafter, and over John Doe's strong objection, UC ordered John Doe removed from the physics lab he and Roe were in. In so doing, UC engaged in Title IX retaliation by: (a) taking an adverse action against a male student, John Doe – even though UC found him innocent of Roe's allegations; and (b) affirming the unlawful demands of a female student Roe whose allegations UC rejected in part because of John Doe's protected activities of providing testimony in a disciplinary proceeding regarding her false allegations.

70. In the aftermath of the aforementioned blog post, Roe continued her sexual harassment and retaliation against John Doe without any attempt by UC to prevent Roe's conduct, thereby enabling a hostile environment to be created against John Doe across UC's campus and into the wider Chicago theater community as well.

71.     Making matters worse, UC again retaliated against John Doe in November of 2014 when UC threatened – via *Exhibit 10* -  to subject John Doe with potential disciplinary action for the alleged violation of the mutual "No-Contact Directive" that was place in connection from his initial disciplinary hearing regarding Roe. UC unlawfully alleged a right to discipline John Doe because his adult sister responded – without John Doe's knowledge – to Roe's fallacious posts about John Doe on Twitter.  Upon information and belief, UC's anti-male gender bias detailed in this Complaint caused UC to: (a) take this unlawful action, while (b) refusing to pursue any discipline of Roe who was a similarly situated female.

### Fall 2014: Jane Doe's Tortious Conduct Related to Counts 1, 2, 10, and 11

72.     On information and belief, Jane Doe is the individual account holder of the Twitter username "@[name omitted to protect Jane Doe's identity]" and runs a blog on Tumblr under the title "The Whore of [last word omitted to protect the identity of Jane Doe.]"

73.     In Jane Doe's own vernacular, John Doe and Jane Doe "hooked up" on September 23, 2013 but never engaged in sexual intercourse.

74.     At no time in September 2013, or at any time thereafter did, did John Doe ever assault Jane Doe or engage in any non-consensual sexual activity.

75.     In November 2014, Jane Doe first began to mention in her blog that she had been "sexually assaulted" and her blog posts indicated that she had communicated to others her alleged assaulter was John Doe.  Then, on December 27, 2014, Jane Doe definitively identified John Doe as the person who allegedly assaulted her.   But, as Jane Doe's admissions against interest in ¶112 below definitively prove, Jane Doe's own text messages and blog posts make it absolutely certain that her assault allegations against John Doe are completely false.

76.     On information and belief, Jane Doe had been discussing and continues to discuss

the alleged "sexual assault" with other individuals who were neither: (a) employed by UC; nor (b) associated with any government or quasi-governmental agency tasked with a responsibility to investigate allegations of sexual misconduct. Nevertheless, John Doe initially decided to ignore Jane Doe's accusations in hopes that she would move on from their relationship and cease making such statements in the future.

### Spring 2016: Jane Doe's Defamatory Conduct Regarding John Doe's Professional and Personal Reputation as Related to Counts 1, 2, 10, and 11.

77.    John Doe is majoring in Philosophy and Theatre and Performance Arts Studies ("TAPS") at UC.

78.    Part of the TAPS curriculum enables students to become involved in theatrical productions as actors, designers, directors, and production staff.  As part of his TAPS' program, John Doe undertook to direct a student-performed theater program (the "Show"). The Show was independent of other programs run under the auspices of the UC Theater (the "UT").

79.    Prior to the first performance of the Show, Jane Doe and others took a series of actions that were intended to interfere with John Doe's direction of the Show.

80.    For example, on or about May 4, 2016, Jane Doe published a series of messages (the "Tweets") on Twitter about John Doe, an online and social networking service that enables registered users to send and read short 140-character messages called "tweets", using the Twitter username "@[name omitted to protect Jane Doe's identity].

81.    These Tweets alleged false, abusive, injurious, malicious, offensive, and defamatory statements against John Doe, stating John Doe assaulted Jane Doe and many others. A copy of the Tweets as they existed on July 14, 2016 is attached as *Exhibit 11*:

> "lol but why is UT putting on a show directed by the boy who assaulted me/many others on this campus"

29

"(just to reiterate its actually TAPS not UT, so don't go knocking down the doors of the wrong precious theater bbs)"

82. The Tweets in Exhibit 11 make clear Jane Doe is referring to John Doe, and Jane Doe's Facebook post on May 5, 2016 also specified that Jane Doe was referring to the Show and John Doe.

83. Additionally, Jane Doe's intent to maliciously damage John Doe's reputation is clear given her specific clarification of the program putting on the Show being "TAPS not UT."

84. As is clear from the Tweet, Jane Doe not only alleges John Doe assaulted her, but also "many others on this campus".

85. As of August 20, 2016, the Tweets were still widely available online for anyone to see.

86. Contrary to the statements published by Jane Doe in the Tweets, John Doe has never assaulted Jane Doe or anyone else in any way.

87. Based on Jane Doe's own public writings, detailed in part in ¶112 below, Jane Doe knew her false and malicious statements alleging John Doe assaulted her were absolutely false.

### May 2016: UC's Unlawful Rejection of John Doe's May 2016 Title IX Complaint and UC's Suggestion that John File a Lawsuit against Jane Doe

88. John Doe, upon learning of the harmful, deceitful, and malicious Tweets, engaged in a protected activity providing UC with John Doe's May 2016 Title IX Complaint. This complaint involved, but was not limited to, the email contained in *Exhibit 12* which John Doe sent to UC in the early morning hours on May 5, 2016 which put UC on notice of Jane Doe's defamatory Tweets and subsequent harassment he received on campus.

89. On May 25, 2016, after a series of communications between representatives of

UC and John Doe, UC informed John Doe – via *Exhibit 13* – of UC's decision to take no action against Jane Doe regarding John Doe's May 2015 Title IX Complaint. Specifically, UC stated John Doe's actions did not fall within UC's definition of harassment under Title IX.

90. Upon information and belief, UC's anti-male gender bias detailed in this Complaint and/or John Doe's protected activities caused UC to refuse to pursue any discipline of Jane Doe and serves as an example of how UC treats similarly situated female students more favorably than male students with regard to Title IX complaints. Evidence supporting this belief includes, but is not limited to, John Doe's conversation with UC employee Inabinet. On or about August 5, 2016, John Doe asked Inabinet if Jane Doe's harassment had been alleged by a female against a male student if UC would have investigated the complaint under its Title IX policies. In response, Inabinet refused to provide John Doe a direct answer.

