## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | Case No. 16-cv-08298 |
| Plaintiff | ) | |
| | ) | Judge Edmond Chang |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| **THE UNIVERSITY OF CHICAGO,** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

---

### JOHN DOE'S VERIFIED FIRST AMENDED COMPLAINT

---

### <u>NATURE OF THIS ACTION</u>

1.      This action was originally filed on August 24, 2016, *inter alia*, to restrain and enjoin Defendant, The University of Chicago ("UC" or "Defendant"), from proceeding with certain disciplinary proceedings (the "Proceedings") against Plaintiff John Doe ("John Doe" or "Plaintiff")[1] in violation of John Doe's rights under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, ("Title IX") and certain UC Policies pursuant to which UC was obligated to protect John Doe from sexual harassment and from wrongful retaliation under Title IX (the "Original Complaint").  UC's prosecution of the Proceedings was wrongful for at least the following reasons:

   a.   UC had failed and was continuing to fail, until the Original Complaint was filed, to

        prosecute John Doe's May 5, 2016 Title IX complaint (the "May 2016 Title IX

---

[1] Contemporaneously with the filing of the Original Complaint in this case, Plaintiff filed a motion to proceed under pseudonym which was granted by the Court *(Docket # 11)*.

Complaint") against fellow student Jane Doe ("Jane Doe") who had engaged in an online campaign which falsely alleged that John Doe sexually assaulted Jane Doe "and many other" females;

b.  UC had wrongfully encouraged and was continuing to prosecute Jane Doe's later-filed bad-faith, false and retaliatory June 2016 Title IX complaint against John Doe (the "June 2016 Title IX Complaint") even though Jane Doe's own public writings, which UC possessed, proved Jane Doe's allegations against John Doe were undeniably false;

c.  UC refused to acknowledge, as Plaintiff had repeatedly established, that Jane Doe's June 2016 IX Complaint violated Title IX's anti-retaliation provisions and/or UC's policies prohibiting the filing of false and retaliatory charges against fellow student John Doe; and

d.  UC was prosecuting the June 2016 Title IX Complaint pursuant to UC's 2015-16 Student Manual ("UC's 2015 Manual") despite the facts that: (a) Jane Doe's allegations involved conduct which supposedly occurred in 2013; (b) UC's 2015 Manual imposed highly stringent limitations on students' sexual interactions which were *not* contained in UC's 2013-14 Student Manual ("UC's 2013 Manual"); and (c) it would have been impossible for John Doe to know whether his consensual physical encounters with Jane Doe in 2013 might violate subsequently-created stringent mandates in UC's 2015 Manual.

2.      The Original Complaint alleged that UC was wrongfully subjecting John Doe to the Proceedings because of his male gender and as a consequence of the UC's anti-male gender-bias, which had created a hostile environment for John Doe as further detailed below.  The Original

Complaint also sought compensatory and punitive damages against UC for violation of Title IX and its own policies intended to protect John Doe, as well as damages for intentional and/or negligent infliction of emotional distress. The Original Complaint named Jane Doe as an additional defendant for defamation *per se*, defamation *per quod* and intentional and/or negligent infliction of emotional distress.

3.     At no time prior to the filing of the Original Complaint did UC acknowledge that: a) John Doe was entitled to have his May 2016 Title IX Complaint prosecuted against Jane Doe; b) Jane Doe's June 2016 Title IX Complaint was false and retaliatory and in violation of both Title IX and UC's policies; or c) Jane Doe's June 2016 Title IX Complaint (alleging conduct that had occurred nearly three years earlier) was required to be adjudicated, if at all, under UC's 2013 Manual. Instead of correcting these violations, UC rejected John Doe's attempts to assert his Title IX rights and at one point advised John Doe that his remedy against Jane Doe's unlawful harassment was to file a civil lawsuit against Jane Doe. As a result, John Doe had no choice but to file the Original Complaint seeking temporary, preliminary, and permanent injunctive relief and damages against both Jane Doe and UC.

4.     Immediately upon being served with the Original Complaint, UC acknowledged it had failed to adjudicate John Doe's May 2016 Title IX Complaint against Jane Doe as it should have done nearly three months earlier. Only after being served with the Original Complaint did UC acknowledge that Jane Doe's June 2016 Title IX Complaint could not be prosecuted under the more stringent definitions of UC's 2015 Manual, but rather must be adjudicated, if at all, under UC's 2013 Manual. UC also reversed the position it had taken at all times prior to filing the Original Complaint by representing to the Court that it would now consider John Doe's claim that Jane Doe's June 2016 IX Complaint had been filed in violation of Title IX's anti-retaliation

3

provisions and/or UC policies prohibiting the filing of false and retaliatory charges against fellow students. UC made each of these admissions against interest when it conceded in open Court that it would present John Doe's claims to be adjudicated simultaneously with Jane Doe's subsequently-filed complaint against John Doe before a single decision-making body.

5.     After Jane Doe learned UC intended to fulfill its obligations to John Doe by: (a) prosecuting his May 2016 Title IX Complaint against her; (b) admitting Jane Doe would be subjected to disciplinary proceedings for alleged violations of Title IX's and UC's prohibitions against filing false and retaliatory charges; and (c) adjudicating Jane Doe's June 2016 Title IX Complaint under UC's 2013 Manual instead of the 2015 Manual, Jane Doe and John Doe reached a settlement regarding John Doe's Original Complaint's counts against Jane Doe for defamation and intentional and/or negligent infliction of emotional distress (the "Settlement"). Prior to executing the Settlement, Jane Doe repeatedly requested the University in writing to withdraw her June 2016 Title IX Complaint against John Doe.

6.     In conjunction with the Settlement, Jane Doe executed and provided to John Doe a letter (Exhibit A to the Settlement) that clearly states: "Based on [Jane Doe's] personal knowledge, [John Doe's] conduct did not violate any of the University of Chicago's policies or the laws of the State of Illinois relating to sexual relations involving me or any other persons." A redacted copy of Exhibit A to the Settlement is attached to this First Amended Complaint as Exhibit 1.

7.     On information and belief,[2] if UC had conducted the "thorough and impartial investigation" required by UC's policies and Title IX at the time John Doe filed his May 2016

---

[2] "Information and belief" allegations in the Complaint are based, inter alia, on: (1) John Doe's previous court filings in this Proceeding and evidence and/or exhibits attached to this Complaint which provide a plausible basis for Plaintiff's "information and belief" allegations; (2) documentation submitted by Jane Doe during the Proceedings; and (3) John Doe's belief that Defendant possesses and/or controls additional evidence supporting Plaintiff's "information and belief" allegations that John Doe believes will be revealed in discovery.

Title IX Complaint, UC would have discovered the truth (*i.e.*, that at no time did John Doe assault Jane Doe or any other person) and the Proceedings against John Doe and the filing of the Original Complaint would have been completely unnecessary).

8.      On information and belief, if UC had properly apprised Jane Doe that: (a) UC was obligated to proceed on John Doe's May 2016 Title IX Complaint against her; (b) her June 2016 Title IX Complaint could subject her to disciplinary proceedings for filing a false and retaliatory complaint against a fellow student; and/or (c) UC's 2013 Manual would apply to her claims against John Doe, *Jane Doe never would have filed her June 2016 Title IX Complaint.*  Accordingly, the Proceedings and this entire lawsuit would have been avoided but for UC's unlawful conduct detailed in this Complaint.

9.      For his part, John Doe only agreed to withdraw his May 2016 Title IX Complaint against Jane Doe because John Doe's entire experience at UC, as detailed in this Amended Complaint, convinced him that UC's gender-biased, hostile environment against males like John Doe and UC's pattern and practice of: (a) subjecting male students who engage in consensual physical contact with female students to disciplinary procedures; (b) retaliating against male students who exercise their rights under Title IX; and (c) providing female students preferential treatment under UC's Title IX policies so as to prevent UC from rendering a fair and appropriate remedy at the University level for the damages inflicted on John Doe by Jane Doe and UC.

10.      On November 24, 2016 – nearly three months after the Original Complaint was filed and more than six months after John Doe's May 2016 Title IX Complaint against Jane Doe was instituted and wrongfully rejected by UC – UC finally agreed to stop the Proceedings.

