# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
|     Plaintiff, | ) No. 16 C 08298 |
| v. | ) |
| | ) Judge Edmond E. Chang |
| THE UNIVERSITY OF CHICAGO, *et al.*, | ) |
|     Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Doe[1] and defendant Jane Doe are students at the University of Chicago. R. 1, Compl. ¶¶ 12, 14.[2] John Doe filed this suit against the University of Chicago and Jane Doe, asserting numerous Title IX violations, 20 U.S.C. §§ 1681 *et seq.*, as well as state-law claims.[3] *See id.* ¶¶ 119-205. At the time of filing, John Doe also moved for a temporary restraining order (TRO). R. 4, Pl.'s Br. After a hearing on the motion, the Court denied John Doe's request for a TRO and deemed it converted into a motion for a preliminary injunction. *See* R. 11, 8/24/2016 Minute Entry. For the reasons stated below, John Doe's converted motion for a preliminary injunction is also denied.

---

[1]John Doe has filed a motion to allow certain parties to the case to use pseudonyms. *See* R. 6. This Court has reserved ruling on the motion until defendant Jane Doe has been formally served and has had an opportunity to be heard on the issue. *See* R. 27, 8/24/2016 Tr. at 23.

[2]Citations to the record filings are "R." followed by the docket number and, when necessary, a page or paragraph number.

[3]This Court has subject matter jurisdiction over the Title IX claims under 28 U.S.C. § 1331, and over the state-law claims under 28 U.S.C. § 1367.

## I. Background

This case arises out of Jane Doe's assertion—made, initially, via a variety of social-media outlets—that she had been sexually assaulted by John Doe, and the University's subsequent handling of three related disciplinary complaints: two lodged by John Doe against Jane Doe and one lodged by Jane Doe against John Doe. To understand the factual setting, the Court will set forth facts drawn from the Complaint, and assume them to be true (because that assumption does not impact the decision on the preliminary injunction).

For purposes of the pending motion, the lead-up to the lawsuit begins in November 2014, when Jane Doe began to claim on her personal blog that she had been sexually assaulted. Compl. ¶ 75. By December 2014, Jane had "definitively identified John Doe as the person who had allegedly assaulted her." *Id.* When she found out in the spring of 2016 that John was directing a theater program, she posted a series of tweets on Twitter about the program, "stating John Doe assaulted [her] and many others." *Id.* ¶¶ 77-81.

Upon learning of Jane Doe's tweets, John sent the University an email to complain against Jane for "online sexual harassment." Compl. ¶ 88; R. 1-12, May 2016 Compl. In late May, Associate Dean Jeremy Inabinet informed John that he had reviewed the information that John had provided and had determined that there was "no evident violation of the University Policy on Harassment, Discrimination, and Sexual Misconduct." Compl. ¶ 89; R. 1-13, 5/25/2016 Inabinet Email. Following Inabinet's determination, John's counsel sent Jane a cease-and-

desist letter "demanding Jane Doe remove the offending Tweets and issue a public apology to John Doe for the defamatory statements made repeatedly by Jane Doe." Compl. ¶ 92; R. 1-16, Cease & Desist Letter. Jane did not delete her tweets. Compl. ¶ 93.

In June 2016, Jane Doe made her own complaint to the University; she claimed that John had sexually assaulted her on September 23, 2013. *See* Compl. ¶ 111. In response, the University launched its disciplinary process. *See id.* ¶ 11; Pl.'s Br. at 6. John then lodged a second complaint with the University, this time alleging that Jane's June 2016 complaint is "false, in bad faith[,] and retaliatory." 8/24/2016 Tr. at 10.

