# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 08298 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THE UNIVERSITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises out of Plaintiff John Doe's challenge to the University of Chicago's handling of sexual assault allegations brought against him by two female students, Jane Roe and Jane Doe.[1] In his Amended Complaint, John Doe claims that the University violated Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, et seq. R. 50, Amended Complaint (Am. Cmplt.) ¶¶ 93-126. He also brings state-law claims for promissory estoppel and for negligent and intentional infliction of emotional distress.[2] Am. Cmplt. ¶¶ 127-51. The University moves to dismiss John Doe's complaint in its entirety for failure to state a claim. R. 64, Def.'s Motion to Dismiss.

For the reasons stated below, the University's motion is granted as to Counts 4 (Promissory Estoppel), and 5 (Negligent Infliction of Emotional Distress). The

---

[1] In light of the allegations of sexual assault and severe emotional distress, and the relative youth of the individuals involved in the allegations, the parties have been permitted to proceed under pseudonyms. *See Doe v. Blue Cross & Blue Shield United of Wisc.*, 112 F.3d 869, 872 (7th Cir. 1997).

[2] This Court has subject matter jurisdiction over the Title IX claims under 28 U.S.C. § 1331, and over the state-law claims under 28 U.S.C. § 1367.

Court also dismisses Count 1 insofar as it asserts a hostile-environment theory of Title IX liability. The claims of gender discrimination and retaliation under Title IX (Counts 1, 2, and 3) and the claim of intentional infliction of emotional distress (Count 6) survive, albeit narrowly. As detailed in the Opinion, their survival is contingent on a particular interpretation of key allegations in the Amended Complaint, Am. Cmplt. ¶¶ 46-48, and Plaintiff must file a position paper confirming that interpretation by the deadline set forth below.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Documents attached to a complaint are considered part of the complaint for all purposes. Fed. R. Civ. P. 10(c).

### A. Accusations by Jane Roe

In Spring 2014, Jane Roe, a female University of Chicago student, accused John Doe of sexual assault. Am. Cmplt. ¶¶ 15, 20. The University convened a disciplinary proceeding, which resulted in a finding that the preponderance of the evidence did not support the allegations. Am. Cmplt., Exh. 2.[3]

---

[3] The Amended Complaint states that the University "completely exonerated" John Doe. R. 50, Am. Cmplt. ¶ 20. But a copy of the University's formal announcement of the proceeding's result is attached as Exhibit 2 to the Amended Complaint, R. 50-2, Am. Cmplt., Exh. 2, and the actual finding simply states that the University committee "found that the preponderance of the evidence did not support" the allegation, *id.* at 1. The announcement does not use the term "completely exonerated," or any words to that effect. When a complaint characterizes an exhibit in a certain way but the exhibit contradicts the characterization, the exhibit trumps the allegation. *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017 (7th Cir. 2013).

Despite the no-liability finding, in Fall 2014, Roe began to publicly accuse John of sexual assault. She placed John's name on a document called the "Hyde Park List," which purported to identify "people known to commit varying levels of gender-based violence." Am. Cmplt. ¶ 21. This list was distributed during student orientation week and published online. *Id*. Roe also told members of the University of Chicago community that John Doe was a "sexual predator," and falsely told fellow students that the University found John Doe "guilty" but failed to punish him. *Id*. After the publication of the Hyde Park List, John Doe brought Jane Roe's actions to the attention of University employees who had been involved in the earlier disciplinary process. Am. Cmplt. ¶ 22. In response, the University allegedly told John Doe that the University's confidentiality policies prohibited him from personally refuting Jane Roe's accusations. *Id*. The University also refused to discipline Jane Roe. *Id*.

Roe continued to make the sexual-assault accusations in October 2014, when she blogged that the University was forcing her to participate in a class "with the person who sexually assaulted her." Am. Cmplt. ¶ 23. Soon after that blog post, the University removed John Doe, over his strenuous objections, from the physics lab that he shared with Jane Roe. Am. Cmplt. ¶ 24.

Finally, in November 2014, John Doe's adult sister responded (without John Doe's knowledge) to Roe's Twitter comments about the alleged sexual assault. Am. Cmplt. ¶ 26. Based on John Doe's sister's contact with Jane Doe, the University threatened to discipline him for violation of a "No-Contact Directive" that was in

3

place in connection with the earlier disciplinary proceeding. Am. Cmplt. ¶ 26; Am. Cmplt. Exh. 2 (directing John Doe to refrain from contact with Jane Roe).

## B. Accusations by Jane Doe

The Amended Complaint also details accusations of sexual assault by Jane Doe, another female University of Chicago student. Am. Cmplt. ¶ 14. John Doe and Jane Doe "hooked up" in September 2013, an encounter which Jane Doe described on her Tumblr blog. Am. Cmplt. ¶¶ 27-28. According to the Amended Complaint, all sexual contact between John and Jane Doe was consensual. Am. Cmplt. ¶ 29. John Doe also alleges that this characterization is consistent with Jane Doe's blog posts, which describe the September 2013 encounter as "beautiful and sweet and all great things" and stated that Jane wanted to pursue a romantic relationship with John Doe in the months following the alleged assault. *Id.* at ¶ 51; Am. Cmplt., Exh. 3. By November 2014, however, Jane Doe began to claim on her blog that she had been sexually assaulted, and by December she had definitively identified John Doe as her attacker. Am. Cmplt. ¶ 30. Jane Doe continued to repeat her accusations against John Doe through Summer 2016. Am. Cmplt. ¶ 31.