91. Instead of subjecting Jane Doe to a disciplinary proceeding, UC suggested John Doe file a lawsuit against Jane Doe for her highly defamatory remarks. Specifically, UC wrote:

> "[a]lthough statements made in good faith as part of University disciplinary proceedings are legally protected and should not be used as the basis for a defamation lawsuit, statements made outside of the proceedings lack that protection and could lead to a legal claim by a person who believes that the statements are false, identify him or her to others, or have harmed his or her reputation." See, *Exhibit 14.*

92. Following UC's unlawful rejection of John Doe's complaint against Jane Doe, John Doe, through counsel, sent Jane Doe a cease and desist letter – contained in Exhibit 15 - demanding Jane Doe remove the offending Tweets and issue a public apology to John Doe for the defamatory statements made repeatedly by Jane Doe.

93. Despite having received the cease and desist letter, Jane Doe has yet to delete the defamatory Tweets, and therefore continues to maliciously harm John Doe even several months later.

**Facts Relating to John Doe's Promissory Estoppel, Tort, and Title IX Claims against UC**

94.     Despite being made aware of UC students' plans to violate UC Policies by engaging in retaliatory and sexual harassing behavior, UC did not prevent these students from interrupting The Show.  For example, these students videoed their demonstration at the Show and placed the video on the internet.  Both UC's 2013 Manual and UC's 2015 Manual contain the following two promises which should have caused UC implement Title IX disciplinary proceedings against these Students:[3]

a. "The University's disciplinary systems and the legal-judicial structures of the general society differ and are distinct in principle. Students who are subject to or involved in University discipline do not automatically abdicate any of the rights that are guaranteed to them by the civil society and, indeed, they remain at all times free to claim and assert those rights through the institutions, presumably judicial, of that society. At the same time, however, students must recognize that the University is a private enclave, dedicated to a purpose that imposes additional and special obligations while, at the same time, granting privileges to its members."  *Exhibit 16,* p.55 (containing UC 2013 Manual)(emphasis added); *Exhibit 17,* p.111 (containing UC 2015 Manual)(emphasis added); and

b. "The University's policy is consistent with federal, state, and local regulations governing non-discrimination and unlawful harassment including . . . Title IX of the Education Amendments of 1972 . . . ."  *Exhibit 16,* p.8 (containing UC 2013 Manual)(emphasis added); *Exhibit 17,* p.39 (containing UC 2015 Manual)(emphasis added).

95.     In making these promises, UC also assured John Doe that UC would adhere to directives such as those implemented by the United States Department of Education's ("DOE") Office of Civil Rights ("OCR").  These directives include, but are not limited to OCR's requirements that:

---

[3] It should be noted UC's 2013 Manual and UC's 2015 Manual force John Doe to rely on promissory estoppel and/or the other tort claims in this Complaint because these manuals state: "The contents of this manual do not create a contract between any individual and the University. The contents of the manual are subject to change from time to time at the sole discretion of the University, and from time to time updated information may be distributed regarding policy and regulation changes." *Exhibit 16,* p.3 (containing UC 2013 Manual); *Exhibit 17,* p.6 (containing UC 2015 Manual).

a. "Public and state-supported schools must provide due process to the alleged perpetrator" *U.S. Dep*'t of Education Office of Civil Rights, *Dear Colleague Letter,* (Apr. 4. 2011); http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (accessed X/XX/16);

b. UC must employ "[p]rocedures that . . . will lead to sound and supportable decisions." *U.S. Dep*'t of Education Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001); http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf; (accessed X/XX/16); and

*c.* UC's "Investigations must be adequate, reliable and impartial, including the opportunity for both parties to present witnesses and other evidence." *Id.*

96.     With these mandates in mind, UC likely included the following promise in UC's 2015 Manual:  in "all cases" of alleged sexual misconduct UC "is committed to providing a prompt, fair, impartial, and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent." *Exhibit 17,* p.27 (containing UC 2015 Manual) (emphasis added).

97.     But, UC's decision to adjudicate Jane Doe's June 2016 Title IX Complaint pursuant to UC's 2015 Manual violates UC's aforementioned promises in at least three ways: (1) Jane Doe's allegations involve conduct that occurred in 2013; (2) UC's 2015 Manual imposes highly stringent limitations on students' sexual interactions which were not contained in UC's 2013 Manual; and (3) it was *impossible* for John Doe to know his consensual physical encounters with Jane Doe in 2013 might violate these stringent limitations because these limitations not exist in 2013.

98.     These three facts are detailed in UC Provost Isaac's September 24, 2015 notification to UC "Faculty, Students, and Staff" contained in Exhibit 18.  In this notification, UC Provost Isaac admitted UC's 2015 Manual contained "substantial revisions to [UC's earlier] Policy on . . . Sexual Misconduct.  Id. (emphasis added).  Provost Isaac also noted: "the new

policy offers much clearer definitions of consent and confidentiality. It articulates new principles regarding consensual relationships . . . and I encourage every member of this community to read the entire policy." Id., (emphasis added). To help implement this "new" policy, Provost Isaac detailed how: "[o]ver the summer [of 2015 UC had] also developed new content for student orientation programs . . . [this] updated content emphasizes key concepts such as consent . . . ." Id.

99.     Given Provost Isaac's statements above, it would have been impossible for John Doe to anticipate – in 2013 – that UC would radically change its policies in 2015 and retroactively apply these yet-to-be published policies to adjudicate Jane Doe's June 2016 Title IX Complaint.

100.     As a result, John Doe sent UC Associate Dean Inabinet the email contained in Exhibit 19. In this email, John Doe asking Inabinet to reconsider his earlier stated intention to prosecute John Doe under UC's 2015 Manual. Id., Specifically, on August 7, 2016, John Doe wrote:

> "I write to reiterate the concerns I raised during our conversation about the unlawful nature of adjudicating my alleged 2013 conduct under the University's [current] policies. I raised this concern in part because it would be impossible for me to know in 2013 what rules and regulations [UC's Policies] would impose in 2016. For example, [UC's 2013 Manual] defined consent as:
>
>> 'Consent' is the freely given agreement to the act of sexual conduct or sexual penetration in question. The lack of explicit consent does not imply consent. The lack of verbal or physical resistance or the submission by the victim resulting from the use of force or threat of force by the accused does not constitute consent. The manner of dress of the victim at the time of the offense does not constitute consent. A person who initially consents to sexual penetration or sexual conduct is deemed not to have consented to any sexual penetration or sexual

conduct that occurs after he or she withdraws consent during the course of that sexual penetration or sexual conduct.

Use of alcohol or drugs may impair an individual's capacity to consent freely and may render an individual incapable of giving consent."

While [UC's 2015 Manual] defines consent in far broader terms by stating:

**'Consent'** means voluntary, active and clear agreement, communicated by words or actions, to participate in specific sexual activity. Consensual sexual activity happens when each participant willingly chooses to participate.

In cases where a victim asserts that sexual activity occurred without consent, the standard is whether a sober, reasonable person in the same circumstances as the accused should have known that the victim did not or could not consent to the sexual activity in question.