11.      Notwithstanding UC's belated action to terminate the Proceedings (which never should have been instituted and which never would have been terminated but for UC forcing John

Doe to file the Original Complaint), John Doe has suffered and continues to suffer serious economic damages, injury to his reputation and future economic opportunities, severe emotional distress, and conscious pain and suffering as a result of UC's creation of a gender-biased, hostile environment against males and UC's specific breach of duties and promises to John Doe, as well as the intentional and/or negligent infliction of emotional distress inflicted upon John Doe by UC as further detailed below.

## FACTS

### The Parties and Non-Parties Essential to the Complaint

12.     John Doe is a domiciliary of Somers, NY.  At all relevant times John Doe was and remains a student in good standing at UC.

13.     On information and belief, UC is an Illinois non-profit corporation with a principal place of operation located in Chicago, Illinois.

14.     Non-defendant Jane Doe is a student at UC who engaged in a pattern of publishing public false and defamatory statements against John Doe long before Jane Doe ever filed the retaliatory, bad faith and false allegations contained in Jane Doe's June 2016 Title IX Complaint.

15.     Non-defendant Jane Roe ("Roe"), also a student at UC, was and is a close personal friend of Jane Doe.  Beginning in 2014, Roe asserted a similar false claim of assault against John Doe as detailed below.

### Jurisdiction and Venue

16.     This action arises under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, and Illinois common law. This Court has jurisdiction over this action by virtue of federal question jurisdiction pursuant to 28 U.S.C. § 1331 and the protection of civil rights pursuant to 28 U.S.C. § 1343.

17.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 on the basis that the matter involves complete diversity of citizenship between Plaintiff and Defendant who are citizens of different States and the amount in controversy exceeds $75,000.

18.     Court has personal jurisdiction over Defendant because UC resides and/or conducts business within the State of Illinois.

19.     Venue rests with this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

### The History of UC's Unlawful Conduct Toward John Doe

20.     John Doe's harm began after John Doe first prevailed in a disciplinary hearing conducted by UC of the false claim of assault asserted by non-defendant Roe in the spring of 2014 (the "Roe Claim").  Even though John Doe was completely exonerated in a disciplinary hearing on the Roe Claim, UC allowed Roe to continue to falsely accuse John Doe in public of assaulting her. A redacted copy of UC's letter dated June 2, 2014 reporting the results of the hearing on the Roe Claim is attached hereto as Exhibit 2.

21.     Dissatisfied with UC's disciplinary committee's exoneration of John Doe, Roe commenced a vendetta against John Doe that included placing John Doe's name on the so-called "Hyde Park List" in the fall of 2014.  This list purported to keep the "Hyde Park Community safe from people known to commit varying levels of gender-based violence…"  The list was distributed during orientation week of 2014 and placed on the website Tumblr.  Roe also falsely and maliciously advised members of the UC community that John Doe was a sexual predator.  In the aftermath of the Hyde Park List, upon information and belief, Roe also publicly lied about the outcome of the 2014 hearing by falsely telling UC students that UC found John Doe "guilty" at the May 2014 disciplinary hearing but UC had "failed to punish" John Doe.

22.     When the Hyde Park List was published, John Doe engaged in activities protected under Title IX by bringing Roe's gender based harassment to the attention of UC's employees involved in his earlier disciplinary process.   In response, UC retaliated against John Doe for asserting his rights under Title IX by warning John Doe that UC's "confidentiality" policies prohibited him from personally refuting Roe's defamatory gender based harassment within the UC community.  Moreover, UC refused to take disciplinary action against Roe even though Roe was violating UC's gender based harassment  policies related to the outcome of the disciplinary hearing the previous spring.

23.     Because UC refused to address Roe's sexual harassment and allowed her to retaliate against John Doe in violation of Title IX, Roe began to blog in October, 2014 that UC was forcing her to participate in class "with the person who sexually assaulted [her]."  UC students who had heard Roe's false allegations about John Doe knew Roe was referring to John Doe.

24.     Shortly thereafter, and over John Doe's strong objection, UC ordered John Doe removed from the physics lab that he and Roe were participating in.  In so doing, UC engaged in Title IX retaliation by: (a) taking an adverse action against a male student, John Doe, even though UC had found him innocent of Roe's false allegations; and/or (b) affirming the unlawful demands of a female student, Roe, whose allegations UC had previously determined were false.  UC's removal of John Doe, a male student, from his physics lab created a gender based hostile environment in part because UC knew Roe's false complaint against John Doe amounted to prohibited retaliation under Title IX.

25.     In the aftermath of the aforementioned blog post, Roe continued her sexual harassment and retaliation against John Doe without any attempt by UC to prevent Roe's conduct,

thereby enabling a hostile environment to be created against John Doe across UC's campus and into the wider Chicago theater community.

26.     Making matters worse, UC again retaliated against John Doe in November of 2014 when UC threatened to subject John Doe with potential disciplinary action for the alleged violation of a "No-Contact Directive" that was place in connection with Roe's initial false claim.  UC unlawfully alleged a right to discipline John Doe because Doe's adult sister responded – without John Doe's knowledge – to Roe's fallacious posts about John Doe on Twitter, by impeaching Roe's lies with Roe's own public writings.  Upon information and belief, UC's anti-male gender-bias detailed in this Amended Complaint caused UC to: (a) take this unlawful action, while (b) refusing to pursue any discipline of Roe who was a similarly situated female.

### Fall 2014: Jane Doe's Conduct

27.     On information and belief, Jane Doe is the individual account holder of the Twitter username "@[name omitted to protect Jane Doe's identity]" and runs a blog on Tumblr under the title "The Whore of [last word omitted to protect the identity of Jane Doe.]" A redacted copy of Jane Doe's relevant Twitter and Facebook posts are attached hereto as Exhibit 3.

28.     In Jane Doe's own vernacular, John Doe and Jane Doe "hooked up" on September 23, 2013 but never engaged in sexual intercourse.

29.     At no time in September 2013, or at any time thereafter did, did John Doe ever assault Jane Doe or engage in any non-consensual sexual activity.

30.     In November 2014, Jane Doe first began to mention in her blog that she had been "sexually assaulted" and her blog posts indicated that she had communicated to others her alleged assaulter was John Doe.  Then, on December 27, 2014, Jane Doe definitively identified John Doe as the person who allegedly assaulted her.   But, as Jane Doe's admissions against interest in ¶51

9

below definitively prove, Jane Doe's own text messages and blog posts make it absolutely certain that her assault allegations against John Doe were completely false.

31.     On information and belief, Jane Doe had been discussing and continued, until the filing of the Original Complaint, to discuss her false allegations of "sexual assault" by John Doe with other individuals who were neither: (a) employed by UC; nor (b) associated with any government or quasi-governmental agency tasked with a responsibility to investigate allegations of sexual misconduct. Nevertheless, John Doe initially decided to ignore Jane Doe's accusations in hopes that she would move on from their relationship and cease making such statements in the future.

## Spring 2016: Jane Doe's Conduct Regarding John Doe's Academic Opportunities and Defendant's Failure to Protect John Doe

32.     John Doe is majoring in Philosophy and Theatre and Performance Arts Studies ("TAPS") at UC.

33.     Part of the TAPS curriculum enables students to become involved in theatrical productions as actors, designers, directors, and production staff.  As part of his TAPS' program, John Doe undertook to direct a student-performed theater program entitled "The [name withheld to protect John Doe's identity]" (the "Show").  The Show was independent of other programs run under the auspices of the UC Theater (the "UT").

34.     Prior to the first performance of the Show, Jane Doe and others took a series of actions that were intended to interfere with John Doe's direction of the Show.

35.     For example, on or about May 4, 2016, Jane Doe published a series of messages on her Twitter account regarding John Doe's performance of the Show.

36.     These Tweets (included in Exhibit 3) alleged false, abusive, injurious, malicious,

offensive, defamatory, and gender based statements against John Doe, stating John Doe assaulted Jane Doe and many others, including:

      a.   "lol but why is UT putting on a show directed by the boy who assaulted me/many others on this campus"

      b.   "(just to reiterate its actually TAPS not UT, so don't go knocking down the doors of the wrong precious theater bbs)"

37.    Not only were the Tweets clearly aimed at John Doe, but Jane Doe's Facebook post on May 5, 2016 also specified that Jane Doe was referring to the Show and John Doe.

38.    Additionally, Jane Doe's intent to maliciously damage John Doe's reputation is clear given her specific clarification of the program putting on the Show being "TAPS not UT."