Upon being told by the University that it was investigating Jane Doe's June 2016 complaint, John expressed concerns to Inabinet about the University's investigatory and adjudicatory procedures. *See* Compl. ¶¶ 100, 102; R. 1-20, 8/7/2016 Email. In an August 7, 2016 email, John articulated disagreement with Inabinet's "stated intention" to adjudicate John's alleged 2013 conduct according to the University's 2015 student manual. Compl. ¶ 100; 8/7/2016 Email at 3-6. He also objected to the possibility that the University would adjudicate Jane's June 2016 complaint before investigating and deciding his May and June 2016 complaints. Compl. ¶ 102; 8/7/2016 Email at 1-2. Hearing nothing in response to these concerns, *see* Compl. ¶ 103, John Doe filed this suit against Jane Doe and the University of Chicago, asserting several Title IX violations and making numerous state-law claims, *see id.* ¶¶ 119-205.

3

At the time of the lawsuit's filing, John moved for a temporary restraining order to restrain the University from subjecting him to its disciplinary process. *See* Pl.'s Br. at 3. The Court held a hearing on the motion on the day that it was filed. *See* 8/24/2016 Minute Entry. At that hearing, the University agreed to use the 2013 student manual's definition of consent, give John an extension of time to respond to Jane's June 2016 complaint, and consider all three[4] disciplinary complaints in one proceeding. *See id.* The Court ultimately denied John's request for a TRO, because there was no irreparable harm that justified even a temporary injunction without notice to the University and an opportunity for the University to be heard. But the Court did convert the TRO motion into a motion for preliminary injunction and requested further briefing on the issue of irreparable harm. *Id.*

## II. Legal Standards

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail on a motion for a preliminary injunction, a moving party must show that its case has some likelihood of success on the merits and that it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied. *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). If the moving party meets these threshold requirements, then the court balances the nature and degree of the

---

[4]Despite Inabinet's May 25, 2016 email, the University has since said that it will address John Doe's May 2016 complaint. *See* 8/24/2016 Tr. at 13; R. 21-1, Exhs. to Def.'s Br. at 42 (email from the University's counsel confirming the University's TRO hearing commitments).

4

potential harm to each party and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

### III. Analysis

John Doe contends that the University is subjecting him to a "fundamentally unfair, arbitrary, and capricious disciplinary procedure that violates both Title IX and [the University's] Policies." Pl.'s Br. at 2. He has asked for an injunction—relying specifically on the basis of his negligence, promissory estoppel, and Title IX retaliation claims, *see id.* at 3—to (a) prevent the University from using the 2015 student manual to evaluate the 2013 sexual encounter and to (b) halt the University's disciplinary process until it remedies the alleged Title IX violations and fully adjudicates his May 2016 Complaint, *id.*[5] John initially claimed that an injunction was necessary because money damages could not adequately compensate him for any lost educational opportunities and any damage to his reputation that might result from the University's disciplinary process. *Id.* at 30. He now claims that an injunction is necessary because the way in which the University is conducting its disciplinary proceeding is causing him psychological harm, which has recently resulted in episodes of self-harm. *See* R. 23, Pl.'s Reply Br.

### A. Irreparable Harm

Irreparable harm is harm that cannot be "fully rectified by the final judgment after trial." *Stuller*, 695 F.3d at 680 (internal quotation marks omitted). "Not every

---

[5]As detailed in the Background section, at the August 24, 2016 TRO hearing, the University committed itself to using the 2013 student manual's definition of consent and to considering all three disciplinary complaints in one proceeding. *See* 8/24/2016 Minute Entry.

5

conceivable injury entitles a litigant to a preliminary injunction," *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005), and "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22 (emphases added); *see also E. St. Louis Laborers' Local 100,* 414 F.3d at 704 ("[S]peculative injuries do not justify th[e] extraordinary remedy.").

To satisfy the threshold requirement of irreparable harm, John Doe primarily claims that the way in which the University is conducting its disciplinary process has caused him serious psychological harm and that, absent a preliminary injunction, it will continue to cause him serious psychological harm. *See* Pl.'s Reply Br. at 1-2. █████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

That said, the Court is not convinced that John has shown that the psychological harm that he is suffering from is the sort of harm that should be the premise for the extraordinary remedy of a preliminary injunction.