Jane Doe's allegations against John Doe came to a head in Spring 2016. At the time, John Doe was the director of a student-performed theater program (referred to in the complaint as "the Show" in order to protect John Doe's identity). Am. Cmplt. ¶ 33. In early May 2016, Jane Doe published a series of tweets and a Facebook post criticizing the University for putting on a show "directed by the boy who sexually assaulted me/many others on this campus." Am. Cmplt. ¶ 36; Am.

4

Cmplt. Exh. 3. The Facebook post identified the Show and John Doe as the subject of Jane Doe's criticism. Am. Cmplt. ¶ 37.[4]

## C. The University's Response

Upon learning about Jane Doe's tweets, John Doe emailed a complaint to several University officials. Am. Cmplt. ¶ 43-46; Am. Cmplt., Exh. 4. The complaint, sent on May 5, 2016, characterized Jane Doe's comments as "online sexual harassment" and stated that the email constituted a formal Title IX complaint. Am. Cmplt., Exh. 4. Jay Ellison, the University's Dean of Students, referred the complaint to Jeremy Inabinet, the Associate Dean for Disciplinary Affairs. Am. Cmplt. ¶ 44.

While John Doe's May 5 complaint was under review, Inabinet met with Jane Doe. Am. Cmplt. ¶ 46. In a crucial allegation, the Amended Complaint asserts that Inabinet "intentionally and/or negligently encouraged and 'approved' Jane Doe's filing of a false and retaliatory" Title IX complaint against John Doe. *Id.* Inabinet "encouraged" Jane to file her complaint by (1) advising her that her complaint would be adjudicated under the University's 2015 Student Manual, which had a more stringent sexual assault standard than the manual in place in 2013; (2) failing

---

[4] The Amended Complaint asserts that Jane Doe's tweets were meant to incite fellow students to "knock[] down the doors" of the theater in which John was directing the Show. Am. Cmplt. ¶ 39. The full context of the statement makes it unlikely that the tweet urged students to literally "knock down the doors" of the theater. The full context is contained in Exhibit 3 to the Amended Complaint: in response to a comment correcting Jane Doe's initial misattribution of the theater sponsoring John Doe's show, Jane Doe replied "now I know who to picket." She followed up by correcting her mistake: "it's actually TAPS, not UT, so don't go knocking down the doors of the wrong precious theater bbs." R. 50-3, Pl. Exh. 3. When viewed in that context, the tweet is not necessarily an incitement to literally and physically "knock down the doors" of the theater.

to tell Jane Doe that the University was obligated to proceed on John Doe's May 5 complaint against her; and (3) failing to advise her that her own complaint would subject her to disciplinary proceedings. Am. Cmplt. ¶ 48.

In late May, Inabinet informed John Doe, via email, that the University would not proceed on John Doe's May 5 complaint. Am. Cmplt. ¶ 49 & Exh. 5. The email stated that Inabinet found "no evident violation" of the University's Policy on Harassment, Discrimination, and Sexual Misconduct. Am. Cmplt., Exh. 5. Instead, Inabinet suggested that Jane Doe's behavior might violate other University policies or be the basis of a defamation lawsuit. *Id*. Inabinet also referred the matter to Assistant Dean Stephen Scott. *Id*.

Communications between Inabinet and John Doe continued to sour throughout the summer. On August 5, 2016, John Doe and Inabinet discussed the two dueling complaints on a phone call. Am. Cmplt. ¶ 56. During the call, Inabinet told John that the University would not consider Jane Doe's June 2016 complaint to have been filed in retaliation for John Doe's May complaint. Am. Cmplt. ¶ 50. Inabinet reiterated that the 2015 Manual's definition of sexual misconduct would be applied Jane Doe's complaint, and stated that John Doe would not be allowed to raise his complaints of harassment in response to Jane Doe's complaint. Am. Cmplt. ¶ 50. During the phone call, John Doe repeatedly asked Inabinet if he would have investigated the conduct exhibited by Jane Doe if it had been perpetrated by a male student against a female student. *Id*. Inabinet refused to give John a direct answer. *Id*.

After the August 5 phone call, John wrote to Inabinet to ask UC to change its position. Am. Cmplt. ¶ 51. As proof that Jane Doe's allegations were false, John Doe provided Inabinet with Jane Doe's blog posts from Fall 2013. *Id*. As discussed above, these blog posts tended to undermine Jane Doe's claim that John Doe had sexually assaulted her. *Id*.; *see also* Am. Cmplt., Exh. 3. Inabinet did not dismiss Jane Doe's complaint or change any of the University's positions after receiving this evidence. Am. Cmplt. ¶¶ 51-52. In light of the rapidly approaching deadline to respond to Jane Doe's complaint, John Doe filed this lawsuit. Am. Cmplt. ¶ 53.