In Illinois, the legal age of consent is 17 but rises to 18 if the accused holds a position of trust, authority, or supervision in relation to the victim. This means that there can be no consent when one participant in the sexual activity is under the legal age of consent and any other participant is at or over the legal age of consent.

Consent is such a critical factor that Section VI is entirely dedicated to discussing it.

**V. CONSENT**

**What is Consent?**
☐ Consent means voluntary, active and clear agreement, communicated by words or actions, to participate in specific sexual activity. Consensual sexual activity happens when each participant willingly chooses to participate. It is the responsibility of the person who wants to engage in a sexual activity to obtain the consent of the other person for that sexual activity. Consent may also be withdrawn or modified at any time by the use of clearly understandable words or actions.

☐ In Illinois, the legal age of consent is 17 but rises to 18 if the accused holds a position of trust, authority, or supervision in relation to the victim. This means that there can be no consent when one participant in the sexual activity is under the legal age of consent and any other participant is at or over the legal age of consent.

☐ In cases where a victim asserts that sexual activity occurred without consent, the standard is whether a sober, reasonable person in the same circumstances as the accused should have known that the victim did not or could not consent to the sexual activity in question." *Id.,* (quoting UC's 2013 Manual and UC's 2015 Manual).

101.    To date, nobody at UC has notified John Doe that UC decided to modify Inabinet's intention that UC will rely on UC's 2015 Manual to prosecute Jane Doe's June 2016 Title IX Complaint against John Doe.  Instead, Inabinet set an August 24, 2016 deadline for John Doe to issue a written response to Jane Doe's Title IX Complaint.  As a result, John Doe reasonably concludes that UC has rejected his requests contained in his August 7, 2016 email to Inabinet.

102.    In *Exhibit 19*, John Doe also reiterated questions John Doe raised with Inabinet regarding the timing of UC's investigation of Jane Doe's June 2016 Title IX Complaint, but, to date, Inabinet has not provided answers to these questions.   Specifically, John Doe wrote:

" . . .  please inform me whether [Jane Doe's] complaint against me will be stayed until after the University resolves the complaints I filed against [Jane Doe].  As you know, my first complaint was filed *before* [Jane Doe] filed her complaint against me.  *See generally, Exhibit A* (containing your email regarding same).  This complaint addressed in part [Jane Doe]'s defamatory conduct towards me.  *See e.g., Exhibit B* (containing some of [Jane Doe's] defamatory conduct).

During our conversation on Friday, you suggested Dean Scott was waiting for me to contact him before opening a disciplinary proceeding against [Jane Doe] for the aforementioned conduct.   In response, I explained it was my understanding Dean Scott was supposed to contact me if [UC] decided to subject [Jane Doe] to a disciplinary procedure.  As a result, when I return from Maine, I will request Dean Scott open this disciplinary procedure.   In the meantime, I request the disciplinary procedure against me be stayed because the facts detail how [Jane Doe's] complaint against me is in retaliation for my engaging in protected activities by filing complaints protected by Title IX and

the University's policies.  This is established in part because my first complaint advanced good faith claims for violations of Title IX claims and/or [UC's Policies].

Similarly, my second complaint – lodged with you after [Jane Doe]'s complaint – clearly establishes violations of Title IX claims and/or University policies.  This is because [Jane Doe] filed her false allegations of sexual assault against me within days of receiving [UC's] "no contact" order related to my first complaint.  And, if you have any doubt that [Jane Doe's] assault claims are absolutely false, these doubts will be satisfied by her attached blog posts which prove she never considered any of our contact during "O Week" of 2013 to be non-consensual.  *See, Exhibit C* (containing [Jane Doe's] blog posts).  Consequently, [UC's Policies] appear to require [Jane Doe's] complaint against me be stayed until the University resolves my complaints against her.

However, if the University refuses to stay [Jane Doe's] complaint, at a minimum, [UC] should require her complaint be adjudicated in the same disciplinary procedure that she is pursuing against me.  This is because [UC's] *Policy on Harassment, Discrimination, and Sexual Misconduct* ("SMP") promises that: "[i]n all cases, the University is committed to providing a prompt, *fair, impartial*, and thorough investigation and resolution that is consistent with the University's policies and *is transparent to* the complainant and *the respondent*."  Otherwise, the factfinders in my case may be denied massive amounts of evidence proving [Jane Doe's] retaliatory conduct." *Id.*

103.    As detailed in the preceding paragraph, UC has recently alleged the *possibility* that it might reverse itself and *potentially* subject Jane Doe to a disciplinary procedure – outside Title IX – with regard to John Doe's May 2016 Title IX Complaint.  But, upon information and belief, the facts detailed in this Complaint prove UC will not honor UC's Policies with regard to disciplining Jane Doe unless directed to do so by this Court.  Evidence supporting this belief includes, but is not limited, the fact that nobody at UC has answered the questions John Doe posed about either: (a) staying Jane Doe's June 2016 Title IX Complaint; or (b) whether John

Doe's May 2016 Title IX Complaint and Jane Doe's June 2016 Title IX Complaint will be adjudicated by the same UC decision makers contemporaneously.

104.    UC's refusal to adjudicate John Doe's May 2016 Title IX Complaint *before* prosecuting Jane Doe's June 2015 Title IX Complaint violated UC Policies. This is because UC's Policies require UC to adjudicate Jane Doe's June 2015 Title IX Complaint first since: (a) John Doe's protected activities in John Doe's May 2016 Title IX Complaint were the but for cause of Jane Doe's June 2015 Title IX Complaint; and (b) John Doe notified UC of the false, bad-faith, and retaliatory nature of Jane Doe's June 2015 Title IX Complaint.

105.    In addition, in refusing to discipline Jane Doe's aforementioned conduct, UC violated the promise it made in UC's 2015 Manual requiring Jane Doe's discipline by stating:

> "There are . . . some circumstances in which behavior so violates our community's standards that formal University intervention may be appropriate. The University may restrict expression that violates the law, that falsely defames a specific individual, that constitutes a genuine threat or harassment, that unjustifiably invades substantial privacy or confidentiality interests, or that is otherwise directly incompatible with the functioning of the University." *Exhibit 17*, p.8 (containing UC's 2015 Manual).

106.    UC also breached promises it made regarding disciplining Jane Doe for violations of UC's 2015 Manual's prohibition against retaliation. Regarding these issues, UC's 2015 Manual states:

> UC defines "Retaliation" as: "any adverse action taken against a person participating in a protected activity because of their participation in that protected activity. Retaliation against an individual for alleging harassment, supporting a party bringing a complaint, or assisting in providing information relevant to a claim of harassment is a serious violation of University policy and will be treated as another possible instance of harassment or discrimination." *Exhibit 17*, p.65 (containing UC's 2015 Manual).