39.    As is clear from the Tweets, Jane Doe alleged that John Doe assaulted not only her, but also "many others on this campus," and [Jane Doe's] Tweets were designed to incite fellow students to "knock[] down the doors" of the theater in which John Doe was directing the Show.

40.    As of the filing of the Original Complaint, Jane Doe's Tweets were still widely available online for anyone to see. The Tweets were removed prior to the Settlement and are no longer available.

41.    Contrary to the statements published by Jane Doe in the Tweets, as confirmed in Exhibit A to the Settlement, John Doe has never assaulted Jane Doe or anyone else in any way.

42.    Based on Jane Doe's own writings, including but not limited to those detailed in part in ¶51 below, Jane Doe knew her false and malicious statements alleging John Doe assaulted her were absolutely false.

**May 2016: UC's Unlawful Rejection of John Doe's May 2016 Title IX Complaint and UC's Suggestion that John File a Lawsuit against Jane Doe**

43.    John Doe, upon learning of the harmful, deceitful, malicious, and gender based

Tweets, engaged in a protected activity by providing UC with his May 2016 Title IX Complaint. This complaint involved, but was not limited to, the Tweets and Facebook message circulated by Jane Doe. John Doe also apprised UC that, spurred on by Jane Doe's false, malicious and gender based campaign of slander, Jane Doe and her cohort were inciting others to knock down the doors of the theater in which the Show was being performed in order to disrupt the Show. John Doe notified UC of the students' intended unlawful conduct more than one week before the Show. A copy of John Doe's May 5, 2016 Notice alerting UC of Jane Doe's defamatory Tweets and the unlawful protest planned against the Show is attached hereto as Exhibit 4.

44.     In response to John Doe's May 2016 Title IX Complaint, UC's Dean of Students, Jay Ellison, informed John Doe that UC would investigate and take appropriate action against Jane Doe in accordance with UC's obligations under Title IX and UC's policies. The matter was referred to UC's Associate Dean for Disciplinary Affairs, Jeremy Inabinet ("Inabinet").

45.     On information and belief, Inabinet unlawfully determined that he would *not* accord John Doe the protections due John Doe under Title IX and UC policies. Inabinet intentionally and/or negligently made this determination not to take actions necessary to protect John Doe due in part because of Inabinet's and UC's gender-bias in affording female students preferential treatment under UC's Title IX procedures.

46.     Rather than take corrective actions required following John Doe's May 2016 Title IX Complaint, on information and belief, Inabinet met with Jane Doe on or about May 11, 2016 and intentionally and/or negligently encouraged and "approved" Jane Doe's filing of a false and retaliatory complaint against John Doe in violation of Title IX and UC's policies prohibiting the filing of such false and retaliatory charges against a fellow student.

47.     Inabinet further encouraged Jane Doe to file her false and retaliatory charge against

12

John Doe by intentionally and/or negligently advising Jane Doe that her false charges concerning conduct that allegedly occurred in 2013 would be adjudicated under UC's more stringent standards of the 2015 Manual, instead of the standards that were actually in existence under the 2013 Manual at the time the alleged conduct occurred.

48. On information and belief, if Inabinet had not intentionally and/or negligently failed to apprise Jane Doe that: (a) UC was obligated to proceed on John Doe's May 2016 Title IX Complaint against her; (b) her false and retaliatory June 2016 Title IX Complaint would subject her to disciplinary proceedings; and/or (c) UC's 2013 Manual would apply to her false and retaliatory claims, *Jane Doe never would have filed her June 2016 Title IX Complaint*.

49. On May 25, 2016, after encouraging Jane Doe to file a Title IX Complaint against John Doe, Inabinet informed John Doe of Inabinet's decision to deny John Doe the relief to which he was entitled in connection with the May 2016 Title IX Complaint. *See,* Exhibit 5. In making his determination, Inabinet intentionally and/or negligently decided that Jane Doe's conduct did not fall within UC's definition of harassment under Title IX because it was directed at John Doe, a male student, as opposed to a female student. Inabinet further advised John Doe that John Doe's remedies against Jane Doe were limited to filing a lawsuit against Jane Doe by writing:

> "Although statements made in good faith as part of University disciplinary proceedings are legally protected and should not be used as the basis for a defamation lawsuit, statements made outside of the proceedings lack that protection and could lead to a legal claim by a person who believes that the statements are false, identify him or her to others, or have harmed his or her reputation." *Id.*

50. Upon information and belief, UC's anti-male gender-bias caused Inabinet to refuse to pursue any discipline of Jane Doe and to retaliate against John Doe because UC treats similarly situated female students more favorably than male students with regard to Title IX complaints.

Further evidence of UC's and Inabinet's gender-bias was established in an August 5, 2016 telephone call between Inabinet and John Doe. Specifically, in the course of the telephone call, John Doe repeatedly asked Inabinet if he would have investigated the same conduct exhibited by Jane Doe if it had been exhibited by a male student against a female student. Inabinet refused to provide John Doe a direct answer. Moreover, Inabinet refused to alter any other position he had by then asserted on behalf of Jane Doe. Specifically, Inabinet reiterated that: (a) UC would not consider Jane Doe's June 2016 Title IX Complaint to have been filed in retaliation for John Doe's May 2016 Title IX Complaint; (b) the 2015 Manual's definition of sexual misconduct would be applied to conduct alleged to have occurred in 2013; and (c) John Doe would not even be allowed to raise his claims of harassment asserted in the May 2016 Title IX Complaint in response to Jane Doe's false and retaliatory June 2016 Title IX Complaint.

51.     Following the August 5, 2016 phone call, John Doe wrote to Inabinet requesting that UC reverse its position. In further support of his proof that Jane Doe's allegations were false and that she had only filed her June 2016 Title IX Complaint in retaliation and in bad faith, John Doe supplied Inabinet with Jane Doe's contemporaneous blog posts contained in Exhibit 3, which irrefutably disproved the allegations of the June 2016 Title IX Complaint, to wit:

      a.   Jane Doe described the sexual encounter with John Doe in September 2013 (that she subsequently claimed was a "sexual assault") as "beautiful and sweet and all great things"*;*

      b.   Jane Doe said she and John Doe went back to his room and hooked up. She said she went further than she'd "ever gone before which as gr8." and contemplates having "casual and open" relationships with both John Doe and another boy she liked (and according to her blog) made out with the next day.

14

c. Jane Doe also used the following hashtags in discussing the night she alleges to have been sexually assaulted "#best part is i have a hickey on my neck right before I'm headed to dc #luv lyfe #tmi???"

d. While blogging about John Doe, Jane Doe was also blogging about another male college student, who she liked better than John Doe (at the time). Yet, Jane Doe blogged—mere weeks after the alleged sexual assault—that she should have chosen John Doe over this other boy, stating: "I realized that [John Doe] seems to get me more and I don't have to try so hard to be cool around him, so wow isn't that what relationshippy things are???" However, John Doe told Jane Doe he was going to focus on his studies.

e. Approximately two months after the alleged sexual assault, Jane Doe blogged about wanting her relationship with John Doe back.

f. Jane Doe's renewed interest in John Doe continued to intensify in the fall and winter of 2013 following the alleged sexual assault. On November 23, 2013, Jane Doe blogged: "tipsy maybe idk [John Doe]'s so cute I kinda wanna tap that."

g. Shortly thereafter she blogged: "ugh so [John Doe] was on jeopardy when he was a lil bab (11 or 12) and he looked SO CUTE BABY ARG like wow I want a small one of those he's so cute wowowowowow."

h. In December, Jane Doe worked to renew the relationship with John Doe to the point where the two discussed moving into an intimate relationship that would involve sexual intercourse. Jane Doe was willing to make this progression with John Doe, but he told her he was still in love with his ex-girlfriend and declined bringing the relationship to a level in which sexual intercourse would be involved. This angered

15

Jane Doe.

    i. Nonetheless, with the new year, Jane Doe blogged about John Doe in January 2014: "ugh sometimes I think about how badly i fricked up with [John Doe] and get upset because he was so great and really understood me and we connected at a great leave but I let my interest in [the other guy] get in the way of something that could have been amazing for me."

    j. In fact, throughout January 2014, Jane Doe blogged about John Doe and her interest in having a romantic relationship with him.

    k. But then, Jane Doe learned that John Doe had become involved with another student was very upset and angry.