Although it might be true that the severe emotional distress that John is currently experiencing cannot be fully redressed by an award of damages at the end of this lawsuit, it is not clear that a preliminary injunction would actually redress the psychological harm alleged in this case. The University's conduct is not the sole cause of John's current mental health problems. The affidavits that he submitted aver that his mental health problems began in 2014, *see* Pl.'s Affidavit at 2; Mother's Affidavit at 2, grew worse when he learned of Jane Doe's online accusations, *see* Pl.'s Affidavit at 2; Mother's Affidavit at 2, and have since been exacerbated by his dealings with the University, *see* Pl.'s Affidavit at 4-6; Mother's Affidavit at 2-5. Because John's current psychological problems pre-date and are not wholly caused the University's disciplinary process, *see* Pl.'s Reply Br. at 1-2 (acknowledging that Jane Doe's accusations themselves are another source of "ongoing stress" to John Doe), the Court cannot find that granting the injunction will alleviate the psychological harm. After all, an injunction will not do away with Jane Doe's accusation, nor will it permanently halt the University's disciplinary proceeding. Instead it will postpone final resolution of the matter, which may actually aggravate John Doe's mental health issues.

Moreover, to the extent that the University's communications with John are causing him psychological harm (as he alleges they are), the various letters and emails submitted to the Court by the parties reveal that many of John's reactions to the University's communications have been unreasonable. As the Court stated during the hearing on September 14, that characterization is not meant to be a

pejorative criticism of John Doe, because his mental health might be contributing to his reactions to the communications. But it must be said that innocuous messages from the University have been misconstrued and met with outrage. A prime example of this is John's reaction to Inabinet's request for a list of suggested witnesses. On August 29, Inabinet sent John an email asking that John let the University know if he had any suggested witnesses. *See* R. 22-3, Exh. A Part Two at 82 ("I did not see the names of any witnesses [in your response to Jane Doe's 2016 complaint], but I do not want to assume you do not have any, in case it was an oversight. Please let me know if you do or do not have any witness suggestions."). John's counsel sent a letter in reply claiming that this request "provides further evidence of [Inabinet's] anti-male gender bias and retaliatory conduct" because Inabinet "*requires* John Doe to identify 'witnesses' . . . even though both John Doe and Jane Doe admit there were no first-hand 'witnesses' to Jane Doe's false allegations of assault." R. 22-2, Exh. A Part One at 3 (emphasis added). Contrary to that mistaken interpretation, Inabinet was clearly making a *request* for information, not setting out a requirement with which John had to comply. And at no point in time did Inabinet say that any witnesses had to be "first-hand witnesses"; the request was open-ended and could have included anyone who might have had information that could support John's account of what happened between him and Jane Doe.

In the same August 29 email, Inabinet requested that any concerns about the University's process be "directed to [him] separately and not included in [John's]

8

response to" Jane Doe's 2016 complaint. *See* Exh. A Part Two at 82. This request was similarly misconstrued. John claimed that Inabinet was "not allow[ing him] to attack the process" and was "limit[ing him] to simply answering" Jane Doe's complaint, in supposed contravention of the University's commitment to consider all three complaints with one decision-making entity. *See* R. 22-6, Exh. D at 6. Inabinet, however, had simply made a request that John respond to Jane's complaint in one document, and then address any concerns about the process in a separate document. He had not banned John from criticizing the University's procedures.

Even express efforts by the University to accommodate John's requests have elicited a negative response. When the University committed to using the 2013 student manual's definition of consent—as requested by John Doe, *see* Pl.'s Br. at 3—it gave Jane Doe the opportunity to revise her complaint in light of that definition and told John that he would be given the chance to revise his response should she choose to do so. *See* R. 32-1, Surreply Exhs. at 27. That is only fair: Jane Doe did not know that the University would use the 2013 student manual, so she should have a chance to revise the complaint, and then in turn John should have an opportunity to respond. Yet John replied, "How is that fair? How is that logical? How is that possible? . . . Can you just not stop it here? . . . These broken promises, together with your illogical and Kafkaesque behavior, are causing me great psychological harm and continuing to traumatize me." *Id.* at 34. Though this statement might accurately reflect how John Doe felt upon learning that Jane Doe

9

was being given the chance to amend her complaint, it was not a reasonable response to the University's attempt to equitably implement a procedural change that he himself had demanded.