## II. Standard of Review

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *Hallinan v. Fraternal Order of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94. A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

### III. Analysis

### A. Count 1 – Title IX Hostile Environment and/or Discrimination

Count 1 outlines at least two[5] different theories of recovery under Title IX. *See* R. 69, Pl. Mem. Opp. at 3-4. First, John asserts that the University's Title IX disciplinary process was biased against him because of his male gender. Am. Cmplt. ¶¶ 99-111. For purposes of discussion, this aspect of Count 1 will be labelled the general-discrimination claim; it overlaps with Count 3's selective-enforcement claim. Second, Count 1 alleges that the University is liable on a deliberate indifference theory of Title IX, specifically for failing to prevent sexual harassment of John Doe by Jane Doe and Jane Roe. AC ¶ 113; Pl. Mem. Opp. at 8-9. The Court addresses each theory separately.

### 1. Gender Discrimination

John Doe argues that the University discriminated against him because of his gender. In particular, John Doe alleges that the University ignored his May 5 complaint because he was a male student complaining of harassment by female students and that the University "rewarded and encouraged [] gender-based harassment of Plaintiff" (presumably by encouraging Jane Doe to file her 2016 complaint). Pl. Mem. Opp. at 4. Thus, John Doe's gender discrimination claim boils

---

[5] The Amended Complaint appeared to claim that the University itself was responsible for creating a hostile environment for male students. But John Doe does not develop this argument and seems to have abandoned it in its brief. *See* R. 69, Pl. Mem. Opp. at 8-12 (discussing only the University's response to Jane Doe and Jane Roe's conduct). This was a sensible tact, because the Amended Complaint does not otherwise allege how the University created a hostile environment for John Doe other than the allegations on the response to the complaints against him.

down to a contention that he was treated adversely in the Title IX disciplinary process because he is male, and that Jane Doe, a female student, was treated better because she was female. If true—and assuming that there were concrete factual allegations describing the difference in treatment—this would be enough to make out a claim of gender discrimination in violation of Title IX. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). At the motion to dismiss stage, John Doe must plead sufficient facts to make the inference of disparate treatment based on gender "plausible." *See Iqbal*, 556 U.S. at 678.

Although the Court ultimately concludes that one particular aspect of this discrimination claim survives the dismissal motion, most of the allegations do not adequately state a claim. For starters, the allegations about the *general* climate of the University do not amount to a discrimination claim. Much of the Amended Complaint is dedicated to facts purporting to show that the University favors female sexual-misconduct complainants at the expense of male respondents because of a desire to appease the United States Department of Education's Office of Civil Rights. *See* Am. Cmplt. ¶¶ 54-70. The Amended Complaint notes that the Office of Civil Rights (which calls itself "OCR") discusses sexual assault as a problem that particularly affects women, and characterizes the policies suggested by OCR's 2011 "Dear Colleague" Letter as "anti-male." Am. Cmplt. ¶¶ 54-56. The Amended Complaint also notes that in 2016 the University had been the subject of recent Department of Education scrutiny for its handling of complaints by female students against male students. Am. Cmplt. ¶ 58. John Doe also makes much of Inabinet's

9

affiliation with the Association of Title IX Administrators and the National Center for Higher Education Risk Management. Am. Cmplt. ¶¶ 64-67. The Amended Complaint characterizes these entities as anti-male, largely because they use female pronouns for victims of sexual assault and male pronouns for the accused, and because they advocate complainant-focused procedures for handling sexual assault allegations. Am. Cmplt. ¶¶ 67-69.

Rounding off the attempt to portray the University as pervasively anti-male, the Amended Complaint notes that the University has endorsed the Clothesline Project, a project dedicated to breaking the silence about violence against women, and the Red Flag Campaign, which seeks to raise awareness about sexual and dating violence. Am. Cmplt. ¶¶ 70-72, 74-75. The University also sponsors a chapter of the "Phoenix Survivor's Alliance," an organization dedicated to "encourag[ing] an active dialogue on and an engagement with women[']s and gender issues." Am. Cmplt. ¶ 73; Am. Cmplt., Exh. 11. The University also sponsored a showing of the film "The Hunting Ground," a documentary about campus sexual assault, which some commentators have criticized for being inaccurate. Am. Cmplt. ¶ 75.