> "The University prohibits retaliation against any person for making a report in good faith or cooperating in an investigation in connection with this Policy. Individuals who take retaliatory action will be subject to corrective action up to and including termination of employment." *Id.*

107.    In addition, UC breached promises it made regarding disciplining Roe and/or Jane

Doe for breaching UC's 2015 Manual's confidentiality provisions by resurrecting Roe's false

allegations against John Doe which UC determined to be without merit in 2014.   This occurred

because Jane Doe's June 2016 Title IX Complaint contains Roe's communications with Jane

Doe which address Roe's false allegations that John Doe sexually assaulted Roe.  Regarding the

issue of "confidentiality" UC's 2015 Manual states:

> With regard to UC Title IX investigations: "[t]he University must protect
> privacy and confidentiality to fulfill its commitment to address complaints
> of sexual misconduct fairly and expeditiously. Every member of the
> University community should recognize that confidentiality breaches
> erode the community's trust in this process . . . and may have the purpose
> or effect (unintended or intended) of retaliating against those who
> participate in the process . . . a person who fails to preserve confidentiality
> may face disciplinary action. For example, if a party or witness breaches
> confidentiality in order to retaliate against a person for his or her
> participation in an investigation or hearing, the disciplinary committee
> may hear a complaint of retaliation and impose sanctions."  p.22 (UC's
> 2015 Manual).

Regarding the issue of "confidentiality" UC's 2013 Manual states:

> "The University of Chicago will make every reasonable effort to preserve
> an individual's privacy and protect the confidentiality of information
> related to sexual assault. The University may issue a safety awareness
> alert, a brief description including time and location, to notify the
> community about the occurrence of a serious crime or pattern of crimes
> that might put the public at risk. The University is also required by law to
> tabulate and annually report sexual assault and other campus crime
> statistics to the public. These statistics and the list of people to whom a
> crime may be reported for it to be included in the statistics appear in this
> publication   and   at http://commonsense.uchicago.edu.   Neither safety
> awareness alerts nor campus crime statistics contain specific victim-
> identifying information. The confidentiality of disciplinary proceedings
> deserves special mention. Honoring the confidentiality of disciplinary
> proceedings and their outcomes is the responsibility of the accused, the
> victim, the institution, and all others participating in or privy to those
> proceedings. Unless disclosure is authorized by law, failure to respect the
> confidentiality of the proceedings and their outcome may result in

disciplinary consequences within the University, as well as potential civil liability." p.20 (UC's 2013 Manual).

108.     Notwithstanding UC's policy of not entertaining false, bad faith, and/or retaliatory complaints against those that engage in protected activities, UC is prosecuting Jane Doe's June 2016 Title IX Complaint which was filed in retaliation for John Doe's protective activities which included, but were not limited to: (a) John Doe's May 2016 Title IX Complaint and (b) UC's related "Non-contact Directive" contained in *Exhibit 20.*

109.     Upon information and belief, UC refused to prosecute John Doe's May 2016 Title IX Complaint because of UC's anti-male gender bias detailed in this Complaint which includes, but is not limited to evidence establishing how UC and UC employees such as Inabinet are acting with anti-male animus in part because of a belief that female victim/complainants must receive preferential treatment in their sexual assault accusations against male students.

110.     As a result of UC's conduct detailed in this Complaint, UC inflicted at least the following types of irreparable damage/harm on John Doe:

a.  UC is subjecting John Doe to an unlawful disciplinary proceeding in violation of Title IX and UC's Policies which include, but are not limited to, promises contained in UC's 2013 Manual and/or UC's 2015 Manual;

b.  UC has caused John Doe to suffer continuing extreme physical and emotional harm for which he has sought treatment;

c.  UC has created an unlawfully hostile and/or abusive environment at UC for John Doe in part because this conduct is similar that addressed by academics and investigative reporters who have documented bias against male students accused of sexual misconduct on college campuses in publications referenced in this Complaint; and

d.  UC's conduct is "irreparably damaging John Doe's "good name, reputation, honor, or integrity' with an unlawful disciplinary proceeding that will 'seriously damage [his] standing . . . [and] interfere with later opportunities for higher education and employment." *Goss v. Lopez*, 419 U.S. 565, 573-75 (1975).

**Facts Detailing Why UC's Prosecution of Jane Doe's June 2016 Title IX Complaint
Violates Title IX**

111.    Jane Doe's June 2016 Title IX Complaint alleges a single act of "assault" on September 23, 2013 – nearly three years after the alleged conduct occurred.  It should be noted, Jane Doe did "assault" allegation not involve sexual intercourse because her complaint discusses how Jane Doe and John Doe never had sexual intercourse.

112.    UC knows Jane Doe's nearly-three-year-old "assault" allegation is false because UC possesses the following 15 contemporaneous statements by Jane Doe from her blog and social media postings which irrefutably disprove her allegations:

    a.  In her Tumblr blog, Jane Doe described the sexual encounter with John Doe in September 2013 (that she now calls "sexual assault") as "beautiful and sweet and all great things" (*Exhibit 21);*

    b.  In the same blog, Jane Doe said they went back to his room and hooked up. She said she went further than she'd "ever gone before which as gr8." *Id.*

    c.  Jane Doe also used the following hashtags in discussing the night she alleges to have been sexually assaulted "#best part is i have a hickey on my neck right before I'm headed to dc #luv lyfe #tmi???" *Id.*

    d.  The night following the alleged sexual assault, Jane Doe blogged about making out with the other boy she was seeing at the same time as John Doe. *Id.*

    e.  Jane Doe asserted in her Title IX complaint that she was never comfortable with John Doe after the alleged sexual assault. Yet, she blogged on October 12, 2013 that:

        ". . . i wanted to go hang out with [the other boy I've been hooking up with] at the LGBTQ party but he went with his house so it didn't end up

happening. and what do I do when im feeling sad and ignored? Text [John Doe] because im a horrible person"