52. Inabinet should have exercised his discretion and dismissed Jane Doe's June 2016 Title IX Complaint against John Doe in part because: (a) Jane Doe's contemporaneous writings proved her complaints against John Doe were false; and (b) Inabinet knew the allegations in Jane Doe's complaint that John Doe sexually assaulted Jane Roe lacked merit because UC had previously determined the preponderance of the evidence proved Jane Roe's allegations were false. Instead, Inabinet intentionally or negligently: (a) launched the unlawful and/or gender-biased disciplinary Proceedings against John Doe, a male student, while (b) refusing to launch any disciplinary proceedings against female students Jane Doe and Jane Roe even though John Doe presented evidence that both were violating UC policies.

53. For nearly three weeks following the August 5 phone call and John Doe's submission of evidence proving the June 2016 Title IX Complaint was false and retaliatory, Inabinet refused to change any of UC's positions as specified in ¶50, above. With the deadline for responding to Jane Doe's false and retaliatory June 2016 Title IX Complaint set for August 24, 2016, John Doe had

no alternative but to file the Original Complaint which: (a) sought an injunction to stop the Proceedings; (b) required UC to adjudicate the June 2016 Title IX Complaint, if at all, under the 2013 Manual, and (c) force UC to address John Doe's May 2016 Title IX Complaint and John Doe's assertion that the June 2016 Title IX Complaint constituted unlawful retaliation in violation of Title IX and UC Policies. Only upon being served with the Original Complaint did UC acknowledge it was obligated to investigate and pursue John Doe's May 2016 Title IX Complaint and John Doe's assertion that the June 2016 Title IX Complaint constituted unlawful retaliation in violation of Title IX and UC Policies. Similarly, after receiving the Original Complaint, UC conceded in open Court that it was obligated to apply the 2013 Manual to the June 2016 Title IX Complaint, even though Inabinet had consistently refused to acknowledge this requirement at all times prior to the filing of the Original Complaint.

### Facts Establishing that UC's Title IX Policies are Impermissibly Biased Against Males and Have Created a Hostile Environment for John Doe

54. On April 11, 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") sent a "Dear Colleague" letter to colleges and universities with instructions on how to comply with Title IX when investigating and resolving complaints of sexual misconduct. ("2011 Dear Colleague Letter"). The 2011 Dear Colleague Letter:

a. states: "1 in 5 *women* are victims of completed or attempted sexual assault while in college' . . . [a]dditionally, the likelihood that a *woman* with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population. The Department is deeply concerned about this problem . . . .";

b. warns that "the majority of campus sexual assaults occur when *women* are incapacitated, primarily by alcohol." ;

c. suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against *Women* which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability. . . ."; and

d. warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs." In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs.

55. In order to provide females preferential treatment, the 2011 Dear Colleague Letter also imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves. For example, the 2011 Dear Colleague Letter required schools adopt the lowest burden of proof – "more likely than not" - in cases involving sexual misconduct, including assault.

56. OCR further directed colleges such as UC to adopt anti-male policies and procedures by advising that such schools:

a. Must not require a complainant to be present at sexual misconduct disciplinary hearings;

b. May decide to eliminate all opportunities for "cross-examination;" and

c. Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event."

57. UC adopted the Dear Colleague Letter's and the OCR's suggested procedures even though neither the 2011 Dear Colleague Letter nor the OCR's recommended procedures were subject to notice-and-comment rulemaking, and therefore do not have the force of law.

58. UC adopted the anti-male provisions of the 2011 Dear Colleague Letter in part because it had become ensnared in an investigation by OCR because of UC's prior handling of sexual assault and harassment complaints. DOE's scrutiny of UC intensified on or about February 3, 2016, when the DOE opened two additional investigations at UC for possible violations of Title IX over the handling of sexual violence and harassment complaints. Upon information and belief, DOE's investigations of UC stemmed from complaints filed by females who alleged UC was not

adequately addressing complaints by female students who alleged male students engaged in sexual misconduct. Information supporting this belief, includes, but is not limited to OCR's previous investigations which primarily involve females alleging the universities they attend condone sexual harassment and/or sexual violence by males. These complaints by female students have triggered OCR investigations of academic institutions which include, but are not limited to: (i) the University of Virginia; (ii) Southern Methodist University; (iii) Yale University; (iv) George Washington University; (v) Tufts University; and (vi) the University of Montana in Missoula. *See generally,* http://www2.ed.gov/documents/press-releases/university-virginia-letter.pdf; (containing OCR's letter to the University of Virginia regarding OCR's Title IX investigation);http://www2.ed.gov/documents/press-releases/southern-methodist-university-letter.pdf; containing OCR's letter to Southern Methodist University regarding OCR's Title IX investigation); http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-a.html (containing OCR's letter to Yale University regarding OCR's Title IX investigation). http://www2.ed.gov/about/offices/list/ocr/docs/investigations/11112079-a.pdf (containing OCR's letter to George Washington University regarding OCR's Title IX investigation). http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-a.html (containing OCR's letter to Tufts University regarding OCR's Title IX investigation)

59. At all times relevant to this Complaint, UC's investigations by DOE's OCR were ongoing. Upon information and belief, during these investigations, OCR pressured UC to equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

60. Upon information and belief, DOE/OCR's investigations contributed to UC's decision to provide preferential treatment to female students who accuse males of sexual

misconduct in part because UC feared that OCR would impose civil penalties and/or suspend UC from participating in federal student financial aid programs. Information supporting this belief includes, but is not limited to, information John Doe detailed in his Original Complaint in Docket 1.

61.     For UC, the withdrawal of federal funding would have meant the loss of approximately $3,000,000 in Pell Grants and over $8,600,000 in Federal Student Loans in 2015. *generally,*     http://nces.ed.gov/collegenavigator/?q=university+of+chicago&s=all&id=144050 (accessed 8/21/16).

62.     Adhering to the provisions of the 2011 Dear Colleague Letter and OCR pressure convinced UC to: (a) aggressively prosecute males accused of sexual misconduct; (b) severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence, and (c) equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

63.     Upon information and belief, OCR pressured UC to change its burden of proof for sexual misconduct offenses from clear and convincing to a preponderance of the evidence standard. Upon information and belief, UC agreed to this change to make it easier to: (a) find accused male students responsible in sexual misconduct cases, even if it meant depriving these accused male students of their Constitutional rights; and (b) equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government.

64.     Therefore, upon information and belief, pressure from governmental agencies such as OCR/DOE and/or internal forces at UC caused UC to apply its Title IX policies in an unlawful and gender-biased manner against John Doe. Information supporting this belief includes, but is

not limited to, UC's adherence to the principles established by two groups: (a) the Association of Title IX Administrators ("ATIXA"); and (b) the National Center for Higher Education Risk Management ("NCHERM").   For example, Inabinet is employed as a consultant for NCHERM and affiliated with ATIXA.  As set forth in Exhibit 6, Inabinet consults with universities and counsels them to comply with recommendations from NCHERM and ATIXA in matters such as drafting Title IX policies, handling campus sexual assault investigations and the resulting "backlash."

65.    Upon information and belief, UC hired Inabinet because his affiliations with NCHERM and ATIXA eased relations with students who were protesting UC's handling of sexual assault allegations and helped UC to avoid negative publicity arising out of criticism from the student body and the press. http://www.chicagoreader.com/chicago/university-of-chicago-rape-culture-sexual-assault/Content?oid=19237712 (accessed 8/21/16).

66.    In carrying out his responsibilities at UC, Inabinet draws on the principles of ATIXA and NCHERM in implementing Title IX policies and handling campus sexual assault investigations.

67.    However, the facts detailed in this Amended Complaint prove Inabinet and UC embrace NCHERM's gender-bias views against male students wrongfully alleged to have engaged in sexual misconduct which include, but are not limited to:

   a. NCHERM uses the feminine pronouns when referring to the victim of alleged sexual misconduct.  *See Exhibit 7* (containing pages from NCHERM's website);

   b. NCHERM uses masculine pronouns when referring to the student accused of perpetrating allegations of sexual misconduct, referring to them as "the usual suspects"; *Id.*

c. NCHERM alleges the burden of proof regarding whether a female student consented to sexual contact should be placed on the male student because: "[t]he core of consent is the right of the victim to be unmolested until *she* gives clear permission for sexual activity to take place-what [we]I call sexual sovereignty;" *Id.* and

d. NCHERM's bias in favor of female victims is reflected in an Open Letter from the NCHERM Group which states: ". . . our experience suggests victims tell the truth." *See, Exhibit 8* (containing NCHERM's Open letter).