These examples, and the Court's review of the back-and-forth between the University and John Doe, show that how or what the University is communicating is *not* the cause of John's emotional distress, at least not the "cause" in the way that the law would recognize. Unfortunately, John has interpreted even benign communications as if they have been crafted to undermine his interests, and he claims that they are causing him ongoing psychological harm. But to the extent that innocuous requests and attempts to accommodate are psychologically harming him, it is hard to see how an injunction will help: an injunction will not make the University's reasonable efforts to communicate with him any more reasonable.

Even if it were clear that an injunction would help John's mental state, the actions taken by the University that John says are causing him ongoing psychological harm cannot reasonably be said to cause the sort of harm that a preliminary injunction is intended to address. As examples of alleged misconduct, John identifies nine particular University actions which have allegedly impacted his mental health. *See* Pl.'s Reply Br. at 4-7. John's framing of these actions portrays him as a respectfully inquisitive student mistreated by an unresponsive and inflexible university. *See id.* The communications cited in connection with the nine examples, however, tell a different story. *See* Exh. A Part One at 2-4 (John Doe's Counsel's Aug. 30, 2016 Letter); *id.* at 7-17 (John Doe's Aug. 29, 2016 Letter);

10

Exh. D at 6-21 (John Doe's Aug. 31, 2016 Letters). John has not simply been making "requests to reach a mutually agreeable understanding" or asking Inabinet questions about the disciplinary process, *see* Pl.'s Reply Br. at 4-5. Rather, he has been making numerous demands that the University adopt procedures or change its existing disciplinary process. These demands misconstrue previous communications with the University and seek to (1) conform the University's process to federal court-like procedures, *see, e.g.*, Exh. A Part One at 12-13 (demanding specific evidentiary standards), (2) shape precisely how a future hearing might unfold, *see, e.g.*, *id.* at 12 (demanding to know how the University intends to structure a hearing), and (3) ensure that his complaints receive preferential treatment, *see, e.g.*, *id.* at 9 (demanding that the disciplinary committee only consider a redacted (by John Doe) version of Jane Doe's complaint). Many of these demands have not been reasonable—the University never promised John that he could dictate all of the disciplinary procedures that would apply to him, nor has it decided that a hearing will be necessary—so it has been reasonable for the University to respond to them unfavorably. Again, in light of John's mental health, it is understandable that he feels that the University's responses to his demands are causing him psychological harm, but the Court ultimately does not believe that psychological harm—however genuinely experienced—arising from John Doe's unreasonable demands is the type of harm that should be the basis for the grant of a preliminary injunction.

To the extent that John Doe is still claiming that the University's disciplinary process threatens his reputation and his educational opportunities, these injuries

are too speculative to constitute irreparable harm. The University has only recently begun its processing of the complaints; indeed, as of the August 24 TRO hearing, it had not even begun its investigation. *See* 8/24/2016 Tr. at 12. If a hearing is eventually held, we do not know that harm will result; a tribunal might very well clear John of any wrongdoing.