All of those high-level allegations do little to advance the actual gender discrimination claim at issue in this case. With the conclusory characterizations (as distinct from factual allegations) of "anti-male" bias set to the side, these allegations do not plausibly allege anti-male bias. For example, the allegations concerning the Department of Education at most raise the prospect that OCR believes that campus sexual assault of women is a problem. The University's adoption of positions

10

recommended by the federal government does not in turn suggest that the University did so because of gender bias—all it plausibly suggests is that the University sought to comply with OCR's recommendations for handling sexual-assault complaints. Similarly, the gender-pronoun allegations about the organizations in which Inabinet is (or was) a member suggest only that both organizations believe that women are more likely to be accusers of sexual violence and men are more likely to be the accused. The Amended Complaint does not assert otherwise, nor does any allegation in the Amended Complaint even imply otherwise. And despite the Amended Complaint's *conclusory* characterization of the Clothesline Project, the Phoenix Survivors' Alliance, and the Red Flag Campaign as anti-male, the *factual* allegations do not plausibly suggest that is so. For example, the materials John Doe provides on the Red Flag Alliance contain scenarios where the perpetrator of dating violence is female. Am. Cmplt., Exh. 12. Even more importantly, again there is no allegation that the *University* sponsored those initiatives with the intent to discriminate against males. All in all, John Doe's allegations about the University's general climate do not give rise to any plausible inference of anti-male (or pro-female) bias on the part of the University.

Moving on from the generalized attack to this specific case, the key allegation that avoids dismissal of the discrimination claim arises from Inabinet's meeting with Jane Doe on May 11, 2016. One interpretation of the allegation is that, during the meeting, Inabinet encouraged Jane Doe to file a false complaint—knowing it was false:

11

> Rather than take corrective actions required following John Doe's May 2016 Title IX Complaint, on information and belief, Inabinet met with Jane Doe on or about May 11, 2016 and *intentionally* and/or negligently encouraged and "approved" Jane Doe's filing of a false and retaliatory complaint against John Doe in violation of Title IX and UC's policies prohibiting the filing of such false and retaliatory charges against a fellow student.

Am. Cmpl. ¶ 46 (emphasis added). If Inabinet *intentionally* encouraged Jane Doe to file a false complaint—that is, he knew or believed that her complaint was false and encouraged her to file it anyway—then it is plausible that Inabinet did so based on gender bias. The plausibility is reinforced by another allegation: as noted earlier, on August 5, 2016, John Doe and Inabinet discussed the complaints on a phone call. Am. Cmplt. ¶ 50. According to John Doe, during the call, he repeatedly asked Inabinet if he would have investigated the same conduct exhibited by Jane Doe if a male student had engaged in that same conduct against a female student. *Id.* Inabinet allegedly refused to give John a direct answer. *Id.* It is plausible to expect that Inabinet, if he were treating both genders alike, would have answered directly (and would have answered that the situations would be treated the same regardless of gender). In combination, these two factual assertions sufficiently allege that Inabinet engaged in discrimination on the basis of sex when he refused (at least initially) to proceed on John Doe's harassment complaint.

A sharp-eyed reader will have noted that the key allegation in paragraph 46 is not crystal clear. The allegation states that Inabinet "intentionally *and/or negligently*" encouraged Jane Doe to file false charges. Am. Cmplt. ¶ 46 (emphasis added). The difference between intentional and negligent conduct is crucial: if

12

Inabinet was merely negligent,[6] then the inference of gender bias dissipates. Inabinet, after all, is charged with enforcing the University policy on sexual misconduct. Am. Cmplt., Exh. 5. Ensuring that the University's complaint system is open to students is part of his job. Against this background, negligently encouraging a complaint is not the kind of inexplicable and suspicious conduct that would give rise to a plausible inference that gender bias was the motivating factor.

In light of the ambiguity on this critical point, John Doe is directed to file a position statement by October 2, 2017, confirming that he is alleging that Inabinet intentionally encouraged the filing of a false report, knowing that the report was false. If John Doe disavows this interpretation of the allegation, then the Court will invite the parties to argue whether reconsideration of the motion to dismiss is necessary.

It is worth noting that Inabinet's initial refusal to proceed on John Doe's harassment complaint and Inabinet's willingness to proceed on Jane Doe's complaint would not—standing alone—give rise to a plausible inference of gender bias. The two complaints alleged different conduct: John Doe's alleged that he was harassed by being falsely accused of sexual assault, while Jane Doe's alleged that she was the victim of sexual assault. Am. Cmplt. ¶ 52. Inabinet could reasonably conclude, without drawing an inference of intentional discrimination, that Jane Doe's conduct did not amount to "harassment" under the University's policies. Indeed, Inabinet even informed John Doe that he could have a legal claim against

---

[6] The Amended Complaint does not specify *how* Inabinet was negligent in allowing Jane Doe to file her complaint. Without specifics, it is difficult to infer anything about his conduct, let alone that it was motivated by gender bias.

Jane Doe for defamation. Am. Cmplt. ¶ 49; Am. Cmplt., Exh. 5. To be sure, if Inabinet had rejected John's complaint for an irrational reason, that rejection might give rise to an inference that Inabinet rejected the complaint because of gender bias. But Inabinet's conclusion that Jane Doe's conduct was not harassment based gender is not that sort of transparently false reason.