*Id.*

f.  Jane Doe blogged about: (i) open conversations she and John Doe had about the sexual encounter she now falsely alleges sexual assault, and (ii) how John Doe was working to make the experience pleasurable for her, but that she consoled him by saying the problem was her, not him. *Id.*

g.  Jane Doe blogged that she stayed after the alleged sexual assault to "cuddle" and that she wanted to spend the night, but left because John Doe had a cough, which she did not want to catch. *Id.*

h.  Again, during all of these blogs about John Doe, Jane Doe was also blogging about another male college student, who she liked better than John Doe (at the time). Yet, Jane Doe blogged—mere weeks after the alleged sexual assault—that she should have chosen John Doe over this other boy. *Id.* "I realized that [John Doe] seems to get me more and I don't have to try so hard to be cool around him, so wow isn't that what relatiohsippy things are???" *Id.* However, John Doe told Jane Doe he was going to focus on his studies. *Id.*

i.  Approximately two months after the alleged sexual assault, Jane Doe blogged about wanting her relationship with John Doe back. *Id.*

j.  Jane Doe's renewed interest in John Doe continued to intensify in the fall and winter of 2013 following the alleged sexual assault. On November 23, 2013, Jane Doe blogged "tipsy maybe idk [John Doe]'s so cute I kinda wanna tap that." *Id.*

k.  And, then she blogged shortly after, "ugh so [John Doe] was on jeopardy when he was a lil bab (11 or 12) and he looked SO CUTE BABY ARG like wow I want a

small one of those he's so cute wowowowowow." *Id.*

l.   In late December, Jane Doe worked to renew the relationship with John Doe to the point where the two discussed moving into an intimate relationship that would involve sexual intercourse. Jane Doe was willing to make this progression with John Doe, but he told her he was still in love with his ex-girlfriend. This angered Jane Doe. *Id.*

m.   Nonetheless, with the new year, Jane Doe blogged about John Doe in January 2014:

"ugh sometimes I think about how badly i fricked up with [John Doe] and get upset because he was so great and really understood me and we connected at a great leave but I let my interest in [the other guy] get in the way of something that could have been amazing for me." *Id.*

n.   In fact, throughout January 2014, Jane Doe blogged about John Doe and her interest in having a romantic relationship with him. *Id.*

o.   But then, Jane Doe learned that John Doe had become involved with Roe and she was very upset and angry. *Id.*

113.   There is no rational reason for UC to proceed with Jane Doe's June 2106 Title IX Complaint against John Doe – other than UC's anti-male gender bias – in light of this evidence. Besides this evidence irrefutably proves that the alleged event was not sexual assault.

114.   Unfortunately, it is well-documented in academic research that anger can lead to false claims of sexual misconduct.  Reggie D. Yager's recent study entitled *What's Missing From Sexual Assault Prevention and Response* reviewed multiple academic studies which suggest a substantial percentage of sexual assault allegations are made under false pretenses

because of: (1) the need for a cover story or alibi; (2) retribution for a real or perceived wrong, rejection or betrayal; and/or (3) desire to gain sympathy or attention). *See e.g.,* Reggie D. Yager, *What's Missing From Sexual Assault Prevention and Response*, (April 22, 2015) http: ssrn.com/abstract=2697788 (accessed 8/21/15).

115.    Similarly, an academic study found approximately 50% of sexual assault allegations at two Midwest colleges were false.   Eugene J. Kanin, *False Rape Allegations* Archives    of    Sexual    Behavior,    Vol.    23    No.1    (1994)    available https://archive.org/details/FalseRapeAllegations).   Another academic paper exposes the lack of objective proof behind a "consensus among legal academics that only two percent" of sexual assault allegations are false.) Edward Greer,   *The Truth behind Legal Dominance Feminism's Two-Percent False Rape Claim Figure,* 33 Loy. L.A.L. Rev. 947(2000); available http; digitialcommon.Imu.edu/llr/vol33/iss 3/3).

116.    Moreover, as described in in part in ¶¶105, 177, and 187 of this Complaint, UC knows Jane Doe's June 2016 Title IX Complaint violates the confidentiality provisions of UC's 2015 Manual and/or UC's Policies by resurrecting Roe's false allegations which UC found meritless in 2014.

117.    Nevertheless, UC rejected every request and argument made by John Doe asserting Jane Doe's June 2016 Title IX Complaint should be dismissed outright or stayed until the determination is made by an appropriate body that Jane Doe's complaint is, in fact, retaliatory and a violation of UC's Policies.

118.    Instead of acknowledging any of the aforementioned fatal flaws in Jane Doe's 2016 Title IX Complaint, UC is proceeding with an unlawful disciplinary procedure that is causing the damages/harms to John Doe detailed this Complaint, which – if not enjoined – could

result in John Doe's permanent expulsion from UC given the anti-male gender bias at UC detailed in this Complaint.

## Count 1 – Defamation Per Se
## Against Jane Doe Only

119.    John Doe hereby incorporates by reference the aforementioned allegations contained in this complaint as though fully set forth herein.

120.    The aforementioned Tweets published by Jane Doe on Twitter under the Twitter handle "@[name omitted to protect Jane Doe's identity] wrongfully, falsely, and maliciously accused John Doe of committing assault against both Jane Doe and "many others."

121.    Jane Doe knew and intended the Tweets would be read by persons in the city of Chicago, and the state of Illinois, and intended the Tweets to damage the professional and personal reputation of John Doe.

122.    Jane Doe made and published the Tweets with actual malice and reckless disregard of their falsity, or with knowledge of their falsity.

123.    Jane Doe's defamatory statements related to this count were not made by Jane Doe in support of any complaint she filed against John Doe with UC or any governmental or quasi-governmental body. Rather, Jane Doe's defamatory statements related to this count are: (a) completely unrelated to any complaint Jane Doe made about John Doe to UC or any governmental or quasi-governmental body; and (b) were not made in the presence of UC employees or any other governmental or quasi-governmental body involved in an action against John Doe.

124.    As a direct and proximate result of Jane Doe's false and defamatory statements, John Doe has suffered damage to his reputation, emotional distress, humiliation, and embarrassment.

125.     As a direct and proximate result of the statements, John Doe has suffered actual damage of a pecuniary nature, including medical fees for therapy and legal fees in defending John Doe's reputation.

**Count 2 – Defamation *Per Quod***
(Against Jane Doe Only)

126.     John Doe hereby incorporates by reference the aforementioned allegations contained in this complaint as though fully set forth herein.

127.     The aforementioned Tweets published by Jane Doe on Twitter under the Twitter handle "@[name omitted to protect Jane Doe's identity] wrongfully and falsely accused John Doe of committing assault against both Jane Doe and others.

128.     Jane Doe knew and intended the Tweets would be read by persons in the city of Chicago, and the state of Illinois, and intended the Tweets to damage the professional and personal reputation of John Doe.

129.     Jane Doe made and published the Tweets with actual malice and reckless disregard of their falsity, or with knowledge of their falsity.

130.     Jane Doe's defamatory statements related to this count were not made by Jane Doe in support of any complaint she filed against John Doe with UC or any governmental or quasi-governmental body.  Rather, Jane Doe's defamatory statements related to this count are: (a) completely unrelated to any complaint Jane Doe made about John Doe to UC or any governmental or quasi-governmental body; and (b) were not made in the presence of UC employees or any other governmental or quasi-governmental body involved in an action against John Doe.

131.     As a direct and proximate result of Jane Doe's false and defamatory statements,

John Doe has suffered damage to his reputation, emotional distress, humiliation, and embarrassment.