68.     Similarly, the facts detailed in this Amended Complaint demonstrate that UC explicitly and/or implicitly incorporates ATIXA's approach creating gender-biased procedures as set forth in ATIXA's Whitepaper which states: "victims have historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically women, equity may require institutions to recalibrate the pendulum to right the historical imbalance. An equitable process on many campuses will force a victim focus, but only as a casualty of history." www.ncherm.org/.../2012/01/2014-Whitepaper-FINAL.pdf (accessed 8/21/16).

69.     ATIXA's Whitepaper also encouraged UC to limit the due process rights of males accused of sexual misconduct by stating: (a) "[a] hearing became a panel . . . [t]he panel afforded presumptions of innocence, rights to attorneys, rights to remain silent. Rights, rights, rights. But, we forgot about victims along the way." and (b) OCR's 2011 Dear Colleague Letter "indicated that we must deconstruct part of the due process castle . . . [and ensure the] complainants should be inconvenienced only as far as absolutely required to remedy the discrimination." *Id.,* pages 5, 13-14.

70.     Upon information and belief, UC's decision to create a hostile environment for male students such as John Doe is evidenced in part by UC's embrace of the "Clothesline Project." *See e.g.,* http://www.chicagoreader.com/chicago/university-of-chicago-rape-culture-sexual-assault/Content?oid=19237712 (accessed 8/21/16); https://thinkprogress.org/university-of-

chicago-alumni-demand-sexual-assault-reform-saying-nothing-has-changed-in-decades-
18aaa57b229#.48zwib746                 (accessed                 8/21/16);
http://chicago.cbslocal.com/2014/09/25/university-of-chicago-students-protest-rape-threat-from-
hackers/ (accessed 8/21/16).

71.    Upon information and belief, UC embraced the "The Clothesline Project" as part
of UC's intent to: (a) afford preferential treatment to females instead of implementing a gender
neutral approach to alleged sexual misconduct; and/or (b) create a hostile environment for male
students like John Doe.   Evidence supporting this belief includes, but is not limited to, the
following information contained on The Clothesline Project's Website's webpage dedicated to
detailing the "History of the Clothesline Project:"

a)  The Clothesline Project's events are designed to develop "provocative 'in-your-
    face' educational and healing tool[s]" that "break the silence and bear witness to
    _one issue – violence against women_." *Exhibit 9*, p. 1 (containing the "History of the
    Clothesline Project" from The Clothesline Project's Website) (emphasis added);

b)  "Survivor = _A woman_ who has survived intimate personal violence such as a rape,
    battering, incest, child sexual abuse;" *Id.,* p.1 (emphasis added), and;

c)  Victim = _A woman_ who has died at the hands of her abuser; *Id.,* p.2 (emphasis
    added).

72.    According to a September 16, 2016 interview with UChicago News – contained in
Exhibit 10 - UC's then Title IX Coordinator Sarah Wake discussed how the "Clothesline Project;"
"Phoenix Survivors Alliance;" and the "Red Flag Campaign" shape UC's views on how UC
addresses Title IX issues.

73.    Upon information and belief, UC's involvement with the "Phoenix Survivors
Alliance" evidences UC's intent to: (a) afford preferential treatment to females instead of
implementing a gender-neutral approach to alleged sexual misconduct; and/or (b) create a hostile
environment for male students like John Doe.   Evidence supporting this belief includes, but is not

limited to, the UC chapter of Phoenix Survivors Alliance's bylaws which identify its "purpose" as "encourage[ing] an active dialogue on and an engagement with women s *[sic]* and gender issues, and to promote initiatives and leadership in this field." *See, Exhibit 11* (containing UC's Phoenix Survivors Alliance Chapter's bylaws and pages from UC's website regarding UC's Phoenix Survivors Alliance Chapter). In addition, as the "parent organization" of the Phoenix Survivors Alliance, UC maintains "in an effort to provide survivor-centered support, we believe that": (a) "Sexual Violence is never the survivor's fault;" (b) "[t]he survivor's story should be believed"; and (c) "[o]ur goal is to return power and agency to the survivor by providing them the information and support to make decisions based upon their own needs and priorities. *Id.*

74. Upon information and belief, UC's involvement with the "Red Flag Campaign" evidences UC's intent to: (a) afford preferential treatment to females instead of implementing a gender neutral approach to alleged sexual misconduct; and/or (b) create a hostile environment for male students like John Doe. Evidence supporting this belief includes, but is not limited to, UC's embrace and the anti-male "Red Flag Campaign" stereotypes detailed in Exhibit 12.

75. Upon information and belief, UC's sponsoring of the showing of the film "The Hunting Ground" evidences UC's intent to: (a) afford preferential treatment to females instead of implementing a gender neutral approach to alleged sexual misconduct; and/or (b) create a hostile environment for male students like John Doe. In promoting the film, UC described the "The Hunting Game" as a "startling expose of rape crimes on U.S. campuses, institutionalized cover-ups and the brutal social toll on victims . . . the film follows survivors as they pursue their educations while fighting for justice – despite harsh retaliation, harassment and pushback on every level. *See e.g., Exhibit 13.* The film's showing was followed by panel discussion about

"transforming rape culture" on UC's campus.    *Id.*   But, as detailed in items 1-4 below, "The Hunting Ground" has been widely criticized for anti-male bias:

(1)  Nineteen Harvard University professors denounced the film as "*propaganda*" that paints "a seriously false picture of general sexual assault phenomenon at universities and or our student Branon Winston in part because "Harvard University School Faculty concluded after extensive review of the facts that there was insufficient evidence to support the [sexual assault] charges made against him" by the female profiled in the Hunting Ground. *See, Exhibit 14 (containing Harvard University Law School's Nov. 11, 2015 Press Release);*

(2)  The National Review noted the film was "highly misleading if not dishonest" in its portrayal of sexual assaults of male students by their male counterparts.   In discussing this anti-male bias, the article states: *"[w]e don't operate the same way as journalists — this is a film project very much in the corner of advocacy for victims, so there would be no insensitive questions or the need to get the perpetrator's side."  See,*   The Hunting Ground co-producer Amy Herdy; http://www.nationalreview.com/article/427166/hunting-ground-smoking-gun-e-mail-exposes-filmmaker-bias-against-accused (accessed 1/4/17);

(3)  Numerous news outlets detailed in part how the file features three women, whose claims of sexual assault were later largely discredited, including in one case fabricating evidence (a bloody condom that when eventually tested contained DNA of another male who was not the alleged assailant);   *See*, http://www.slate.com/articles/news_and_politics/doublex/2015/06/the_hunting_ground_a_closer_look_at_the_influential_documentary_reveals.html   (accessed 1/4/17);   http://www.nationalreview.com/article/415269/cinematic-railroading-jameis-winston-stuart-taylor-jr   (accessed   1/4/17),   and http://www.thedailybeast.com/articles/2015/02/03/columbia-student-i-didn-t-rape-her.html (accessed 1/4/17); and

(4)  The film repeats the false claim that one in five college women are sexually assaulted in college even though the U.S. Department of Justice reports a woman's risk is less than one percent (0.61%) each year.  *See e.g., Docket 1, PageId.21-22* (discussing the U.S. Department of Justice's finding that only .61% of female college students are sexually assaulted during their college years).

76.    UC's unlawful actions and/or gender-bias created a hostile environment, which in turn created an adverse educational setting in violation of Title IX, because UC engages in sex stereotyping discrimination based on unlawful notions of masculinity and femininity. This hostile environment causes innocent males on UC's campus, including John Doe, to be unlawfully

disciplined, while denying males the ability to participate in or benefit from various activities including learning on campus.