The case law cited by the parties is consistent with this conclusion. *See Jackson v. Macalester College*, No. 16-cv-0448 (WMW/BRT), 2016 WL 3029932 (D. Minn. Mar. 11, 2016) (denying student's motion to restrain college from conducting any investigation or disciplinary proceeding for, among other things, lack of irreparable harm); *Doe v. Ohio State Univ.*, 136 F. Supp. 3d 854 (S.D. Ohio 2016) (same). John tries to analogize this case to *Johnson v. Western State Colorado University*, No. 13-cv-2747-WJM-KMT, 2013 WL 5716849 (D. Colo. Oct. 21, 2013), in which a district court granted a temporary restraining order enjoining a college from conducting a disciplinary hearing, but the situation in *Johnson* was meaningfully different from the situation here. In *Johnson*, the district court initially denied the student's TRO motion, but considered the motion to be converted into a motion for a preliminary injunction and requested further briefing from the parties. *See id.* at *1. Shortly thereafter, the student filed a new TRO motion and notified the court that the college planned to proceed with the disciplinary hearing itself before the preliminary injunction motion would be fully briefed. *Id.* Upon receiving this information, the court granted the new TRO motion solely to preserve the status quo until it could rule on the preliminary injunction

motion. *See id.* It later denied the student's preliminary injunction motion. *See* 13-cv-2747-WJM-KMT, 2013 WL 6068464 (D. Colo. Nov. 18, 2013). In this case, unlike *Johnson*, the University is not about to imminently convene a disciplinary hearing, and in any event, the Court is denying the preliminary injunction motion in this very Opinion. *Johnson* does not support John Doe.

### B. Likelihood of Success on the Merits

Even if John Doe had made a proper showing of irreparable harm, he has not met the "low" threshold, *see D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016), of establishing a likelihood of success on the merits of his promissory estoppel, negligence, and Title IX retaliation claims.

#### 1. Title IX Retaliation Claim

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Retaliation against a person because that person has complained of sex discrimination is a form of intentional sex discrimination covered by Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Accordingly, "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.* at 174.

John alleges that the University retaliated against him for engaging in certain "protected activities"—namely, participating in a previous disciplinary

proceeding (which exonerated him), making his May and June complaints, and defending himself against Jane's complaint, *see* Compl. ¶ 160—by (1) refusing to stay his disciplinary proceeding until after it adjudicates his May 2016 complaint, *see id.* ¶ 157; (2) allowing Jane Doe to include in her June 2016 complaint another student's previous allegation that John had committed sexual assault, *see id.* ¶ 158; and (3) rejecting John's request that the same decision-makers adjudicate Jane's complaint at the same time as John's June 2016 complaint, *see id.* ¶ 159. As an initial matter, the University has expressly committed itself to adjudicating all three student complaints in the same proceeding, *see* 8/24/2016 Tr. at 13; Exhs. to Def.'s Br. at 42, so John's retaliation claim cannot succeed on the basis of the third act.

John also falls short of showing a likelihood of success on the basis of the first two acts. He has not alleged any facts from which it can be inferred that the University took these actions *because* John engaged in protected activities. With regard to the first action, the student manual gives the University discretion over how to proceed when an accused student makes a complaint against the complainant. *See* R. 1-17, 2013 Student Manual at 58 ("On the rare occasion that the accused student makes a complaint against the complainant, the Dean of Students may investigate the accused student's complaint at or about the same time he or she investigates the complainant's complaint. The Dean of Students may decline to recommend that a disciplinary committee hear either complaint or one of the complaints. The Dean of Students also may recommend that both complaints be

14

simultaneously heard by a single disciplinary committee or heard separately by the same or different disciplinary committee."); *see also* R. 1-18, 2015 Student Manual at 116. In this instance, it is only logical for the University to adjudicate Jane and John's complaints at the same time because they share the same factual basis, and John has not pointed to anything that suggests that the decision was motivated by anything other than the common-sense notion that the complaints overlap. As for the University's second action, there is no reason to believe that the University can control what facts a student includes in his or her complaint. To the extent that the University could exercise such control, there is no reason to believe that it allowed Jane Doe to reference another student's allegation *because* John engaged in protected activities.