Along the same lines, Inabinet's decision not to dismiss Jane Doe's complaint even after John Doe provided Jane Doe's blog posts is also insufficient, standing alone, to give rise to a plausible claim of gender bias. True, Jane Doe's blog posts tended to undermine her claim that John Doe had sexually assaulted her. But Inabinet's decision to proceed did not, on its own, amount to discrimination. The blog posts were only one piece of evidence, and Inabinet could sensibly conclude that the best way to evaluate their weight would be to proceed to a hearing. The upshot is that the allegation that Inabinet *intentionally* encouraged the filing of a false report and Inabinet's refusal to answer John Doe's question about differential treatment are the key allegations supporting the discrimination claim.

One final note: the parties should bear in mind that the facts sufficient to survive a motion to dismiss may not be enough at a later stage of the case, especially after discovery. The Court expects that more specific details about the phone call and Inabinet's conversations with Jane Doe will emerge in discovery. At this point, however, the Court is not deciding whether John Doe is *likely* to win, only whether he has told a story that holds together. *Swanson v. Citibank*, 614 F.3d

14

400, 404 (7th Cir. 2010). Contingent on the interpretation of Paragraph 46, he has done so.

## 2. Deliberate Indifference

John Doe's next liability theory is that the University was deliberately indifferent to sexual harassment carried out by Jane Doe and Jane Roe against John Doe. Am. Cmplt. ¶ 113; Pl. Mem. Opp. at 8-9. In order to state a claim of sex discrimination based on a school's deliberate indifference to student-on-student sexual harassment, a plaintiff must allege that the defendant is a funding recipient who exhibited deliberate indifference to known acts of sexual harassment. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643-44 (1999). Crucially, the underlying harassment must be sex-based to state a claim under Title IX. *Mary M. v. N. Lawrence Cmty. School Corp.*, 131 F.3d 1220, 1228 (7th Cir. 1997); *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) ("Title VI protects students from discrimination only if it is based on race, color, or national origin, and Title IX only if based on sex."). In this case, John Doe's deliberate indifference theory fails for two reasons. First, no allegations suggest that the harassment he suffered was sex-based. Second, the facts do not give rise to an inference that the University was deliberately indifferent.

The main problem with the deliberate indifference claim is that the harassment John Doe complains of was not plausibly sex-based. The behavior John Doe points to as harassment comprises: (1) Jane Roe's public accusations, including placing John on the Hyde Park List; (2) Jane Doe's public accusation that John

15

sexually assaulted her and "many others;" and (3) Jane Doe's 2016 Title IX complaint accusing John Doe of sexual misconduct. Pl. Mem. Opp. at 8-9. Even taking as true that these accusations were false, they do not constitute sexual harassment under Title IX.

For Title IX purposes, actionable sexual harassment means harassment *because of sex. Mary M.*, 131 F.3d at 1228; *Galster*, 768 F.3d at 617. Both the Supreme Court and the Seventh Circuit have long recognized in the Title VII context that not all comments having to do with sex constitute sexual harassment. *See Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); *Johnson v. Hondo*, 125 F.3d 408, 412 ("Although explicit sexual content or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender … this need not necessarily be the case."); *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016) (comments with "sexual overtones" did not constitute harassment because of sex).

So too in the Title IX context. As several courts have recently held, a false accusation of sexual assault is not, without more, harassment based on sex, notwithstanding the sexual content of the accusation. *Eilenfeldt v. United C.U.S.D. # 304 Bd. of Educ.*, 84 F.Supp.3d 834, 839, 842 (C.D. Ill. 2015) (allegations that a male student was called "a rapist, pedophile, and child molester" were insufficient

16

to state a claim that the student was harassed because of his gender); *Nungesser v. Columbia Univ.*, 169 F.Supp.3d 353, 365 (S.D.N.Y. 2016) (rejecting the assertion that calling someone a rapist is inherently gendered); *Doe v. Univ. of Massachusetts-Amherst*, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) (dismissing complaint where plaintiff failed to give any examples of conduct that targeted him based on gender rather than his status as a student accused of sexual assault). When someone levels an accusation that another person, male or female, committed sexual assault, the accuser is not making the accusation *because* the alleged perpetrator is one gender or the other. Instead, the accusation is that the perpetrator committed a crime. To be sure, accusations of sexual assault might be part of gender-based harassment—consider if a man was called a "male rapist pig," purely out of a desire to harass him for being male—but sexual-assault accusations on their own are not inherently gendered.

The kind of mechanical formula that would label any comment referencing sex or gender as "sexual harassment" is inconsistent with the case law's approach to identifying sexual harassment. Context is crucial, and the ultimate question is whether the object of the harassment was treated differently *because of their gender*. Even seemingly gendered words, in context, may not be harassment based on gender. *See Oncale,* 523 U.S. at 80; *Galloway v. Gen. Motors Servs. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996), *abrogated on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Hall v. City of Chi.*, 713 F.3d 325, 334-35 (7th Cir. 2013). Examined in context, there is no reason to think that

Jane Roe and Jane Doe's comments were aimed at John *because* of his gender. To the contrary, the allegations suggest only that Doe and Roe harassed him either because they believed he had committed sexual assault or because of personal—not gender—animus. *See, e.g.* Am. Cmplt. ¶ 51(j)-(k). False accusations of sexual misconduct are, of course, disturbing and harmful—both to the victim of the false accusation and to true survivors of sexual assault. But Title IX's reach is limited to discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Because John Doe has not alleged facts plausibly suggesting that Jane Roe and Jane Doe's harassment was based on sex, he has failed to state a viable deliberate indifference claim.