132.     As a direct and proximate result of the statements, John Doe has suffered actual damage of a pecuniary nature, including medical fees for therapy and legal fees in defending John Doe's reputation.

WHEREFORE, with regard to Counts 1-2, John Doe demands judgment against Jane Doe as follows:

(a) For actual, special, and compensatory damages, including John Doe's medical fees and legal fees, in an amount to be determined at trial but in no event less than $75,000.00;

(b) For punitive damages in an amount sufficient to deter Jane Doe from conducting similar future conduct but in no event less than $100,000;

(c) Judgment for attorneys' fees, pursuant any applicable statute;

(d) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(e) Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or; and

(f) Such other and further relief as this Court finds just and equitable.


**<u>Count 3:</u>**
**<u>Violation of Title IX –Hostile environment sexual harassment and/or discrimination</u>**
**(against UC only)**


133.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

134.     Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

135.     Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination based on sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

136.     UC receives federal financial assistance and is thus subject to Title IX.

137.     Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

138.     Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

139.     Title IX mandates UC afford equitable procedures and due process to John Doe, a qualified male student of UC, which includes, but is not limited to: (a) having proper jurisdictional authority to conduct an investigation; (b) providing adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other

48

evidence, and/or (c) that UC employees involved in the conduct of the procedures have adequate training.

140.    UC knew, or in the exercise of due care should have known, that UC lacked jurisdiction under UC Policies to investigate John Doe for his consensual physical encounter with Jane Doe.

141.    Upon information and belief, UC knew, or in the exercise of due care should have known, employees including, but not limited to, Inabinet received gender biased training regarding Title IX which caused them to violate UC Policies and Title IX rights in part by equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment over their male counterparts.

142.    UC's Policies and/or UC's gender biased implementation of these policies, fail to meet the standards required by Title IX and/or safeguards as interpreted by United States' courts regarding how institutions of higher education conduct disciplinary proceedings. As a result, John Doe has suffered the adverse actions detailed herein, which include but are not limited to interference with his education, harm to his reputation, and retaliation.

143.    Upon information and belief, in virtually all cases of campus sexual misconduct by UC students, the accused student is male and the accusing student is female.

144.    As detailed throughout this Complaint, UC created an environment in which male students accused of sexual assault, such as John Doe, are fundamentally denied rights owed under UC Policies as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male UC students like John Doe of educational opportunities based on their gender. Upon information and belief, UC has, at least in part, adopted such discriminatory

policies to refute criticism within the student body and public press that UC is turning a blind eye to female complaints of sexual assault.

145. Upon information and belief, UC's investigation and/or discipline of John Doe was taken in order to demonstrate to DOE, DOJ, OCR, President Obama's Administration, and/or the general public that UC: (a) is aggressively disciplining male students accused of sexual assault; and (b) providing females involved in sexual misconduct proceedings with preferential treatment not provided to males.

146. UC has actual or constructive knowledge that UC's disciplinary proceeding against John Doe posed a persuasive and unreasonable risk of gender discrimination with regard to John Doe.

147. UC's actions and inactions detailed in this Complaint set in motion a series of events that UC knew, or reasonably should have known, would cause male UC students, such as John Doe, to suffer unlawful gender discrimination.

148. UC's disciplinary proceeding against John Doe is discriminatory and based upon or motivated by John Doe's male gender.

149. The male gender discrimination by UC against John Doe includes, but is not limited to, providing preferential treatment to Jane Doe. This preferential treatment includes, but is not limited to: (a) prosecuting Jane Doe's 2016 Title IX Complaint _before_ prosecuting John Doe's preexisting complaint contained in John Doe's May 2016 Title IX Complaint; (b) adjudicating Jane Doe's 2016 Title IX Complaint _before_ adjudicating the retaliatory, bad faith, and false allegations in Jane Doe's June 2016 Title IX Complaint; and (c) taking such actions with no objectively rationale reason based on the evidence.

150. UC employees, including but not limited to Inabinet, unlawfully failed to exercise the authority to institute corrective measures to remedy UC's violations of John Doe's rights under UC Policies, Title IX, and/or guidance promulgated by OCR.

151. UC employees, including but not limited to Inabinet, exhibited deliberate indifference based on gender bias by refusing to remedy UC's violations of John Doe's rights under UC Policies, Title IX, and/or guidance promulgated by OCR.

152. UC's deliberate indifference caused John Doe to suffer sexual harassment, retaliation, and/or discrimination so severe, pervasive or objectively offensive that it deprived John Doe of access to educational opportunities or benefits and caused other harm/damage detailed above.

153. Upon information and belief, UC possesses additional documentation evidencing UC's unlawful pattern of gender-biased decisions to provide preferential treatment to female students over male students like John Doe who are falsely accused of sexual assault.

154. Upon information and belief, UC possess additional documentation evidencing UC's refusal to discipline female students who were alleged to have sexually assaulted male students.

155. UC's violations of Title IX caused John Doe to be damaged in an amount to be determined at trial.


**<u>Count 4</u>**
**<u>Violation of Title IX – Retaliation</u>**
(against UC only)

156.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

157.     As described in this Complaint, UC's Title IX retaliation includes, but was not limited to, three separate adverse actions taken because of John Doe's protected activities.  First, UC subjected John Doe to an adverse action by rejecting his request to stay his disciplinary proceeding related to Jane Doe's June 2016 Title IX Complaint until *after* UC adjudicates John Doe's May 2016 Title IX Complaint.

158.     Second, UC inflicted an adverse action on John Doe by violating UC Policies in allowing Jane Doe to irreparably damage John Doe by resurrecting Roe's false allegations against John Doe in Jane Doe's 2016 June Title IX Complaint even though UC determined in 2014 that Roe's claims lacked merit.

159.     Third, UC is subjecting John Doe to an adverse action by rejecting John Doe's request that Jane Doe's June 2016 Title IX Complaint be adjudicated by the same UC decision makers contemporaneously with John Doe's May 2016 Title IX Complaint.

160.     UC subjected John Doe to the adverse actions in ¶¶157-59, and other retaliatory adverse actions, treatment, and/or conditions *because of* his protected activities of: (a) participating in the disciplinary proceeding regarding Jane Doe's false allegations; (b) engaging in activities related to John Doe's May 2016 Title IX Complaint; (c) protesting the retaliatory nature of Jane Doe's June 2016 Title IX Complaint; and/or (d) defending himself against the false allegations contained in Jane Doe's June 2016 Title IX Complaint.

161.     UC employees, including but not limited to Inabinet, possessed actual or constructive knowledge of John Doe's protected activities under Title IX.

162.     Upon information and belief, Defendants possess communications evidencing Defendants' Title IX retaliation against John Doe.