77. Altogether, UC's history of dealing with John Doe following his exoneration on the Roe Complaint, its refusal to protect John Doe from the false allegations of Jane Roe and Jane Doe in the two years prior to instituting this lawsuit, its refusal to act on John Doe's May 2016 Title IX Complaint, its institution of the Proceedings and UC's categorical refusal to alter any of its positions prior to the filing of the Original Complaint manifest UC's pattern and practice of: (a) providing preferential treatment to females – like Jane Doe – who falsely allege they were sexually assaulted by male students; and (b) imposing presumptions against male students – like John Doe – who are falsely accused of sexual misconduct. In addition, this Amended Complaint has demonstrated the Proceedings were motivated by UC's pro-female, anti-male bias which was, at least in part, adopted to refute criticism within the student body and public press that UC was turning a blind eye to female complaints of sexual assault. As demonstrated by the Settlement, neither the Proceedings nor this lawsuit would have been necessary if UC had implemented its policies and Title IX's requirements in a gender-neutral and unbiased manner.

78. As a result of UC's anti-male bias detailed in this Amended Complaint (and established by the wrongful conduct of the Proceedings), UC decided to prosecute Jane Doe's June 2016 Title IX complaint against John Doe while rejecting: (a) John Doe's May 2016 Title IX Complaint against Jane Doe; and (b) John Doe's complaint regarding the bad faith, false, and retaliatory nature of Jane Doe's June 2016 Title IX Complaint.

79. In adopting the anti-male, gender-biased policies and procedures for addressing complaints of sexual assault, UC attempted to avoid negative publicity. Instead, it created an environment in which female students like Jane Doe and Jane Roe were encouraged to make

baseless claims of sexual assault against innocent males with impunity and without fear of suffering adverse disciplinary action, which they actually and wrongfully made against John Doe *until the day he filed the Original Complaint.*

80.     UC's anti-male, gender-biased policies are further evident in UC's failure, following John Doe's May 2016 Title IX Complaint, to take action against any of the students who interrupted John Doe's performance of The Show based on the false allegations of assault circulated by Jane Doe.

81.     In addition to Inabinet's failure to take appropriate action on John Doe's May 2016 Title IX Complaint, this Amended Complaint and the Proceedings detail how Inabinet: (a) encouraged and approved Jane Doe's false and retaliatory June 2016 Title IX Complaint against John Doe; (b) sought to increase the likelihood that John Doe would be found responsible by repeatedly rejecting John Doe's requests to redact highly prejudicial, irrelevant, and false allegations contained in Jane Doe's June 2016 Title IX Complaint; and (c) sought to increase the likelihood that John Doe would be found responsible by repeatedly requiring John Doe redact information from his complaints against Jane Doe which Inabinet found objectionable.

**Facts Relating to John Doe's Promissory Estoppel and
Tort Claims against UC**

82.     Despite being made aware of UC students' plans to violate UC policies by engaging in retaliatory and sexually harassing behavior aimed at John Doe and his performance of the Show, UC refused to prevent any of the students known to be planning the disruption from interrupting the Show.  UC's failure to provide security in the face of a known threat of disruption enabled these students to videotape their demonstration at the Show and place the video on the internet.  In so doing, UC allowed its students to violate UC's 2015 Manual which contained promises that

27

required UC to prevent the students from interfering with The Show and/or disciplined the students who engaged in the disruptive behavior.

83.     Specifically, UC's 2015 Manual promised John Doe that it would protect John Doe in the event of "…circumstances in which behavior so violates our community's standards that formal University intervention may be appropriate."  UC's 2015 Manual states UC's standards are violated when a student: "falsely defames a specific individual, that constitutes a genuine threat or harassment, that unjustifiably invades substantial privacy or confidentiality interests, or that is otherwise directly incompatible with the functioning of the University."

84.     UC's 2015 Manual also promised that, in *all cases of alleged misconduct*, UC "is committed to providing a prompt, fair, impartial, and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent."

85.     Similarly, UC's 2015 Manual promised John Doe that it would prohibit retaliation against students like John Doe who participate in protected activities such as the filing of the May 2016 Title IX Complaint.

86.     UC's 2015 Manual also promised John Doe that it would maintain the confidentiality of disciplinary proceedings such as the one undergone by John Doe in the spring of 2014.

87.     UC violated all of the foregoing promises by:

    a.  Allowing Jane Roe to repeatedly breach UC's confidentiality requirements with respect to the spring 2014 disciplinary hearings in which Roe falsely asserted that John Doe had sexually assaulted her and that UC had taken no actions against John Doe;

    b.  Refusing to protect John Doe's performance of the Show despite the knowledge

that an unlawful disruption was planned based upon, among other things, the false and defamatory accusations of Jane Doe; and

c. Allowing and encouraging Jane Doe to file her false and retaliatory June 2016 Title IX Complaint while simultaneously refusing to investigate or prosecute John Doe's previously filed May 2016 Title IX Complaint, which was a protected act under Title IX.

88. Simply put, this Amended Complaint, as with the Proceedings to which UC unnecessarily and wrongfully subjected John Doe, prove that notwithstanding UC's promises not to entertain false, bad faith and/or retaliatory complaints against those that engage in protected activities, UC allowed the prosecuting of Jane Doe's 2016 Title IX Complaint and would have continued to prosecute the Proceedings but for the filing of the Original Complaint in this lawsuit.

89. For, immediately upon being served with the Original Complaint, UC acknowledged its failure to adjudicate John Doe's May 2016 Title IX Complaint as it should have done nearly three months earlier. Only after being served with the Original Complaint did UC acknowledge that Jane Doe's June 2016 Title IX Complaint could not be prosecuted under the more stringent definitions of UC's 2015 Manual, but rather must be adjudicated, if at all, under UC's 2013 Manual. UC also reversed the position it had taken at all times prior to filing the Original Complaint by representing to the Court that it would now consider John Doe's claim that Jane Doe's June 2016 IX Complaint had been filed in violation of Title IX's anti-retaliation provisions and/or UC policies prohibiting the filing of false charges against fellow students and present John Doe's claims to be adjudicated simultaneously with Jane Doe's June 2016 Title IX Complaint before a single decision-making body.

90.     And, as detailed in part in Paragraphs 5-8 above, the Proceedings and the Original Complaint would have been unnecessary if it were not for: (a) UC's negligent or intentional malfeasance; and/or (b) UC's pattern and practice of: (i) disciplining male students who engage in consensual physical contact with female students; (ii) retaliating against male students; and (iii) providing female students preferential treatment under UC's Title IX policies.

91.     Notwithstanding UC's belated action to terminate the Proceedings (which never should have been instituted and which never would have been terminated but for UC forcing John Doe to institute this lawsuit), John Doe has suffered and continues to suffer serious economic damages, injury to his reputation and future economic opportunities, severe emotional distress, and conscious pain and suffering as a result of UC's creation of a gender-biased, hostile environment against males and its specific breach of duties and promises to John Doe, as well as its intentional and/or negligent infliction of emotional distress upon John Doe for which he has been required to seek and will continue to seek professional medical treatment at great personal expense.

## **Damages Suffered by John Doe**

92.     As a result of UC's conduct detailed in this Amended Complaint, UC inflicted at least the following types of compensable damages and harm on John Doe:

a.  During the two years prior to August 24, 2016, UC denied John Doe his rights to enjoy educational opportunities in an environment free from unlawful sexual harassment and retaliation for John Doe's previous participation in protected activities under Title IX and/or UC's policies;

b.  For more than three months prior to August 24, 2016, UC denied John Doe's right to seek disciplinary proceedings against Jane Doe based on her publishing of false and defamatory statements intended to harass him within the UC community;

c.  For nearly five months UC subjected John Doe to the unlawful disciplinary Proceedings in violation of Title IX and UC's policies which would have prevented the prosecution of Jane Doe's false and retaliatory June 2016 Title IX Complaint;

d. Each of the foregoing harms would continue to date but for UC's forcing John Doe, at considerable financial expense, to institute the present lawsuit;

e. Throughout each of the foregoing periods, UC caused John Doe to suffer continuing extreme emotional trauma, as further detailed in affidavits previously submitted to the Court under seal (Docket No. 34) for which John Doe has received and continues to receive professional medical treatment incurring great expense;

f. UC has created an unlawfully hostile and/or abusive environment at UC for John Doe by maintaining anti-male, gender-biased policies and refusing to apply disciplinary standards to female students in the same manner as applied to male students; and

g. UC has damaged John Doe's good name, reputation, honor and integrity through its failure to prevent Jane Roe and Jane Doe from continuing to falsely allege John Doe assaulted them and other females and by subjecting John Doe to the unlawfully biased disciplinary Proceedings that would not have ended but for the institution of this lawsuit.