## 2. Promissory Estoppel and Negligence Claims

Under Illinois law, to establish a claim of promissory estoppel, a plaintiff must prove that (1) the defendant made an unambiguous promise to the plaintiff, (2) the plaintiff relied on this promise, (3) the plaintiff's reliance was expected and foreseeable by the defendant, and (4) the plaintiff relied on the promise to his detriment. *See Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523-24 (Ill. 2009). A claim for promissory estoppel will only succeed where all of the other elements of a contract exist (offer, acceptance, mutual assent), but consideration is lacking. *See Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005). To make out a claim of negligence, a plaintiff must show that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3)

15

the breach was the proximate cause of the plaintiff's injury. *See Krywin v. Chi. Transit Auth.*, 938 N.E.2d 440, 446 (Ill. 2010).

John Doe's promissory estoppel and negligence claims are quite similar. The basic premise of both claims is that the University made certain promises to him in the 2013 and 2015 student manuals, that the University has since broken some of these promises, and that breaking these promises has caused him harm. *See* Compl. ¶¶ 172-91. As an initial matter, it is not at all clear that the University has made the promises that John claims it has made. The 2013 Manual does not expressly guarantee that a student will not be subject to any of a later manual's provisions. *See id.* ¶¶ 173, 183. Indeed, the Manual even warns students that "[t]he contents of the manual are subject to change from time to time at the sole discretion of the University." 2013 Student Manual at 4. In addition, neither of the manuals guarantees that related complaints will be adjudicated in the order that they are received. *See* Compl. ¶¶ 174-75, 184. Rather, the manuals allow the Dean of Students to "recommend that both complaints be simultaneously heard by a single disciplinary committee or heard separately by the same or different disciplinary committee." 2013 Student Manual at 58; 2015 Student Manual at 116. Moreover, the manuals do not promise to subject a student to discipline for filing a retaliatory complaint or for breaching confidentiality prior to the University investigating and determining that the complaint is in fact retaliatory or that confidentiality has been breached, nor do they promise to subject a student to discipline in all cases of breached confidentiality. *See* Compl. ¶¶ 176-177, 186-87.

16

To the extent that John does identify express statements in the manuals that he thinks the University has disregarded, these statements are at such a high level of generality that they do not contain concrete promises. *See* Compl. ¶¶ 178-80, 188-90; 2013 Student Manual at 8 ("The University's policy is consistent with federal, state, and local regulations governing non-discrimination and unlawful harassment including . . . Title IX of the Education Amendments of 1972."); *id.* at 57 ("Students who are subject to or involved in University discipline do not automatically abdicate any of the rights that are guaranteed to them by the civil society and, indeed, they remain at all times free to claim and assert those rights through the institutions, presumably judicial, of that society."); 2015 Student Manual at 28 ("In all cases, the University is committed to providing a prompt, fair, impartial, and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent."). Broad statements like these do not constitute *unambiguous* promises within the meaning of the promissory estoppel doctrine. Besides, John has not identified any acts that the University has taken since it committed itself to adjudicating all three complaints at once and to applying the 2013 definition of consent that would constitute a breach of its duty to uphold these supposed promises. Given both the explicit warnings that the policies in the student manual are subject to change and the ambiguity of the policies themselves, John Doe is unlikely to succeed on the merits of either his promissory estoppel claim or his negligence claim.

## IV. Conclusion

Because he has failed to show irreparable harm or some likelihood of success on the merits of his Title IX retaliation, negligence, and promissory estoppel claims, Plaintiff John Doe's motion for a preliminary injunction is denied. For the same reasons, John Doe's motion for expedited discovery, *see* R. 7, Pl.'s Dx. Mt.; R. 22, Pl.'s Renewed Dx. Mt., is also denied. There is no good cause to expedite discovery in the absence of irreparable harm. Discovery shall not begin until after the defendants have answered, and if dismissal motions are filed, then the Court will address whether to further suspend discovery until after those motions are decided. The November 1, 2016 status hearing remains in place.

One final note: for now, the Court will issue this Opinion under seal in order to allow either side to explain why any part of the Opinion should remain under seal (the Opinion will be provided only to the parties and their counsel at this time). Any party wishing to propose maintaining part of the Opinion under seal shall file a Position Paper requesting that relief (and explaining why) by September 29, 2016.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 22, 2016

18