But even if Jane Doe and Jane Roe's conduct could be considered sexual harassment under Title IX, the Amended Complaint would still have failed to state a deliberate indifference claim. That is because the Amended Complaint does not plausibly allege that the University's conduct rose to the level of deliberate indifference. A school's response to student-on-student sexual harassment is not deliberately indifferent unless its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648 (1999). When it comes to Jane Roe's accusations, the Amended Complaint states that the University responded to John Doe's complaints by refusing to discipline Jane Roe, removing John Doe from his and Jane Roe's shared physics lab, and warning John Doe not to respond to Jane Roe. Am. Cmplt. ¶ 22-26. The University also failed to discipline Jane Roe when she publicly lied about the outcome of her sexual assault complaint against John Doe. Am. Cmplt. ¶ 21. Although the

18

University's response might not have been fair, that is not the standard for deliberate indifference: it must be clearly unreasonable in order to violate Title IX. The University does have a policy on defamation (*see* Am. Cmplt. ¶ 83), but it could not have known with certainty that Jane Roe's accusations were false.[7] And apart from anything else, the University is entitled to exercise discretion in the discipline of its students without being second-guessed by federal courts, so long as its exercise of discretion is not "clearly" unreasonable.

John Doe's allegations about the University's response to Jane Doe's comments also fall short. Again, it would not have been clear from the University's perspective that Jane Doe's accusations constituted defamation. Also, the University did act on John Doe's May 5 complaint by referring it to Dean Scott and advising John Doe that Jane Doe's actions might be legally actionable. Am. Cmplt., Exh. 5. This response, though not what John Doe would have wished, was not clearly unreasonable. The deliberate indifference claim fails.

### B. Count 2 – Title IX Retaliation

John Doe's third Title IX theory of liability is that the University retaliated against him for complaining of sexual harassment by Jane Doe and Jane Roe. The framework for Title IX retaliation claims is the same as for Title VII. *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). A plaintiff can state a retaliation claim by alleging that (1) he engaged in protected activity under

---

[7] See note 2, *supra*.

Title IX (2) the defendant took an adverse action against him, and (3) there is a but-for causal connection between the protected activity and the adverse action.[8] *Id.*

Most of the conduct John Doe cites is not plausibly retaliatory. For example, the Amended Complaint alleges that the University retaliated against John Doe by removing him from the physics lab that he shared with Jane Roe. Am. Cmplt. ¶ 21. But the Amended Complaint does not provide any facts to support the claim that the University removed John Doe from the physics lab because he complained about Jane Doe's conduct. A bare, conclusory statement that the University removed John Doe from the lab in order to retaliate is not enough to survive a motion to dismiss. John Doe makes a similar allegation about the University's warnings that John Doe should not publicly refute Jane Roe's accusations. Am. Cmplt. ¶¶ 22, 26. Here as well, there are no facts supporting an inference that the University warned John Doe in order to retaliate against him for complaining of Roe's harassment.

In contrast, John Doe does state a plausible claim of retaliation based on his and Jane Doe's complaints filed in Spring 2016. The same set of facts that supports a plausible inference of gender bias—that John complained of sexual harassment and, shortly after, Inabinet knowingly encouraged Jane to file a false complaint against John—also supports an inference of retaliation. Am. Cmplt. ¶¶ 45-50. As discussed earlier, Inabinet's alleged conduct is so inexplicable that there is room for

---

[8] John Doe may also attempt to proceed by the "indirect" method of proving retaliation. *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 171 F.Supp.3d 830, 839 (W.D. Wis. 2016). But because John Doe does not appear to invoke the indirect method, *see* Am. Cmplt. ¶¶ 117-22; Pl. Mem. Opp. at 12-13, this Opinion will discuss only the direct method.

a retaliatory inference in John Doe's favor to explain Inabinet's behavior. That Inabinet intentionally encouraged the false complaint within days of receiving John Doe's complaint bolsters the inference of retaliation.[9] *See Doe v. Salisbury Univ.*, 107 F.Supp.3d 481, 489–90 (D. Md. 2015) (suspicious timing of defendant's action supported claim of retaliation); *Coleman v. Donahue*, 667 F.3d 835, 861 (7th Cir. 2012) (noting that close temporal proximity can be evidence of causation); *but see Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir.2005) ("suspicious timing alone rarely is sufficient to create a triable issue"); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("mere temporal proximity is not enough to establish a genuine issue of material fact" (internal quotation marks omitted)).