163.     UC's violations of Title IX caused John Doe to be damaged in an amount to be determined at trial.

**Count 5:**
**Violation of Title IX – Selective Enforcement**
(against UC only)

164.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

165.     As detailed in this Complaint, UC violates Title IX's prohibitions against engaging in the "selective enforcement" of UC's Policies on the basis of gender.  *See e.g., Marshall v. Indiana Univ.,* Case No. 1:15-cv-00726, 2016 U.S. Lexis 32999, *19 (S.D. Ind. Mar. 15, 2016)(emphasis in original)(citing *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 211-12 (W.D.N.Y. 2013)(stating that "selective enforcement" liability under Title IX occurs when a plaintiff "allege[s] facts sufficient to give rise to the inference that the school intentionally discriminated against the plaintiff *because of* his or her sex").    In addressing a selective enforcement claim raised by a male student in a similar situation to John Doe, the Second Circuit noted "selective enforcement" theory requires that the school's "decision to initiate the proceeding" or the "severity of the penalty" "was affected by the student's gender" without regard to guilt. *Yusuf v. Vassar College*, 35 F. 3d 709, 715 (2d Cir. 1994).

166.     UC's Title IX liability to John Doe caused John Doe to be damaged in an amount to be determined at trial.

WHEREFORE, regarding Counts 3-5, John Doe demands judgment and relief against

UC as follows:

a. Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by UC's conduct;

b. Order(s) requiring UC expunge John Doe's official UC files of all information related to his interactions with Jane Doe;

c. Judgment for attorneys' fees, pursuant any applicable statute;

d. Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

e. Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

f. Such other and further relief as this court may deem just, proper, equitable, and appropriate.[4]

### Count 7 – Declaratory Judgment -
(Against UC)

167. John Doe realleges and incorporates all the allegations contained in the preceding paragraphs of the Complaint as though fully rewritten herein.

168. As detailed in this Complaint, John Doe has a legal tangible interest in requiring UC administer UC Policies, Title IX, and/or OCR guidelines in accordance in a lawful manner.

---

[4] For example, John Doe is entitled to injunctive relief in part because UC's discipline of John Doe is unlawful and violates John Doe's rights under UC's Policies, federal and/or state laws. In addition, as detailed in this Complaint, UC's unlawful discipline of John Doe will cause irreparable harm that is certain, great, actual and not theoretical. Moreover, UC's discipline cannot be remedied by an award of monetary damages because of difficulty or uncertainty in proof or calculation. The granting of injunctive relief will cause no harm to UC because these defendants have no cognizable interest in the unlawful discipline of John Doe. The granting of an injunctive relief will also advance a significant and appreciable public interest by protecting members of the public – like John Doe –from having their fundamental rights threatened by unlawful action. Therefore, John Doe is entitled to injunctive relief which includes, but is not limited to an Order requiring UC: (a) expunge John Doe's official UC student file of all information related his encounter with Jane Doe; and (b) be barred from disclosing UC's aforementioned disciplinary procedure of John Doe to third parties in the future.

169.    As detailed in this Complaint, UC is opposing John Doe's aforementioned legal tangible interest in part because of UC's gender bias against male students.

170.    Therefore, an actual controversy between John Doe and UC concerning said legal tangible interests.

171.    Judicial interaction is not premature because unless UC is enjoined, UC will engage in an unlawful disciplinary proceeding against John Doe.

### Count 8 – Promissory Estoppel
(against UC only)

172.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

173.    As described in this Complaint: (a) John Doe detrimentally relied on UC's promises contained in UC Policies to adjudicate complaints in a fair and impartial manner by, among other things, _not_ applying the highly stringent mandates of UC's 2015 Manual which did not exist in 2013 when Jane Doe falsely alleged John Doe acted inappropriately; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

174.    As described in this Complaint: (a) John Doe detrimentally relied on UC's promises detailed above to adjudicate John Doe's May 2016 Title IX Complaint before it prosecuted John Doe for the _subsequently_ filed complaint by Jane Doe; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

175.    As described in this Complaint, John Doe detrimentally relied on UC's aforementioned promises which require UC to either: (a) stay Jane Doe's 2016 Title IX

Complaint _until after_ UC adjudicates John Doe's May 2016 Title IX Complaint and the false, bad faith, and retaliatory allegations contained Jane Doe's June 2016 Title IX Complaint; or (b) have the same UC decision makers contemporaneously address all of John Doe and Jane Doe's complaints. The facts in this Complaint also detail how John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

176.    As described in this Complaint: (a) John Doe detrimentally relied on UC's aforementioned promises to subject Jane Doe to discipline for violating the anti-retaliation provisions in UC's 2015 Manual and/or UC's Policies on filing false charges against fellow students; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

177.    As described in this Complaint: (a) John Doe detrimentally relied on UC's aforementioned promises to subject Jane Doe and/or Roe to discipline for violating the confidentiality provisions of UC's 2015 Manual and/or UC's Policies; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

178.    As described in this Complaint: (a) John Doe detrimentally relied on UC's promises, contained in UC's Polices which including, but were not limited to, UC's promises in UC's 2013 Manual and/or UC's 2015 Manual which "guaranteed" John Doe certain rights afforded by a "civil society"; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

179.    As described in this Complaint: (a) John Doe detrimentally relied on UC's promises, contained in UC's Polices which including, but were not limited to, UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated in "all cases" of alleged sexual

misconduct UC "is committed to providing a prompt, _fair, impartial_, and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

180.    As described in this Complaint: (a) John Doe detrimentally relied on UC's promises, contained in UC's Polices which including, but were not limited to, UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated CU's Policies would be implemented in a manner "consistent with federal, state, and local regulations governing non-discrimination and unlawful harassment including . . . Title IX," and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

181.    UC's breaches caused John Doe to be damaged in an amount to be determined at trial.

**Count 9 – Negligence**
(against UC only)

182.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

183.    As described in this Complaint: (a) UC owed John Doe a duty to honor the provisions of UC's 2013 Manual and/or UC's Policies; (b) UC breached that duty by, by among other things, prosecuting John Doe's 2013 actions under UC's 2015 Manual's highly stringent limitations on sexual interactions which that did not exist in 2013; and (c) UC's breach of this duty is the cause in fact and legal cause of John Doe's injuries.