### Count 1 -- Violation of Title IX
### Hostile Environment Sexual Harassment and/or Discrimination

93. John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Amended Complaint as though fully rewritten herein.

94. Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

95. Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination based on sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

31

96.     UC receives federal financial assistance and is thus subject to Title IX.

97.     Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

98.     Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

99.     Title IX mandates UC afford equitable procedures and due process to John Doe, a qualified male student of UC, which includes, but is not limited to: (a) having proper jurisdictional authority to conduct an investigation; (b) providing adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence, and/or (c) that UC employees involved in the conduct of the procedures have adequate training.

100.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit, UC knew, or in the exercise of due care should have known, that the June 2016 Title IX Claim submitted by Jane Doe was false and retaliatory, and UC therefore lacked jurisdiction under Title IX and UC Policies to prosecute John Doe for his consensual physical encounter with Jane Doe.

101.    Upon information and belief, UC knew, or in the exercise of due care should have known, that its employees, including but not limited to Inabinet, received gender-biased training regarding Title IX which caused them to violate UC policies and Title IX rights in part by equating

"complainants" in sexual misconduct proceedings as being females who must receive preferential treatment over their male counterparts.

102.    UC's policies and/or UC's gender-biased implementation of these policies, fail to meet the standards required by Title IX and/or safeguards as interpreted by United States' courts regarding how institutions of higher education must conduct disciplinary proceedings. As a result, John Doe has suffered the adverse actions detailed herein, which include but are not limited to interference with his education, harm to his reputation, and retaliation.

103.    Upon information and belief, in virtually all cases of campus sexual misconduct by UC students, the accused student is male and the accusing student is female.

104.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit, UC created an environment in which male students accused of sexual assault, such as John Doe, are fundamentally denied rights owed under UC policies as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male UC students like John Doe of educational opportunities based on their gender. Upon information and belief, UC has, at least in part, adopted such discriminatory policies to refute criticism within the student body and public press that UC is turning a blind eye to female complaints of sexual assault and out of fear of losing federal student aid.

105.    Upon information and belief, UC's investigation and/or discipline of John Doe was taken in order to demonstrate to DOE / OCR and/or the general public that UC is: (a) aggressively disciplining male students accused of sexual assault; and (b) providing females involved in sexual misconduct proceedings with preferential treatment not provided to males.

106.    UC has actual or constructive knowledge that UC's disciplinary Proceedings against John Doe posed a pervasive and unreasonable risk of gender discrimination with regard to John Doe.

107.    UC's actions and inactions detailed in this Amended Complaint set in motion a series of events that UC knew, or reasonably should have known, would cause male UC students, such as John Doe, to suffer unlawful gender discrimination.

108.    UC's actions and inactions detailed in this Amended Complaint set in motion a series of events that UC knew, or reasonably should have known, would cause male UC students, such as John Doe, to suffer a hostile environment based on gender in part by subjecting male students to disciplinary hearings which do not satisfy UC Policies' disciplinary hearings threshold criteria.

109.    UC's disciplinary Proceeding against John Doe was discriminatory and based upon or motivated by John Doe's male gender.

110.    The male gender discrimination by UC against John Doe includes, but is not limited to, providing preferential treatment to Jane Doe.  This preferential treatment includes, but is not limited to: (a) prosecuting Jane Doe's 2016 Title IX Complaint even though UC knew or should have known this claim did not satisfy UC Policies' disciplinary hearings threshold criteria; (b) rejecting John Doe's repeated requests that UC prosecute John Doe's May 2016 Title IX Complaint until John Doe requested an injunction from this Court even though UC had a preexisting duty to prosecute John Doe's May 2016 Title IX Complaint in May of 2016; (c) prosecuting Jane Doe's 2016 Title IX Complaint *before* prosecuting John Doe's pre-existing May 2016 Title IX Complaint; (d) seeking to adjudicate Jane Doe's 2016 Title IX Complaint *before* adjudicating the retaliatory, bad faith, and false allegations in Jane Doe's June 2016 Title IX

Complaint; and (e) taking such actions without the fair, impartial and thorough investigation which would have proved Jane Doe's 2016 Title IX Complaint did not satisfy UC Policies' disciplinary hearings threshold criteria. Accordingly, the preferential treatment served no objectively rational, non-discriminatory purpose based on the evidence.

111. UC employees, including but not limited to Inabinet, unlawfully failed to exercise the authority to institute corrective measures to remedy UC's violations of John Doe's rights under UC policies, Title IX, and/or guidance promulgated by OCR.

112. UC employees, including but not limited to Inabinet, exhibited deliberate indifference based on gender-bias by refusing to remedy UC's violations of John Doe's rights under UC Policies, Title IX, and/or guidance promulgated by OCR.

113. UC's deliberate indifference caused John Doe to suffer sexual harassment, retaliation, and/or discrimination so severe, pervasive or objectively offensive that it deprived John Doe of access to educational opportunities or benefits and caused other harm and damages detailed above.

114. Upon information and belief, UC possesses additional documentation evidencing UC's unlawful pattern of gender-biased decisions to provide preferential treatment to female students over male students like John Doe who are falsely accused of sexual assault.

115. Upon information and belief, UC possess additional documentation evidencing UC's refusal to discipline female students who were alleged to have sexually assaulted or harassed male students or who have filed false charges of assault against innocent male students.

116. UC's violations of Title IX caused John Doe to be damaged in an amount to be determined at trial.

### Count 2 -- Violation of Title IX
### Retaliation

35

117.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Amended Complaint as though fully rewritten herein.

118.    As described in part in Paragraphs 20-26, 43-50 and 85-91 of this Amended Complaint, and as manifested in the Proceedings, UC violated Title IX's anti-retaliation prohibitions by taking adverse actions against John Doe.

119.    UC took adverse actions against John Doe because of his protected activities detailed in part in Paragraphs 20-26, 43-50 and 85-91 of this Amended Complaint and in the other documents previously submitted in this lawsuit.  These protected activities include, but are not limited to John Doe's: (a) participating in the disciplinary proceeding regarding Jane Roe's false allegations; (b) engaging in activities related to John Doe's May 2016 Title IX Complaint; (c) protesting the retaliatory nature of Jane Doe's June 2016 Title IX Complaint; (d) defending himself against the false allegations contained in Jane Doe's June 2016 Title IX Complaint; and/or (e) defending himself against Jane Roe's false and retaliatory claims.

120.    UC employees, including but not limited to Inabinet, possessed actual or constructive knowledge of John Doe's protected activities under Title IX.

121.    Upon information and belief, UC possesses communications evidencing UC's Title IX retaliation against John Doe.

122.    UC's violations of Title IX caused John Doe to be damaged in an amount to be determined at trial.

## Count 3 -- Violation of Title IX
### Selective Enforcement

123.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Amended Complaint as though fully rewritten herein.

124.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit, UC violates Title IX's prohibitions against engaging in the "selective enforcement" of UC's policies on the basis of gender.  Selective enforcement theory requires that the school's decision to initiate the proceeding was affected by the student's gender without regard to guilt.

125.    UC's conduct toward John Doe as specified in this Amended Complaint and in the other documents previously submitted in this lawsuit was motivated by John Doe's male gender with a complete and total disregard of the fact that John Doe was not guilty of any misconduct.

126.    UC's Title IX liability to John Doe caused John Doe to be damaged in an amount to be determined at trial.

## Count 4 – Promissory Estoppel

127.    John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Amended Complaint as though fully rewritten herein.

128.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) John Doe detrimentally relied on UC's promise contained in UC policies to protect his educational experience from unlawful harassment based on defamation and other unlawful grounds, which allowed, among other things, UC's students such as Jane Roe and Jane Doe to make repeated, false public allegations of assault against John Doe with impunity and without fear of punishment and allowing UC's student to interrupt the performance of the Show without taking any action to stop the perpetrators of this harassment; and

(b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

129.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) John Doe detrimentally relied on UC's promises contained in UC policies to adjudicate complaints in a fair and impartial manner, including but not limited to: (i) undertaking a thorough investigation into his May 2016 Title IX Complaint, which would have revealed the falsehoods then being disseminated by Jane Doe against him; (ii) not allowing Jane Doe to file her false and retaliatory June 2016 Title IX Complaint; and (iii) _not_ applying the highly stringent mandates of UC's 2015 Manual which did not exist in 2013 when Jane Doe falsely alleged John Doe acted inappropriately; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

130.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit, John Doe detrimentally relied on UC's aforementioned promises which required UC to: (a) prosecute John Doe's May 2016 Title IX Complaint against Jane Doe and/or (b) not prosecute Jane Doe's false, bad faith, and retaliatory 2016 Title IX Complaint.