The University argues that John Doe has not engaged in any protected activity because the conduct he complained of was not sexual harassment. Def.'s Mem. Opp. at 15-16. Yes, the Court agrees that Jane Roe and Jane Doe's conduct was not sexual harassment under Title IX. *See* Section III.A.2, *supra*. But the fact that the conduct a plaintiff challenges turns out not to be sexual harassment in the legal sense does not necessarily undermine a retaliation claim. The wrong identified by a Title IX retaliation claim is the differential treatment of a complaint, whether or not the complaint turns out to have merit. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) ("[Retaliation] is a form of discrimination because the complaint is being subjected to differential treatment." (internal quotation

---

[9] It is worth flagging that, like Count 1, the survival of Count 2 depends on the Court's reading of the Amended Complaint to allege *intentional* conduct by Inabinet. If this is contradicted by John Doe's position statement, then the Court will also reconsider its decision about Count 2.

marks omitted)). Thus, it is enough that John Doe complained of conduct which he believed in good faith to be gender-based harassment prohibited by Title IX. *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002) (explaining that, in the Title VII context, all that is required is a good-faith belief that the practice plaintiff opposed violated Title VII); *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195–96 (7th Cir. 1994) (same). John Doe's email complaint to Inabinet plausibly alleges that he believed that Jane Doe's conduct was gender-based harassment. *See* Am. Cmplt. Exh. 3. So the retaliation claim survives.

## C. Count 3 – Title IX Selective Enforcement

The claim that the University violated Title IX by selectively enforcing its policies against John Doe because of his male gender appears to completely overlap with his general claim of gender discrimination (Count 1), which is based on the same conduct and theory. Because of this overlap, Count 3 shares the fate of Count 1's gender discrimination claim: it survives the motion to dismiss, pending receipt of John Doe's position statement.

## D. Count 4 – Promissory Estoppel

John Doe also brings a state-law claim for promissory estoppel based on statements in the University's 2013 and 2015 Student Manuals. Am. Cmplt. ¶¶ 127-40. To bring a successful claim of promissory estoppel under Illinois law, a plaintiff must prove (and at the pleading stage, allege) that (1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on the promise, (3) plaintiff's

reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment. *Quake Constr., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990). The Amended Complaint fails on the first element, and likely on the third as well: John Doe has not alleged facts suggesting that the University made any unambiguous promise to Plaintiff, and therefore has not stated a claim for promissory estoppel.

The promises that make up John Doe's purported promissory estoppel claim are: (1) the University's promise to protect John Doe's educational experience from unlawful harassment based on defamation and other unlawful grounds (Am. Cmplt. ¶128); (2) the University's promise to adjudicate complaints in a fair and impartial manner (Am. Cmplt. ¶ 129); (3) the University's promises to provide in all cases of alleged sexual misconduct "a prompt, fair, impartial and thorough investigation and resolution that is consistent with the University's policies and is transparent to the complainant and the respondent" (Am. Cmplt. ¶ 134); and (4) the University's promise to implement its policies in a manner "consistent with federal, state, and local regulations governing non-discrimination and unlawful harassment including … Title IX" (Am. Cmplt. ¶135). But none of these statements is definite enough to constitute an *unambiguous* promise. At most, they reflect a commitment to broad principles of fairness and nondiscrimination without giving specifics about how those goals will be achieved.

The context in which these statements were made confirms that they are not the kind of unambiguous promises on which a reasonable person would be entitled

to rely. The 2015 Manual, for example, states that the Manual is subject to change "at the sole discretion of the University."[10] R. 65, Def.'s Mem. in Support of Motion to Dismiss, Exh. 1 at 6. What's more, the introduction to the 2015 Manual emphasizes the broad nature of the promises, and warns that implementation might vary: "Policies and regulations are often not more specific than necessary and often are general enough to allow the University to respond to situations in their unique complexities." *Id.* In addition to casting doubt on the unambiguous nature of the promises pointed to by John Doe, these disclaimers also make it clear that his reliance would not have been expected or foreseeable to the University.

John Doe correctly points out that promises sufficient to support a claim of promissory estoppel may come from a defendant's policies and procedures manual. Pl. Mem. Opp. at 18-19. The cases cited by John Doe, however, all deal with much more specific promises made in the employment context, not the kind of general claims made by the University in its manuals and policies. *See Lawrence v. Bd. of Educ. of Sch. Dist.* 189, 503 N.E.2d 1201 (Ill. App. Ct. 1987); *Perlin v. Bd. of Educ. of City of Chi.*, 407 N.E.2d 792 (Ill. App. Ct. 1980).[11] Because the promises made in

---

[10] Although the 2015 Manual is not attached to the Amended Complaint, the Court may consider it under the incorporation-by-reference doctrine. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[A] court may consider documents attached to a motion to dismiss [ ] if they are referred to in the plaintiff's complaint and are central to his claim." (citation and internal quotation marks omitted)). The University's student manuals and policies are referenced in the Amended Complaint and are central to the promissory estoppel claim. *See, e.g.*, Am. Cmplt. ¶¶ 82-86. John Doe cannot "evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that prove[s] that his claim ha[s] no merit." *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

[11] John Doe also cites *Brown-Wright v. E. St. Louis Sch. Dist. 189*, 2016 IL App (5th) 150148-U, 2016 WL 1182803 (Ill. App. Ct. March 23, 2016) in support of his position. Because this is an unpublished decision, it cannot be cited as precedential authority per

these cases are different in kind from the promises the University makes in its student manuals, the case law does not support the promissory estoppel claim.