184.    As described in this Complaint: (a) UC owed John Doe a duty to honor the provisions of UC's 2013 Manual, UC's 2015 Manual and/or UC's Policies; (b) UC breached these duties by, among other things, adjudicating Jane Doe's June 2016 Title IX Complaint before it adjudicated the John Doe's May 2016 Title IX Complaint and his complaint about the bad faith, false, and/or retaliatory nature of Jane Doe's June 2016 Title IX Policy; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

185.    As described in this Complaint: (a) UC owed John Doe a duty to honor the provisions of UC's 2013 Manual, UC's 2015 Manual and/or UC's Policies; (b) UC breached these duties by, among other things, not allowing the same UC decision makers to contemporaneously adjudicate all of Jane Doe and John Doe's complaints; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

186.    As described in this Complaint: (a) UC owed John Doe a duty to honor the provisions in UC's 2015 Manual and/or UC Policies to discipline Jane Doe for violating anti-

retaliation provisions of UC Policies on filing false charges against fellow students; (b) UC breached these duties in its handling of John Doe's May 2016 Title IX Complaint and his complaint about the bad faith, false, and/or retaliatory nature of Jane Doe's June 2016 Title IX Policy; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

187.    As described in this Complaint: (a) UC owed John Doe a duty to honor the provisions in UC's 2015 Manual and/or UC Policies to subject Jane Doe and/or Roe to discipline for violating the confidentiality provisions of UC's 2015 Manual and/or UC's Policies; (b) UC breached these duties by not subjecting Jane Doe and/or Roe to said discipline for violating said polices; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

188.    As described in this Complaint: (a) UC owed John Doe a duty to honor UC's promises, contained in UC's Polices which including, but were not limited to, UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated in "all cases" of alleged sexual misconduct UC "is committed to providing a prompt, fair, impartial, and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent;" (b) UC breached these duties by not subjecting Jane Doe and/or Roe to said discipline for violating said polices; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

189.    As described in this Complaint: (a) UC owed John Doe a duty to honor UC's promises, contained in UC's Polices which including, but were not limited to, UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated CU's Policies would be implemented in a manner "consistent with federal, state, and local regulations governing non-discrimination and unlawful harassment including . . . Title IX,  (b) UC breached these duties in part by not subjecting Jane Doe and/or Roe to said discipline for engaging in retaliatory conduct and/or

gender based discrimination or harassment in violation of Title IX; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

190.    As described in this Complaint: (a) UC owed John Doe a duty to honor the provisions of UC's 2013 Manual and/or UC's Policies; (b) UC breached that duty by, by among other things, engaging in other breaches of UC's Policies not explicitly detailed in ¶¶ 183- 89; and (c) UC's breach of these duties is the cause in fact and legal cause of John Doe's injuries

191.    UC's negligence caused John Doe to be damaged in an amount to be determined at trial.

WHEREFORE, with regard to Counts 8-9, John Doe demands judgement against UC as follows:

(a) For actual, special, and compensatory damages, including John Doe's medical fees and legal fees, in an amount to be determined at trial but in no event less than $75,000.00;

(b) For punitive damages in an amount sufficient to deter UC from conducting similar future conduct but in no event less than $100,000;

(c) Order(s) requiring UC expunge John Doe's official UC files of all information related to his interactions with Jane Doe;

(d) Judgment for attorneys' fees, pursuant any applicable statute;

(e) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(f) Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

(g) Such other and further relief as this court may deem just, proper, equitable, and appropriate.

## Count 10 – Intentional Infliction of Emotional Distress
(against Jane Doe and UC)

192.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

193.    Jane Doe's conduct detailed in Counts 1-2 was truly extreme and outrageous.

194.    UC's conduct detailed in Counts 8-9 was truly extreme and outrageous.

195.    Jane Doe intended her conduct detailed in Counts 1-2 to inflict severe emotional distress, or knew there was at least a high probability that her conduct would cause severe emotional distress to John Doe.

196.    UC intended its conduct detailed in Counts 8-9 to inflict severe emotional distress, or knew there was at least a high probability that UC's conduct would cause severe emotional distress to John Doe.

197.    Jane Doe's conduct detailed in Counts 1-2 caused John Doe severe emotional distress which included, among other things, John Doe seeking assistance from healthcare professionals.

198.    UC's conduct detailed in Counts 8-9 caused John Doe severe emotional distress which included, among other things, John Doe seeking assistance from healthcare professionals.

199.    UC and/or Jane Doe's aforementioned conduct caused John Doe to be damaged in an amount to be determined at trial.

## **Count 11 – Negligent Infliction of Emotional Distress**
(against Jane Doe and UC)

200.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

201.    Jane Doe owed John Doe a duty to not engaged in the conduct detailed in Counts 1-2.

202.    UC owed John Doe a duty to not engaged in the conduct in Counts 8-9.

203.    Jane Doe breached the duties she owed John Doe to not engage in the conduct detailed in Counts 1-2 (and) this breach was the proximate cause of John Doe's damages which include, but were not limited to, severe emotional distress which caused, among other things, John Doe to seek assistance from healthcare professionals.

204.    UC breached the duties it owed John Doe to not engage in the conduct detailed in Counts 8-9 (and) this breach was the proximate cause of John Doe's damages which include, but were not limited to, severe emotional distress which caused, among other things, John Doe to seek assistance from healthcare professionals.

205.    UC and/or Jane Doe's aforementioned conduct caused John Doe to be damaged in an amount to be determined at trial.

WHEREFORE, with regard to Counts 10-11, John Doe demands judgement against UC and Jane Doe as follows:

(a) For actual, special, and compensatory damages, including John Doe's medical fees and legal fees, in an amount to be determined at trial but in no event less than $75,000.00;

(b) For punitive damages in an amount sufficient to deter Jane Doe and/or UC from conducting similar future conduct but in no event less than $100,000;

(c) Order(s) requiring UC expunge John Doe's official UC files of all information related to his interactions with Jane Doe;

(d) Judgment for attorneys' fees, pursuant any applicable statute;

(e) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(f) Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

(g) Such other and further relief as this court may deem just, proper, equitable, and appropriate.


Respectfully submitted,
Attorney for John Doe

By: /s/ Eric J. Rosenberg – pending *Pro Hac Vice*

Eric J. Rosenberg (0069958)
Tracy L. Turner (0069927)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
866.498.0811 fax
erosenberg@rosenbergball.com
tturner@rosenbergball.com
*Lead Attorneys for Plaintiff*


/s/Chad Nold

Chad Nold (6317549)
Daliah Saper (6283932)
Saper Law Offices, LLC

505 N. LaSalle St., Ste 350
(312) 527 – 4100
chad@saperlaw.com
ds@saperlaw.com
*Local Counsel for Plaintiff*

STATE OF ILLINOIS          :
                                      : SS,
COUNTY OF COOK         :

I, John Doe, after being first duly sworn, deposes and states that: (a) I am the John Doe identified in the Verified Complaint and that I have read the forgoing Verified Complaint; (c) that this verification is upon my own knowledge, information and belief, (d) that I believe the allegations in the forgoing Verified Complaint to be true, to the best of my knowledge, information, and belief, and (e) that I signed this Verification in front of a Notary Public with my real name, of which I seek leave to file this document under seal with this Court in a separate motion.

                                              /s/John Doe
                                                 John Doe