131.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) John Doe detrimentally relied on the aforementioned UC promises; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

132.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) John Doe detrimentally relied on UC's aforementioned promises to subject Jane Doe to discipline for violating the anti-retaliation provisions in UC's 2015

Manual and/or UC's policies on filing false charges against fellow students; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

133.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) John Doe detrimentally relied on UC's aforementioned promises to subject Jane Doe and/or Jane Roe to discipline for violating the confidentiality provisions of UC's 2015 Manual and/or UC's Policies; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

134.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) John Doe detrimentally relied on UC's promises, contained in UC's polices which including, but were not limited to, UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated in "all cases" of alleged sexual misconduct UC "is committed to providing a prompt, fair, impartial, and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent; and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

135.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) John Doe detrimentally relied on UC's promises, contained in UC's polices which including, but were not limited to, UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated UC's policies would be implemented in a manner "consistent with federal, state, and local regulations governing non-discrimination and unlawful

harassment including . . . Title IX," and (b) John Doe's detrimental reliance on these promises and subsequent damages for UC's breach of these promises were foreseeable to UC.

136.     UC's breaches of the aforementioned promises required John Doe to institute the Original Complaint to secure the benefit of these promises at great and unnecessary personal expense, which caused John Doe to be damaged in an amount to be determined at trial.

## Count 5 – Negligent Infliction of Emotional Distress

137.     John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Amended Complaint as though fully rewritten herein.

138.     As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) UC owed John Doe a duty to honor the provisions of UC's 2013 Manual and/or UC's Policies; (b) until the institution of this lawsuit, UC breached that duty by, by among other things, prosecuting Jane Doe's allegations of conduct that occurred in 2013 under UC's 2015 Manual's highly stringent limitations on sexual interactions which that did not exist in 2013; and (c) UC's breach of this duty is the cause in fact and legal cause of John Doe's injuries.

139.     As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit, UC owed John Doe a duty to honor the provisions of UC's 2013 Manual, UC's 2015 Manual and/or UC's policies.  Until the institution of this lawsuit, UC breached these duties by, among other things, (i) failing to make the required investigation into John Doe's May 2016 Title IX Complaint which would have established the falsehoods disseminated by Jane Doe against John Doe; and (ii) adjudicating Jane Doe's June 2016 Title IX Complaint before it adjudicated the John Doe's May 2016 Title IX Complaint and his complaint

that Jane Doe's June 2016 Title IX Complaint was false and submitted in bad faith and in retaliation for protected activities undertaken by John Doe. UC's breach of these duties is the proximate cause of John Doe's injuries.

140. As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) UC owed John Doe a duty to honor the provisions of UC's 2013 Manual, UC's 2015 Manual and/or UC's policies; (b) until the institution of this lawsuit, UC breached these duties by, among other things, not allowing the John Doe to proceed on his May 2016 Title IX Complaint against Jane Doe; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

141. As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) UC owed John Doe a duty to honor the provisions in UC's 2015 Manual and/or UC policies to discipline Jane Doe for violating anti-retaliation provisions of UC policies and UC's policy prohibiting the intentional filing of false charges against fellow students; (b) until the institution of this lawsuit, UC breached these duties in its handling of John Doe's May 2016 Title IX Complaint and his complaint about the bad faith, false, and/or retaliatory nature of Jane Doe's June 2016 Title IX Policy; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

142. As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) UC owed John Doe a duty to honor the provisions in UC's 2015 Manual and/or UC policies to subject Jane Doe and/or Roe to discipline for violating the confidentiality provisions of UC's 2015 Manual and/or UC's Policies; (b) until the institution of this lawsuit, UC breached these duties by not subjecting Jane Doe and/or Roe to said discipline for

violating said polices; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

143.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) UC owed John Doe a duty to honor UC's promises, contained in UC's polices which including, but were not limited to, UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated in "all cases" of alleged sexual misconduct UC "is committed to providing a prompt, fair, impartial and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent;" (b) until the institution of this lawsuit, UC breached these duties by not providing a prompt, fair, impartial and thorough investigation and resolution of the complaints John Doe submitted against Jane Doe and/or Jane Roe or subjecting these students to discipline for violating UC's polices; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

144.    As described in part in this Amended Complaint and in the other documents previously submitted in this lawsuit: (a) UC owed John Doe a duty to honor UC's promises, contained in UC's polices, which included but were not limited to UC's promise in UC's 2013 Manual and/or UC's 2015 Manual which stated UC's policies would be implemented in a manner "consistent with federal, state, and local regulations governing non-discrimination and unlawful harassment including . . . Title IX, (b) until the institution of this lawsuit, UC breached these duties in part by not subjecting Jane Doe and/or Roe to any discipline for engaging in retaliatory conduct and/or gender based discrimination or harassment in violation of Title IX; and (c) UC's breach of this duty is the proximate cause of John Doe's injuries.

145.    UC's negligence caused John Doe to be damaged in an amount to be determined at trial.

## Count 6 – Intentional Infliction of Emotional Distress

146.  John Doe realleges and incorporates all the allegations contained in preceding paragraphs of this Amended Complaint as though fully rewritten herein.

147.  UC's conduct detailed in this Amended Complaint and in the other documents previously submitted in this lawsuit, particularly with respect to the intentional misconduct of Inabinet, was extreme and outrageous and exercised with the specific intent to inflict emotional distress on John Doe by unlawfully maximizing the chances that John Doe would be held responsible for a false and retaliatory allegation of sexual misconduct that Inabinet knew to be false and unsubstantiated.

148.  UC and Inabinet knew there was at least a high probability that its conduct would cause severe emotional distress to John Doe by subjecting him to the fear of an unlawful prosecution for an alleged crime that John Doe did not commit and for which Inabinet knew there was compelling evidence of John Doe's innocence.

149.  UC and Inabinet intended their conduct to inflict severe emotional distress or knew there was at least a high probability that their conduct would cause severe emotional distress to John Doe.

150.  UC's and Inabinet's conduct caused John Doe to suffer severe emotional distress which required, among other things, John Doe to seek professional psychological and psychiatric treatment and to undergo emergency travel to remove himself from the UC campus to a safe environment, interrupting his course of studies which could not be completed due to the hostile environment created by UC's and Inabinet's conduct.

43

151.    UC's aforementioned conduct caused John Doe to be damaged in an amount to be determined at trial.

**WHEREFORE,** John Doe demands judgment and relief against UC as follows:

a.   Compensatory damages in an amount to be determined at trial, but in no event less than Three Hundred and Fifty Thousand Dollars ($350,000) to compensate John Doe's past and future pecuniary and/or non-pecuniary damages caused by UC's conduct;

b.   Punitive damages in an amount sufficient to deter UC from conducting similar future conduct, but in no event less than One Million Dollars ($1,000,000);

c.   Judgment for attorneys' fees pursuant any applicable statute;

d.   Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

e.   Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

f.   Such other and further relief as this court may deem just, proper, equitable, and appropriate.


Respectfully submitted,
Attorney for John Doe

By: /s/Chad Nold

Chad Nold, One of Plaintiff's Attorneys
Saper Law Offices, LLC
505 N. LaSalle Suite 350
(312) 527 – 4100
Cook County No. 51967
chad@saperlaw.com

/s/ Eric J. Rosenberg – admitted *Pro Hac Vice*

Eric J. Rosenberg (0069958)
Tracy L. Turner (0069927)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
740.644.1027
866.498.0811 fax
erosenberg@rosenbergball.com
tturner@rosenbergball.com

STATE OF NEW YORK       :
                                     : ss.
COUNTY OF WESTCHESTER    :

       I, John Doe, under penalty of perjury, hereby affirm and state that: (a) I am the John Doe identified in the Verified First Amended Complaint, (b) that I have read the foregoing Verified First Amended Complaint; (c) that this verification is upon my own knowledge, information and belief, and that as to the allegations asserted on information and belief, I have a reasonable basis to believe in the truth of such allegations: and (d) that I therefore believe the allegations in the foregoing Verified First Amended Complaint to be true, to the best of my knowledge, information and belief.

                                              /s/ <u>John Doe</u>

46