### E. Count 5 – Negligent Infliction of Emotional Distress

Count 5 alleges negligent infliction of emotional distress as a result of the University's alleged refusal to honor the 2013 Manual and the University's other policies. Setting aside the question whether the University had any legal duty to honor the provisions of the student manual and, if so, whether it breached that duty, this claim fails because Illinois common law follows the "impact rule." *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 59 (Ill. 2016), *reh'g denied* (Mar. 27, 2017); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009). Specifically, under the impact rule, a plaintiff cannot recover for negligent infliction of emotional distress unless he suffers a contemporaneous *physical* injury or impact. *Scweihs*, 77 N.E.3d at 59. Because John Doe has not alleged any contemporaneous physical injury or impact,[12] he has failed to state a claim for negligent infliction of emotional distress.

---

Illinois Supreme Court Rule 23(e)(1). In any event, *Brown-Wright* does not help John Doe's claim because, like the other cases he cites, it involves promises that are much more concrete than the University's statements in the Manuals.

[12] John Doe suggests in a footnote to his response brief that the injuries described in the redacted portions of the prior Order (R. 35 at 6) and in the sealed affidavits submitted to the Court (R. 34-1 and 34-2, incorporated by Am. Cmplt. ¶ 92) are sufficient to support an emotional-distress claim. Pl. Mem. Opp. at 22 n. 11. But this argument-in-passing is not developed, and underdeveloped arguments are deemed waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991). And in any event, the injuries described in the sealed affidavits are not contemporaneous with the University's alleged misconduct, and so would be insufficient to support the claim.

## F. Count 6 – Intentional Infliction of Emotional Distress

John Doe's final claim is that the University intentionally caused him severe emotional distress. He points to Inabinet's "intentional misconduct" as the source of his distress. As with Counts 1, 2, and 3, John Doe has alleged enough facts to state a claim if the Amended Complaint is interpreted as alleging that Inabinet deliberately encouraged Jane Roe to file a false complaint, knowing that the complaint was false.

To make out a claim of intentional infliction of emotional distress, a plaintiff must allege that (1) the defendant's conduct was "extreme and outrageous;" (2) the defendant either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress; and (3) the defendant's conduct in fact caused severe emotional distress. *Shweihs*, 77 N.E.3d at 63. Run-of-the mill annoyances and oppressions do not constitute "extreme and outrageous" conduct. The offending conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. (citing Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)).

Because the bar for extreme and outrageous conduct is so high, Inabinet's mere *negligent* encouragement of Jane Doe's complaint would not be sufficient to state a claim of emotional distress. Reading the Amended Complaint to allege that

Inabinet *intentionally* encouraged Jane Doe to file a false complaint, however, casts things in a different light. Deliberately encouraging one student to file a Title IX sexual-assault complaint about another student, *knowing the complaint is false*, is conduct that a factfinder could reasonably find to be extreme and outrageous. The accused student is subjected to the anxiety and uncertainty of participation in the university disciplinary process, and often becomes the target of public disdain caused by the accusation. Under the circumstances alleged here, Inabinet must have known that there was a high probability that being pursued by a false sexual-assault complaint would cause John Doe severe emotional distress. And indeed, John Doe has plausibly alleged that he is suffering from severe emotional distress, and that his distress was caused, at least in part, by the University's disciplinary process in pursuing Jane Doe's Title IX complaint. Am. Cmplt. ¶ 92; R. 34, sealed Exhibits 1 and 2. John Doe has sufficiently alleged the elements of intentional infliction of emotional distress.

## IV. Conclusion

At the motion to dismiss stage, the Court must decide only whether the plaintiff has alleged sufficient facts to make his legal claims "plausible." *Iqbal*, 556 U.S. at 678. As interpreted, the Amended Complaint does allege sufficient facts to support a plausible Title IX violation based on gender discrimination, selective enforcement, and retaliation (Counts 1-3). John Doe has also successfully pled intentional infliction of emotional distress (Count 5). But the deliberate indifference theory of liability under Title IX (part of Count 1), and the claims for promissory

estoppel (Count 4) and negligent infliction of emotional distress (Count 5), fall short of alleging a valid claim.

As discussed in detail, the survival of Counts 1, 2, 3, and 5 depends on the interpretation of Amended Complaint paragraphs 46-48 to allege that Inabinet *intentionally* encouraged Jane Doe to file a false complaint against John Doe, knowing that the complaint was false. John Doe is reminded that he must file a position paper by October 2, 2017, either confirming that interpretation or explaining how the allegations should otherwise be read. The status hearing of October 5, 2017, remains as scheduled.

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 20, 2017